# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

STEPHEN P. CURTIS, LIBERTARIAN
PARTY OF NEW MEXICO, CHRIS
LUCHINI, and RANOTA Q. BANKS,

      Plaintiffs,

vs.                                            No. CIV 20-0748 JB\JHR

MAGGIE TOULOUSE OLIVER,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction with Verified Complaint in Support, filed July 29, 2020 (Doc. 7)("Motion").  The Court held a hearing on August 7, 2020.  See Clerk's Minutes at 1, filed August 7, 2020 (Doc. 13).  The primary issues are: (i) whether the Eleventh Amendment to the Constitution of the United States of America bars Plaintiffs Stephen P. Curtis, Libertarian Party of New Mexico, Chris Luchini, and Ranota Q. Banks (collectively, the "Libertarian Plaintiffs") from suing Secretary of State of New Mexico Maggie Toulouse Oliver for allegedly not complying with New Mexico law and abusing her authority as Secretary of State of New Mexico by not quickly responding to Mr. Curtis' recount request and directing the New Mexico State Canvassing Board to conduct a vote recount; (ii) whether the Libertarian Plaintiffs have standing, because they did not first seek redress in State court by contesting the election, see N.M. Stat. Ann. §§ 1-14-3 and 1-14-21, or successfully apply for a recount under New Mexico election law's discretionary recount provision, see N.M. Stat. Ann. § 1-14-15; (iii) whether the Libertarian Plaintiffs have established that they are substantially likely to succeed on the merits of their claim that Secretary Oliver violated their constitutional right to vote and have their votes

counted by not counting all votes for Mr. Curtis in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico; (iv) whether the Libertarian Plaintiffs have established that they are likely to succeed on the merits of their claim that New Mexico election law's discretionary recount provision violates the First Amendment to the Constitution, the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and the Due Process Clause of the Fourteenth Amendment; (v) whether the Libertarian Plaintiffs have established that they are entitled to a temporary restraining order ("TRO") to have all votes counted in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in Bernalillo County, because they will suffer irreparable harm that outweighs any harm to Secretary Oliver and the State of New Mexico, and because the TRO is serves the public's interest.  The Court concludes that: (i) although the Eleventh Amendment does not bar the Libertarian Plaintiffs' federal constitution claims -- which seek prospective relief against a State official in her official capacity -- the Eleventh Amendment bars any claims by the Libertarian Plaintiffs that Secretary Oliver has violated New Mexico law by abusing her authority, because the Supreme Court of the United States of America has held that the Eleventh Amendment bars claims that a State official has violated State law, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984); (ii) the Libertarian Plaintiffs have standing, because the Court is capable of redressing alleged deprivations of their constitutional rights, because 42 U.S.C. § 1983 does not require a litigant to pursue state judicial remedies before commencing an action in federal court, and because no parallel proceedings brought by the Libertarian Plaintiffs are pending in State court; (iii) the Libertarian Plaintiffs have established that they are substantially likely to succeed on the merits of their right-to-vote claim under the Due Process Clause, because the facts in the record before the Court indicate that Banks' vote and a significant number of votes in the Libertarian Party primary

election in Bernalillo County, New Mexico, for Position 2 on the Court of Appeals of New Mexico have not been counted and, if some of the uncounted votes are for Mr. Curtis -- who is the only candidate for the position for which he ran in the Libertarian Party primary election -- then Secretary Oliver has violated the Libertarian Party's constitutional right to vote, which includes the right to have one's vote counted; (iv) the Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their claim that the discretionary recount provision violates the First Amendment, the Equal Protection Clause, and the Due Process Clause, because there is no constitutional right to a recount, the discretionary recount provision is a privilege that New Mexico election law affords electoral candidates, and the discretionary recount provision is rationally related to New Mexico's interest in ensuring the accuracy and integrity of elections; and (v) the Libertarian Plaintiffs have established that they are entitled to a TRO, because, on the facts in the record before the Court: (a) they are substantially likely to succeed on their right-to-vote claim under the Due Process Clause, (b) they very likely will suffer irreparable harm if the Court does not grant injunctive relief, as many of Mr. Curtis' votes will not be counted, and he thus will not qualify to have his name added to the general election ballot, (c) the Libertarian Plaintiffs' interest in vindicating their rights to vote outweighs Secretary Oliver and New Mexico's interest in regulating elections, and (d) ensuring that all votes have been counted serves the public's interest by ensuring that the June 2, 2020, primary elections were fair.  Accordingly, the Court grants the Motion in part, and denies it in part, and the Court orders that Secretary Oliver direct the New Mexico State Canvassing Board to count the votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in Bernalillo County, but not in other Counties.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must [] state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Accordingly, the Court finds as follows:

1. Plaintiff Stephen P. Curtis is a registered Libertarian voter in New Mexico and was a Libertarian Party of New Mexico candidate for Position 2 on the Court of Appeals of New Mexico during the 2020 New Mexico primary elections. See Plaintiff's Verified Complaint for

Declaratory and Injunctive Relief ¶ 2, at 3, filed July 23, 2020 (Doc. 1)("Complaint")[1]; "Stephen Curtis," Libertarian Party of New Mexico, https://lpnm.us/stephen-curtis/ (last visited August 4, 2020); Secretary of State's Response to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction ¶¶ 1-2, at 2, filed August 6, 2020 (Doc. 10)("Response").

      2.     Plaintiff Libertarian Party of New Mexico is New Mexico's third largest political party, and it helps candidates run for public office in New Mexico.  See Complaint ¶ 3, at 3; "Libertarian Party of New Mexico," Ballotpedia, https://ballotpedia.org/Libertarian_Party_of_New_Mexico (last visited August 5, 2020); Motion at 2.

      3.     Plaintiff Chris Luchini is the Chair of the Libertarian Party and a registered voter in New Mexico who voted for Mr. Curtis in the 2020 primary election for Position 2 on the Court of Appeals of New Mexico.  See Complaint ¶ 4, at 3; "Executive Biographies," Libertarian Party of New Mexico, https://lpnm.us/lpnm-executive-bios/ (last visited August 5, 2020).

      4.     Plaintiff Ranota Q. Banks is a registered voter in New Mexico who voted for Mr. Curtis in the 2020 Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico, and she is running in the November 3, 2020, general election as the Libertarian Party's candidate to represent District 15 of the New Mexico House of Representatives.  See Complaint ¶ 5, at 3; "Ranota Banks," Libertarian Party of New Mexico, https://lpnm.us/ranota-banks/ (last visited August 5, 2020); "Ranota Banks," Ballotpedia, https://ballotpedia.org/Ranota_Banks (last visited August 5, 2020).

---

[1]The Complaint's first page is a Civil Cover Sheet, and the Complaint's pleadings begin on the Complaint's second page.  The Court cites to the Case Management/Electronic Case Files system's page numbers, which appear at the top of each page of the Complaint.

5.      Secretary Oliver is the Secretary of State of New Mexico.  See Complaint ¶ 6, at 3;
"About the Secretary," New Mexico Secretary of State, https://www.sos.state.nm.us/about-the-
office/about-the-secretary/ (last visited August 5, 2020).

6.      Secretary Oliver and the Office of the Secretary of State of New Mexico:
(i) "administer elections and government ethics in accordance with state and federal law";
(ii) "maintain and provide access to the laws, official acts, and other instruments vital to the
efficient operation of state government"; and (iii) "file and maintain records vital to the interests
of commerce and industry."    "About the Office," New Mexico Secretary of State,
https://www.sos.state.nm.us/about-the-office/ (last visited August 5, 2020).  See Complaint ¶ 6,
at 3.

7.      In early April, 2020, several dozen New Mexico election officials petitioned the
Supreme Court of New Mexico to permit the State of New Mexico to close polling sites and
conduct the June 2, 2020, New Mexico primary elections through mail-in ballots, because of public
health risks that in-person voting poses during the COVID-19 pandemic.  See Dan McKay, "NM
high court rejects petition for mail election," Albuquerque Journal (April 14, 2020),
https://www.abqjournal.com/1443735/state-supreme-court-blocks-petition-for-all-mail-
election.html (last visited August 5, 2020)("Mail Election Article"); Complaint ¶ 10, at 4.

8.      On April 16, 2020, the Supreme Court of New Mexico "ruled unanimously that
state law prohibits [it] from ordering a mail-in election," and the Supreme Court of New Mexico
"directed county clerks throughout the state to mail absentee-ballot applications to voters to
encourage people to vote absentee, rather than in person, a step the court said is permitted by law."
Mail Election Article.  See Complaint ¶ 10, at 4; State of New Mexico v. Oliver, Order, No. S--
SC--38228,          available          at          https://www.nmcourts.gov/uploads/FileLinks/

- 6 -

a6efaf23676f4c45a95fdb3d71caea83/38228_Final_Order__4_16_20_.pdf (last visited August 5, 2020)("April 6 Order"); Motion at 3.

9.      Following the Supreme Court of New Mexico's April 6 Order, New Mexico sent absentee voter applications to every registered voter in the state.  See Matthew Reichbach, "Secretary of State encourages absentee voting," NM Political Report (May 16, 2020), https://nmpoliticalreport.com/2020/05/16/secretary-of-state-encourages-absentee-voting/   (last visited August 8, 2020)("State Encourages Absentee Voting Article").

10.     On May 5, 2020, early voting in New Mexico's 2020 primary elections began.  See Dan McKay, "New Mexico voters turning to absentee ballots," Albuquerque Journal (May 5, 2020),              https://www.abqjournal.com/1451256/new-mexico-voters-turning-to-absentee-ballots.html (last visited August 5, 2020)("Absentee Ballot Article"); Complaint ¶ 11, at 4; Motion at 3.

11.     New Mexico voters could choose to vote in-person or by absentee ballot.  See Absentee Ballot Article.

12.     New Mexico has three major political parties: (i) the Democratic Party of New Mexico; (ii) the Republican Party of New Mexico; and (iii) the Libertarian Party.  See "NM Political Party Information," New Mexico Secretary of State, https://www.sos.state.nm.us/voting-and-elections/voter-information-portal/nm-political-party-information/ (last visited August 5, 2020)("NM Political Party Website").

13.     In New Mexico, "only major political party candidates will appear on the Primary Election ballot," NM Political Party Website, and "only those who are members of major political parties can vote in primary elections," State Encourages Absentee Voting Article.

14.     All candidates seeking a political party nomination to a statewide office must file a declaration of candidacy and a nominating petition.  See N.M. Stat. Ann. 1-8-21(A).

15.     To have one's name appear on a political party's primary election ballot, a candidate must obtain preprimary convention designation, see N.M. Stat. Ann. § 1-8-21(A), or, if a candidate is unable to obtain such designation, the candidate must collect signatures "to total at least four percent of the total vote of the candidate's party in the state . . . , and file a new declaration of candidacy and nominating petitions for the office for which the candidate failed to receive a preprimary designation," N.M. Stat. Ann. § 1-8-33(D).  See "Ballot access requirements for political candidates in New Mexico," Ballotpedia, https://ballotpedia.org/Ballot_access_requirements_for_political_candidates_in_New_Mexico#cite_note-16 (last visited August 5, 2020)("Ballot Access Article").

16.     Write-in candidates are also permitted in New Mexico primary elections for "any office voted upon by all voters of the state."  N.M. Stat. Ann. § 1-8-36.1(A).

17.     Under New Mexico law, a

person may be a write-in candidate only for nomination by the major political party with which the person is affiliated as shown by the certificate of registration, and such person shall have the qualifications to be a candidate in the primary election for the political party for which the person is a write-in candidate.

N.M. Stat. Ann. § 1-8-36.1(B).  See Ballot Access Article.

18.     To qualify as a write-in candidate in a New Mexico primary election, a person must "file with the proper filing officer a declaration of intent to be a write-in candidate.  Such declaration of intent shall be filed between 9:00 a.m. and 5:00 p.m. on the third Tuesday in March."  N.M. Stat. Ann. § 1-8-36.1(C).  See Ballot Access Article.

19.     Under New Mexico law, a "write-in candidate shall be considered a candidate for all purposes and provisions relating to candidates in the Election Code, including the obligations to report pursuant to the Campaign Reporting Act, except that the write-in candidate's name shall not be printed on the ballot."  N.M. Stat. Ann. § 1-8-36.1(E).  See Ballot Access Article.

20.     Mr. Curtis filed to run and qualified as a write-in Libertarian Party candidate for Position 2 on the Court of Appeals of New Mexico in the New Mexico primary elections.  See Complaint ¶ 9, at 4; "New Mexico intermediates appellate court elections, 2020," Ballotpedia, https://ballotpedia.org/New_Mexico_intermediate_appellate_court_elections,_2020  (last  visited August 5, 2020)("NM Court of Appeals Election Article"); Motion at 3.

21.     The other candidates running for Position 2 on the Court of Appeals of New Mexico are Shammara Henderson, the Democratic Party's candidate, and Gertrude Lee, the Republican Party's candidate.  See NM Court of Appeals Election Article.

22.     Whereas Mr. Curtis ran as a write-in candidate for his party, his opponents were not write-in candidates for their parties, and their names thus appeared on the ballots in the New Mexico primary elections.  See NM Court of Appeals Election Article.

23.     Leading up to the primary elections, the Libertarian Party expended resources to promote Mr. Curtis' candidacy, such as "undertaking an expensive direct mail campaign to its registered voters."  Complaint ¶ 14, at 4.  See Motion at 3.

24.     On June 2, 2020, the New Mexico primary elections were held.  See Complaint ¶ 12, at 4; "Official Results -- Statewide Offices & Questions," New Mexico Secretary of State, https://electionresults.sos.state.nm.us/resultsSW.aspx?type=SW&map=CTY      (last      visited August 6, 2020)("Official Results -- Statewide"); Motion at 3.

25.     After the primary election, the election results "fluctuated" on the Office of the Secretary of State of New Mexico website, and Mr. Curtis' total votes "increased by several votes between when the unofficial results were first reported on June 2, 2020, and when the State Canvassing Board met on June 23, 2020, to certify the results of the primary election."  Complaint ¶ 17, at 5.  See Motion at 4.

26.     On election night, the Office of the Secretary of State of New Mexico website posts "unofficial results" for an election, which do not become official until the statewide canvass is complete.  Draft Transcript of Hearing at 38:24-39:16 (held August 7, 2020)(Lance, Vigil)("Aug. 7 Tr.").[2]

27.     Mr. Curtis received 204 votes.  See Complaint ¶¶ 16, 22, at 5-6; Response ¶ 6, at 2; Official Results.

28.     Of Mr. Curtis' 204 votes, 122 voters voted by absentee ballot, fifty-four voters voted in-person on election day, and twenty-eight voters voted in-person through early voting.  See Statewide Offices & Questions Spreadsheet, New Mexico Secretary of State, http://electionresults.sos.state.nm.us/resultsMedia.aspx (last visited August 11, 2020)("Statewide Results Spreadsheet").

29.     To appear on the New Mexico general election ballot, Mr. Curtis needed to obtain 230 write-in votes.  See Complaint ¶ 9, at 4; Response ¶¶ 1-2, at 2 (citing N.M. Stat. Ann. § 1-13-24(C)); Ballot Access Article; "2020 Primary Election Candidate Information Guide" at 25, Office of the Secretary of State of New Mexico, https://www.sos.state.nm.us/candidate-and-

_____

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

campaigns/how-to-become-a-candidate/2020-candidate-information-guide/# (last visited August 6, 2020)("Candidate Information Guide"); Motion at 3.

30.     Because Mr. Curtis did not receive 230 or more write-in votes in the Libertarian Party primary election, he does not qualify to have his name on the general election ballot.  See Complaint ¶ 16, at 5; Motion at 4.

31.     Approximately 1,570 ballots were cast in the Libertarian Party primary election for President of the United States of America.  See "Official Results -- President," New Mexico Secretary of State, https://electionresults.sos.state.nm.us/ resultsSW.aspx?type=FED&map=CTY (last visited August 6, 2020)("Official Results -- President"); Complaint ¶ 13, at 4; Motion at 3.

32.     Mr. Curtis was the only write-in candidate in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico.  See Official Results -- Statewide; Complaint ¶ 18, at 5; Motion at 4.

33.     The Libertarian Party received "feedback . . . from its members [] that numerous voters, well above the 230-vote threshold, cast votes for Mr. Curtis."  Complaint ¶ 15, at 4.  See Motion at 3.

34.     When a voting machine scans an absentee ballot that contains a vote for a write-in candidate, the voting machine flags the ballot, which is then sent to an election worker who "complete[s] a handwritten tally sheet."  Aug. 7 Tr. at 50:1 (Vigil).

35.     County clerks submit handwritten tally sheets from each precinct to the New Mexico State Canvassing Board to review.  See Aug. 7 Tr. at 50:2-19 (Wiest, Vigil).

36.     Tally sheets for each County and precinct had been "accounted for" by the New Mexico State Canvassing Board.  Aug. 7 Tr. at 50:25 (Vigil).

37.     The Bernalillo County Clerk's Office website indicates that, in Bernalillo County, New Mexico, 270 voters cast write-in ballots in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico -- 175 voters voted by submitting absentee ballots, thirty voters voted early, and sixty-five voters voted in-person on election day.  See "Primary Election -- Unofficial Results," Bernalillo County Clerk's Office, https://bce.sks.com/# (last visited August 6, 2020)("Bernalillo County Primary Election Results"); Complaint ¶ 18, at 5; Motion at 4.

38.     The Office of the Secretary of State of New Mexico's website indicates that, in Bernalillo County, forty-one voters cast write-in ballots for Mr. Curtis.  See "Official Results -- County Results, Stephen P. Curtis," New Mexico Secretary of State, https://electionresults.sos.state.nm.us/resultsCTY.aspx?type=SW&rid=6248&pty=LIB&osn=356 &map=CTY (last visited August 6, 2020)("Curtis Primary Election Results by County"); Complaint ¶ 18, at 5; Motion at 4.

39.     Mandy Vigil, the New Mexico State Election Director for the Office of the Secretary of State of New Mexico, does not "have any . . . information" about the purported discrepancies in Bernalillo County.  Aug. 7 Tr. at 52:15 (Vigil).  See id. at 52:15-20 (Wiest, Vigil).

40.     In Los Alamos County, New Mexico, County officials initially reported that Mr. Curtis received four write-in votes, but the New Mexico State Canvassing Board later revised that figure to eighteen write-in votes for Mr. Curtis.  See Complaint ¶ 19, at 5; Motion at 4.

41.     Telephone conversations between Mr. Curtis' campaign and the Los Alamos County Clerk revealed that machines properly counted absentee write-in ballots, but "errors in the voting machines prevented" absentee, machine-counted ballot totals from being added to in-person voting and early voting totals; the Los Alamos County Clerk's Office detected this error before

the New Mexico State Canvassing Board later certified the results.  Complaint ¶ 20, at 5-6.  See Motion at 4.

42.     During the primary elections, Vigil received no complaints about voting machine errors.  See Aug. 7 Tr. at 40:5-8 (Lange, Vigil).

43.     The Los Alamos County Clerk raised concerns to Vigil, however, about "some outreach done by the canvassing team."  Aug. 7 Tr. at 40:12-13 (Vigil).

44.     The issue in Los Alamos County involved training about "the necessary requirement to hand tally write-in votes," and, after Vigil followed up to resolve the issue, the Los Alamos County Clerk ultimately provided the New Mexico State Canvassing Board "with the necessary hand tallies," which were entered into the statewide system.  Aug. 7 Tr. at 40:24-41:1 (Vigil).

45.     The training error in Los Alamos County was "isolated within" that County, Aug. 7 Tr. at 41:13 (Vigil), and Vigil had "no reason to believe" the training error extended beyond Los Alamos County, Aug. 7 Tr. at 53:5 (Vigil).

46.     Vigil did not email other County Clerks to ask whether their counties had experienced the same training error that Los Alamos County experienced, see Aug. 7 Tr. at 47:10-15 (Wiest, Vigil), and Secretary Oliver and Vigil did not direct New Mexico County Clerks to recount ballots, see Complaint ¶ 21, at 6; Motion at 5.

47.     After meeting with a vendor who trains election officials, Vigil concluded that the training error was limited to Los Alamos County.  See Aug. 7 Tr. at 47:16-48:4 (Wiest, Vigil).

48.     Secretary Oliver's office provides New Mexico County Clerks with guidance about "what constitutes a vote" and about "qualifying write-in votes."  Aug. 7 Tr. at 42:8-12 (Lange). See id. at 42:7-21 (Lange, Vigil).

49.     If you cast a vote for a write-in candidate in the New Mexico primary elections, there is no way to determine if your vote was "qualified," or counted, because "once the ballot is inserted into the tabulator it is no longer associated with a voter.  And that's very specific to protect the [secrecy] of the ballot."  Aug. 7 Tr. at 42:21-43:9 (Lange, Vigil).

50.     If a voter knows that he or she voted for a candidate in a County, and the County reports that the candidate received zero votes, the voter could conclude that his or her vote was not counted.  Aug. 7 Tr. at 49:11-12 (Vigil).  See id. at 49:13-16 (Wiest, Vigil).

51.     On June 19, 2020, Luchini emailed the Secretary Oliver's office "to advise them that the Stephen P. Curtis campaign intended to seek a recount of the primary election, and inquired what amount would need to be deposited for the recount."  Complaint ¶ 23, at 6.  See Motion at 5.

52.     Secretary Oliver's office did not respond to Luchini's email.  See Complaint ¶ 24, at 6; Motion at 5.

53.     The Office of the Secretary of State of New Mexico receives recount applications and helps facilitate recounts, but the New Mexico State Canvassing Board is responsible for ordering the recount.  See Aug. 7 Tr. at 53:7-25 (Wiest, Vigil).

54.     The Office of the Secretary of State of New Mexico publishes recount cost determinations on its website.  See Cost Determinations -- Estimated Actual Cost of Recount & Recheck Proceedings, New Mexico State Canvassing Board, filed August 6, 2020 (Doc. 10-1)("Recount Cost Determinations"), also available at https://www.sos.state.nm.us/ legislation-and-lobbying/legal-resources/cost-of-recount-recheck-proceedings/ (last visited August 7, 2020)); Aug. 7 Tr. at 37:19-22 (Vigil); Response ¶ 7, at 2.

55.     The Recount Cost Determinations document "provides an estimate of the minimum cost to conduct an election, and it is . . . broken up by precinct as required by state law."  Aug. 7 Tr. at 38:7-10 (Vigil).

56.     The estimated cost to conduct a recount is $3,400.00 per precinct.  See Recount Cost Determinations at 3; Response ¶ 8, at 3.

57.     The Recount Cost Determinations document's estimates are based on: (i) "what [New Mexico has] paid for an election"; (ii) "programming costs which are brought through a vendor"; and (iii) the cost to employ five election officials who oversee the recount in each precinct.  Aug. 7 Tr. at 38:15-23 (Vigil).

58.     The programming costs for a recount are entirely separate from the programming costs associated with the initial vote count, because the programming "that's required [is] detailed and technical and it's essentially an entirely separate election."  Aug. 7 Tr. at 45:7-9 (Vigil).

59.     Write-in ballots for Libertarian Party candidates are not segregated from other ballots during a recount, because such ballots are spread out in ballot boxes, or tabulators, across the state.  See Aug. 7 Tr. at 45:18-46:6 (Wiest, Vigil).

60.     Segregating write-in ballots for Libertarian Party candidates would require reopening each ballot box that contains at least one ballot for a Libertarian Party candidate and "search[ing] through all ballots that were submitted through that one machine."  Aug. 7 Tr. at 46:20-21 (Vigil).

61.     On June 19, 2020, Mr. Curtis also emailed Secretary Oliver's office to tell the Office of the Secretary of State of New Mexico that he intends to apply for a recount and to inquire how much it would cost to request a recount.  See Complaint ¶ 25, at 6; Motion at 5.

62.     Secretary Oliver's office did not respond to Mr. Curtis' email.  <u>See</u> Complaint ¶ 26, at 6; Motion at 5.

63.     On June 23, 2020, three weeks after the primary elections, the New Mexico State Canvassing Board met and "declared the results of the nomination of each candidate voted upon by the entire state, pursuant to N.M. Stat. Ann. § 1-13-15," Response ¶ 3, and 2, and certified the candidates' nominations for Position 2 on the Court of Appeals of New Mexico, <u>see</u> Response ¶ 4, at 2.

64.     On June 25, 2020, Mr. Curtis sent a letter to Secretary Oliver's office "applying for a recount of the primary election results, and requesting that the Secretary of State's office notify him the amount of cash or surety bond that would need to be deposited with the Secretary of State's office to accomplish the recount."  Complaint ¶ 27, at 6-7.  <u>See</u> Letter from Stephen P. Curtis to the New Mexico Office of the Secretary of State at 1 (dated June 25, 2020), filed August 6, 2020 (Doc. 10-2)("Curtis June 25 Letter"); Response ¶ 9, at 3; Motion at 5-6.

65.     Secretary Oliver's office did not respond to Mr. Curtis' letter.  <u>See</u> Complaint ¶ 28, at 7; Motion at 5-6.

66.     The New Mexico State Canvassing Board ordered automatic recounts for four candidate contests pursuant to N.M. Stat. Ann. § 1-14-24.  <u>See</u> Response ¶ 5, at 2.

67.     On June 29, 2020, Luchini emailed Secretary Oliver's office, "requesting the wiring instructions for the recount deposit."  Complaint ¶ 29, at 7.  <u>See</u> Motion at 6.

68.     At 4:46 p.m. on June 29, 2020, Secretary Oliver's office for the first time responded by email to Mr. Curtis' and Luchini's inquires.  <u>See</u> Email from Alicia Romero to Chris Luchini at 1 (dated June 29, 2020), filed August 7, 2020 (Doc. 11)("Romero June 29 Email"); Complaint ¶ 30, at 7; Motion at 6; Response ¶ 10, at 3.

- 16 -

69.     Secretary Oliver's office told Mr. Curtis and Luchini that they must submit a $3,573,400.00 deposit to request a vote recount and that "the fund would not need to be received that day."  Complaint ¶ 30, at 7.  See Romero June 29 Email; Motion at 6.

70.     Because approximately 1,570 ballots were cast in the Libertarian Party primary election, the deposit amount that Secretary Oliver's office requires Mr. Curtis' campaign to submit to request a recount amounts to approximately $2,276.05 per ballot to be recounted.  See Complaint ¶ 30, at 7; Motion at 6-7.

71.     The bond requirement to pay for a statewide recount exceeds $3,573,400.00, because "the bond is treated as a supersedeas bond and requires coming up with more than the base amount."  Complaint ¶ 36, at 8.  See Motion at 7.

72.     On June 29, 2020, Luchini sent Romero an email to amend the application for a statewide recount by requesting recounts for only 182 precincts, because Luchini alleged that "there was a discrepancy between the county canvass report and the state canvass report." Response ¶ 11, at 3 (citing Email from Chris Luchini to Alicia Romero at 1-5 (dated June 29, 2020), filed August 6, 2020 (Doc. 10-4)("Luchini June 29 Email")).[3]

73.     At a recount cost of $3,400.00 per precinct, recounting votes in 182 precincts would cost approximately $618,800.00.  See Response ¶ 12, at 3.

74.     On July 1, 2020, Mr. Curtis emailed Secretary Oliver's office to request that the vote recount be limited to the seven New Mexico Counties that "appeared to have the greatest irregularities in their vote totals": Bernalillo County, Sandoval County, Doña Ana County, Santa

---

[3]Although the Luchini June 29 Email is sent from Luchini's email account, Mr. Curtis' name appears at the end of the email.  See Luchini June 29 Email at 1.

Fe County, San Juan County, Chaves County, and Los Alamos County.  See Complaint ¶ 31, at 7;

Motion at 6.

76.    Of Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San

Juan County, Chaves County, and Los Alamos County, all of the counties use a high-speed scanner

to count ballots except for Chaves County, and they "have been utilizing [high-speed scanners] for

several elections and training and the process related to hand tallies has not changed in that window

of time."  Aug. 7 Tr. at 55:6-9 (Vigil).

76.    Approximately 1,145 voters were cast in the Libertarian Party primary election in

the seven counties for which Mr. Curtis requests a vote recount.  See Complaint ¶ 31, at 7.

77.    On June 30, 2020, Luchini sent Romero an email to "bring[] up a 'systemic error

with a reporting from the machines used to tabulate late absentee ballots.'"  Response ¶ 13, at 3-4

(quoting Email from Chris Luchini to Alicia Romero at 1 (dated June 30, 2020), filed August 6,

2020 (Doc. 10-5)("First Luchini June 30 Email")).

78.    Later on June 30, 2020, Luchini sent Romero another email to confirm that funds

had been transferred, and Luchini also "indicate[d] that the full estimated costs have not been

submitted and erroneously claim[ed] that the Libertarian party must only pay $3,400 per precinct

board instead of per precinct, not the statutory amount based on per precinct recount pursuant to

Section 1-14-15(A)."  Response ¶ 14, at 4 (citing Email from Chris Luchini to Alicia Romero at 1

(dated June 30, 2020), filed August 6, 2020 (Doc. 10-6)("Second Luchini June 30 Email")).

79.    On July 1, 2020, Mr. Curtis' campaign wired $23,800.00 to Secretary Oliver's

office, which amounts "to $3,400 per county for which the recount was requested."  Complaint

¶ 32, at 7.  See Motion at 6; Response ¶ 16, at 4.

80.     Mr. Curtis' campaign wired $3,400.00 per County for which it requested a recount, because, in 2018, one of the Libertarian Party's gubernatorial candidates "secured a recount by depositing $3,400 per county to be recounted."  Complaint ¶ 32, at 7.  See Motion at 6.

81.     On July 1, 2020, Mr. Curtis also electronically sent a letter "constituting a new recount application from his previous June 25 statewide recount application" and requesting that the recount should be limited to Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County.  See Response ¶ 15, at 4 (citing Letter from Stephen P. Curtis to the New Mexico Office of the Secretary of State at 1 (dated July 1, 2020), filed August 6, 2020 (Doc. 10-7)("Curtis July 1 Letter")).

82.     In the Curtis July 1 Letter, Mr. Curtis suggests that election recounts as a result of voting machine errors are "free."  Response ¶ 15, at 4.  See Curtis July 1 Letter at 1.

83.     On July 2, 2020, Secretary Oliver's office sent Mr. Curtis' campaign a letter denying its recount application, because Mr. Curtis' campaign's wire transfer was "untimely and insufficient to cover the required amount of the deposit."  Complaint ¶ 33, at 8.  See Letter from Tonya Noonan Herring to Stephen P. Curtis at 1 (dated July 2, 2020), filed August 6, 2020 (Doc. 10-8)("Herring July 2 Letter"); Motion at 6; Response ¶ 17, at 4.

84.     Mr. Curtis believes that, in Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County, the voting machines "require additional steps to be taken to count write-in votes, which were not taken."  Complaint ¶ 34, at 8.  See Motion at 7.

85.     New Mexico's election laws and processes are designed to protect individuals' right to vote.  See Aug. 7 Tr. at 55:14-16 (Lange, Vigil).

86.     New Mexico law allows the candidates to file a mandamus proceeding in the Supreme Court of New Mexico to contest elections results or to challenge recount determinations. See Response ¶ 18, at 4-5; N.M. Stat. Ann. §§ 1-14-3 and 1-14-21.

87.     N.M. Stat. Ann. § 1-14-21 provides:

> If the state canvassing board, the county canvassing board, secretary of state, county clerk or any member of a precinct board fails or refuses to do or perform any of the acts required of them pertaining to recounts or rechecks, the applicant for recount or recheck may apply to any district court, the court of appeals or the supreme court of New Mexico for writ of mandamus to compel the performance of the required act and such court shall entertain such application.

N.M. Stat. Ann. § 1-14-21.  See Response at 7.

88.     Each New Mexico County "canvasses its own results, approves the report of the canvass, and declares the results no later than ten days from the election."  Response at 5.  See N.M. Stat. Ann. § 1-13-13.

89.     New Mexico law provides election administrators with guidance on validating ballot markings and votes for write-in candidates.  See N.M. Stat. Ann. § 1-1-5.2; Response at 5-6.

90.     On the third Tuesday after each statewide election, the Office of the Secretary of State of New Mexico "prepares the report of the state canvass directly from the county canvass reports," "approves the report of the canvass," "declares the results of the nominations of each candidate voted upon by the entire state," and issues "the certificate of nomination" to qualifying candidates.  Response at 6.  See N.M. Stat. Ann. §§ 1-13-15, 1-13-16(B)

91.     Under certain circumstances, New Mexico law requires automatic recounts, for which the Office of the Secretary of State of New Mexico must pay.  See Response at 6; N.M. Stat. Ann. §§ 1-14-24(A), 1-14-25.

92.     Candidates can request a discretionary recount of election results "if they submit an application 'within six days after completion of the canvass by the proper canvassing board.'" Response at 6 (quoting N.M. Stat. Ann. § 1-14-14(A)).

93.     A recount "pertains to all paper ballots, including absentee ballots, provisional paper ballots, optical scan paper ballots and any other paper ballot and means a verification procedure whereby the voters' selections for an office are retallied and the results compared with the results shown on the official returns." N.M. Stat. Ann. § 1-1-6. See Response at 6.

94.     "Immediately after filing of the application for recount or recheck, . . . the appropriate canvassing board shall issue an order to the county clerk of each county where a precinct specified in the application or notice is located commanding the county clerk to convene a recount precinct board." N.M. Stat. Ann. § 1-14-16(A). See Response at 7.

95.     New Mexico law's discretionary recount provision, N.M. Stat. Ann. § 1-14-15, provides the following procedure for candidates wishing to request a vote recount following an election:

> A.      An applicant for a recount shall deposit with the proper canvassing board or, in the case of an office for which the state canvassing board issues a certificate of nomination or election, with the secretary of state sufficient cash, or a sufficient surety bond, to cover the cost of a recount for each precinct for which a recount is demanded. An applicant for a recheck shall deposit with the proper canvassing board or, in the case of an office for which the state canvassing board issues a certificate of nomination or election, with the secretary of state sufficient cash, or a sufficient surety bond, to cover the cost of the recheck for each voting machine to be rechecked. The state canvassing board shall determine the estimated actual cost of a recount per precinct and a recheck per voting machine no later than March 15 of even-numbered years. The secretary of state shall post the recount and recheck cost determinations on the secretary of state's web site when the state canvassing board issues its cost determinations.

> B.      The deposit or surety bond shall be security for the payment of the costs and expenses of the recount or recheck in case the results of the recount or recheck are not sufficient to change the results of the election.

C.      If it appears that error or fraud sufficient to change the winner of the election has been committed, the costs and expenses of the recount or recheck shall be paid by the state upon warrant issued by the secretary of finance and administration supported by a voucher of the secretary of state, or shall be paid by the county upon warrant of the county clerk from the general fund of the county, as the case may be.

D.      If no error or fraud appears to be sufficient to change the winner, the costs and expenses for the recount or recheck shall be paid by the applicant.  Costs shall consist of any docket fees, mileage of the sheriff in serving summons and fees and mileage of precinct board [election board] members, at the same rates allowed witnesses in civil actions.  If error or fraud has been committed by a precinct board [election board], the board members shall not be entitled to such mileage or fees.

N.M. Stat. Ann. § 1-14-15 (alterations in original).  See Complaint ¶ 35, at 8; Motion at 7; Response at 6.

96.      If the New Mexico State Canvassing Board conducts a recount and recheck and determines that there is insufficient error or fraud to change an election's winner, then the applicant must pay the costs and expenses for the recount or recheck.  See Response at 6; N.M. Stat. Ann. § 1-14-15(D).

97.      N.M. Stat. Ann. § 1-10-4(B) requires Secretary Oliver to send general election ballots "to the printer" sixty days before the election, which for the upcoming general election is in early September, 2020, Aug. 7 Tr. at 20:20-21 (Lange), and Secretary Oliver aims to finalize the general election ballot about two weeks before sending them to be printed, see Aug. 7 Tr. at 77:5-18 (Lange).

98.      The Libertarian Plaintiffs sue Secretary Oliver in her official capacity only. See Complaint ¶ 6, at 3.

## PROCEDURAL BACKGROUND

1.     On July 23, 2020, the Libertarian Plaintiffs filed the Complaint.  See Complaint at 1.  In the Complaint, the Libertarian Plaintiffs allege claims for: (i) violation of the First Amendment to the Constitution of the United States of America, see Complaint ¶¶ 39-43, at 8-9; (ii) violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, see Complaint ¶¶ 44-49, at 10; (iii) violation of the Due Process Clause of the Fourteenth Amendment, see Complaint ¶¶ 50-52, at 10-11; and (iv) general violation of the Libertarian Plaintiffs' Constitutional rights, privileges, or immunities, see Complaint ¶ 54, at 11.  The Libertarian Plaintiffs request that the Court "issue a declaration that the challenged statute and the practices of Defendant are unconstitutional," Complaint ¶ A, at 11, and "enter a restraining order, preliminary injunction, and permanent injunctive relief to prohibit enforcement of the challenged statute and the practices of Defendant, and to direct that the recount occur," Complaint ¶ B, at 12.

### 1.     The Motion.

2.     On July 29, 2020, the Libertarian Plaintiffs filed the Motion, which requests that the Court grant a temporary restraining order ("TRO") and/or preliminary injunction directing Secretary Oliver to order the country clerks in Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County to recount votes in the Libertarian Party primary election, which occurred on June 2, 2020.  See Motion at 2, 3, 13.  The Libertarian Plaintiffs first summarize the case's facts.  See Motion at 2-7.  The Libertarian Plaintiffs assert that the Libertarian Party is New Mexico's third largest political party and "consists of groups of voters who have come together to achieve political objectives."  Motion at 2 (citing Complaint ¶ 3, at 3).  The Libertarian Plaintiffs state that Mr. Curtis filed to run and qualify as the Libertarian Party's candidate for Court of Appeals of New Mexico judge.  See

Motion at 3 (citing Complaint ¶ 9, at 4).  According to the Libertarian Plaintiffs, to qualify for the general election, Mr. Curtis "needed to obtain 230 write-in votes" in the primary election.  Motion at 3 (citing Complaint ¶ 9, at 4).  The Libertarian Plaintiffs note that, "pursuant to a New Mexico Supreme Court order," and because holding an in-person election during the COVID-19 pandemic would pose numerous health risks, Secretary Oliver's office "mailed applications for absentee ballots to all voters registered for a major party in the State of New Mexico in or about May, 2020." Motion at 3 (citing Complaint ¶ 10, at 4).  The Libertarian Plaintiffs say that early voting began on May 5, 2020, and the primary election formally occurred on June 2, 2020, with "unofficial results" announced that day.  Motion at 3 (citing Complaint ¶¶ 11-12, at 4).

     3.     The Libertarian Plaintiffs say that 1,570 votes were cast in the Libertarian Party primary election.  See Motion at 3 (citing Complaint ¶ 13, at 4).  The Libertarian Plaintiffs assert that Mr. Curtis and the Libertarian Party "spent resources to promote Mr. Curtis' race, by undertaking an expensive direct mail campaign to its registered voters."  Motion at 3 (citing Complaint ¶ 14, at 4).  According to the Libertarian Plaintiffs, "[t]he feedback that the party received from its members reveals that numerous voters, well above the 230-vote threshold, cast votes for Mr. Curtis, and, as a consequence, that Defendant and others administering the elections were therefore not appropriately counting the votes."  Motion at 3 (citing Complaint ¶ 15, at 4). The Libertarian Plaintiffs contend that the "Unofficial results" webpage on Secretary Oliver's website "fluctuated" between June 2, 2020, and June 23, 2020, when the New Mexico State Canvassing Board met to certify the primary election results, but the "[u]nofficial returns reflected that Stephen P. Curtis did not receive the 230 write-in votes required to be put on the general election ballot" as the Libertarian Party's nominee for the Court of Appeals of New Mexico. Motion at 4 (citing Complaint ¶¶ 16-17, at 5).

4.      According to the Libertarian Plaintiffs, several counties and precincts incorrectly tallied Mr. Curtis' write-in votes.  See Motion at 3 (citing Complaint ¶ 18, at 5).  The Libertarian Plaintiffs assert that Mr. Curtis "was the only write-in candidate in that election" and that Bernalillo County's website indicates that 270 write-in votes were cast in the Libertarian Party primary election for the Court of Appeals of New Mexico.  Motion at 4 (citing Complaint ¶ 18, at 5).  The Libertarian Plaintiffs contend that there were 170 absentee ballots, and 100 in-person and early voting ballots cast in Bernalillo County, and, of these ballots, Mr. Curtis received: (i) zero votes from the absentee ballots that were machine-counted; (ii) one vote from the absentee ballots that were hand-counted; and (iii) forty votes from the in-person and early voting ballots.  See Motion at 4 (citing Complaint ¶ 18, at 5).  The Libertarian Plaintiffs state that "the Secretary of State's office and the State Canvassing Board only credited Mr. Curtis with 41 votes from Bernalillo County."  Motion at 4 (citing Complaint ¶ 18, at 5).  The Libertarian Plaintiffs also say that, in Los Alamos County, although Los Alamos County initially reported that Mr. Curtis received only four write-in votes, the New Mexico State Canvassing Board later revised that figure to eighteen write-in votes for Mr. Curtis in Los Alamos County.  See Motion at 4 (citing Complaint ¶ 19, at 5).  The Libertarian Plaintiffs argue that the Los Alamos County Clerk's staff disclosed via telephone communication that Los Alamos County's voting machines experienced errors in counting ballots -- after counting absentee ballots, the voting machines would not add the absentee ballot results to the in-person and early voting ballot results.  See Motion at 4-5 (citing Complaint ¶ 20, at 5-6).

5.      The Libertarian Plaintiffs argue that the "voting errors with the machines in Los Alamos County permeated throughout the state."  Motion at 5 (citing Complaint ¶ 21, at 6).  The Libertarian Plaintiffs contend that Secretary Oliver was "aware of these voting machine errors," but she did not require County Clerks to recount ballots and instead "deliberately ignored these

errors statewide." Motion at 5 (citing Complaint ¶ 21, at 6). The Libertarian Plaintiffs assert that, as a result of Secretary Oliver's "malfeasance," Mr. Curtis' vote total was 204 votes, which is 26 votes short of the number of votes he needed to run in the general election. Motion at 5 (citing Complaint ¶ 22, at 6). The Libertarian Plaintiffs state that, on June 19, 2020, Mr. Curtis and Luchini separately emailed Secretary Oliver's office and informed it that Mr. Curtis' campaign intended to seek a recount of the primary election votes. See Motion at 5 (citing Complaint ¶¶ 23, 25, at 6). The Libertarian Plaintiffs argue that Secretary Oliver attempted to "run out the clock" by not responding to either inquiry. Motion at 5 (citing Complaint ¶¶ 24, 26, at 6). The Libertarian Plaintiffs say that, on June 25, 2020, Mr. Curtis sent a letter to Secretary Oliver's office, requesting a recount of the primary election votes and "requesting that the Secretary of State's office notify him of the amount of cash or surety bond that would need to be deposited with the Secretary of State's office to accomplish the recount," but Secretary Oliver did not respond to Mr. Curtis' inquiry. Motion at 5-6 (citing Complaint ¶¶ 27-28, at 6-7). The Libertarian Plaintiff say that, on June 29, 2020, Luchini sent an email to Secretary Oliver's office "requesting the wiring instructions for the recount deposit." Motion at 6 (citing Complaint ¶ 29, at 7). The Libertarian Plaintiffs say that, at 4:46 p.m. on June 29, 2020, Secretary Oliver's office responded -- for the first time -- with wiring instructions and said that "a deposit of $3,573,400 would be required to complete the recount." Motion at 6 (citing Complaint ¶ 30, at 7). According to the Libertarian Plaintiffs, the required deposit "amounted to a demand that the Stephen P. Curtis campaign deposit approximately $2,276.05 per ballot to be recounted," and Secretary Oliver's office required that Mr. Curtis campaign submit the funds that day.[4] Motion at 6 (citing Complaint ¶ 30, at 7).

---

[4]In the Complaint, the Libertarian Plaintiffs allege that Secretary Oliver's office "stated by e-mail that the fund would not need to be received that day," Complaint ¶ 30, at 7, but that

6.     The Libertarian Plaintiffs state that, on July 1, 2020, Mr. Curtis sent an email to Secretary Oliver's office requesting that Secretary Oliver limit the requested recount "to seven counties that appeared to have the greatest irregularities in their vote totals" and in which approximately 1,145 votes were cast in the Libertarian Party primary election -- Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County.  Motion at 6 (citing Complaint ¶ 31, at 7).  The Libertarian Plaintiffs say that, on July 1, 2020, Mr. Curtis' campaign wired $23,800.00 to Secretary Oliver's office, which amounts "to $3,400 per county for which the recount was requested."  Motion at 6 (citing Complaint ¶ 32, at 7).  According to the Libertarian Plaintiffs, in 2018, a Libertarian candidate for Governor of New Mexico "secured a recount by depositing $3,400 per county to be recounted."  Motion at 6 (citing Complaint ¶ 32, at 7).  The Libertarian Plaintiffs say that Secretary Oliver's office denied recount request of Mr. Curtis' campaign, "asserting that the funds tendered were untimely and insufficient to cover the required amount of the deposit."  Motion at 6 (citing Complaint ¶ 33, at 8).

7.     The Libertarian Plaintiffs argue that the challenged Counties' voting machines "require additional steps to be taken to count write-in votes, which were not taken."  Motion at 7 (citing Complaint ¶ 34, at 8).  The Libertarian Plaintiffs contend that Secretary Oliver knew about these issues but did not direct County Clerks to take the additional, necessary steps to ensure that voting machines properly count write-in votes.  See Motion at 7 (citing Complaint ¶ 34, at 8).  The Libertarian Plaintiffs note that N.M. Stat. Ann. § 1-14-15 "requires a bond or cash to be posted to cover the cost of any recount proceeding."  Motion at 7 (citing Complaint ¶ 35, at 8).  The Libertarian Plaintiffs contend that, with only 1,570 ballots at issue, Secretary Oliver's demand that

Secretary Oliver denied Mr. Curtis' campaign's recount application, because "the funds tendered were untimely and insufficient to cover the required amount of the deposit," Complaint ¶ 33, at 8.

Mr. Curtis' campaign deposit $3,573,400.00 for a recount results in a "bond of $2,276 per ballot
. . . , when there is substantial evidence of errors affecting the outcome of the election," is
excessive.  Motion at 7 (citing Complaint ¶ 35, at 8).  According to the Libertarian Plaintiffs, the
bond amount effectively exceeds $3,573,400.00, because "the bond is treated as a supersedeas
bond and requires coming up with more than the base amount."  Motion at 7 (citing Complaint
¶ 36, at 8).  The Libertarian Plaintiffs note that Secretary Oliver and New Mexico law restrict their
ability to fundraise to cover the bond amount.  See Motion at 7 (citing N.M. Stat. Ann. §§ 1-19-25
to 1-19-36; Complaint ¶ 37, at 8).  The Libertarian Plaintiffs argue that Secretary Oliver's and New
Mexico law's requirements "foreclose all but extremely wealthy candidates from being able to
handle and demand a recount, even where there is significant evidence of error, or even fraud."
Motion at 7 (citing Complaint ¶ 38, at 8).

8.      The Libertarian Plaintiffs state the preliminary-injunction standard that a movant
must satisfy to obtain injunctive relief -- the movant must prove: (i) "that he's 'substantially likely
to succeed on the merits'"; (ii) "that he'll 'suffer irreparable injury' if the court denies the
injunction"; (iii) "that his 'threatened injury' (without the injunction) outweighs the opposing
party's under the injunction"; and (iv) "that the injunction isn't 'adverse to the public interest.'"
Motion at 7-8 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067,
1070 (10th Cir. 2009)).  The Libertarian Plaintiffs note that the Tenth Circuit "disfavors"
preliminary injunctions that: (i) mandate action, rather than prohibiting action; (ii) change the
status quo; or (iii) grant all the relief that the movant could expect from winning a trial.  Motion
at 8 (citing Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012); Schrier v. Univ. of Colo., 427
F.3d 1253, 1258-59 (10th Cir. 2005)).  The Libertarian Plaintiffs argue that, although a movant
seeking a disfavored injunction "faces a heavier burden on the likelihood-of-success-on-the-merits

and the balance-of-the-harms factors, . . . the analysis in constitutional cases, such as this one, turns solely on whether or not the Plaintiffs have demonstrated a constitutional violation."  Motion at 8. The Libertarian Plaintiffs argue that, to establish irreparable injury, "'[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury.'"  Motion at 8 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d 792, 805 (10th Cir. 2019), and citing <u>Elrod v. Burns</u>, 427 U.S. 347, 373-74 (1976))(alteration in Motion only).  The Libertarian Plaintiffs contend that, in balancing the harms, constitutional violations "'usually trump[] any harm to the defendant.'"  Motion at 8 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d at 806)(alteration added).  Last, the Libertarian Plaintiffs argue that "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'"  Motion at 8 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d at 807).

9.     The Libertarian Plaintiffs assert that Secretary Oliver has violated their First Amendment rights, because candidates must "post a multi-million-dollar bond or cash[] to obtain a recount to vindicate [Mr. Curtis'] and voters' interests, particularly with substantial evidence of error, imposes a severe burden on the Plaintiffs' associational interests, and the rights of voters to cast ballots."  Motion at 9 (citing <u>Burdick v. Takushi</u>, 504 U.S. 428 (1992); <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983)).  The Libertarian Plaintiffs argue that the Court should apply strict scrutiny to Secretary Oliver's burdens on their First Amendment rights and determine that the bond requirement "is not necessary or narrowly tailored to meet any state interest."  Motion at 9.  The Libertarian Plaintiffs contend, in the alternative, that, even if the Court concludes that the bond requirement is not a severe burden on their rights, the bond requirement "constitute[s] more than a minimal burden, and do[es] not pass muster under the flexible analysis that weighs

the burdens of Plaintiffs against the State's asserted interest and chosen means of asserting it."
Motion at 9 (citing Burdick v. Takushi, 504 U.S. 428; Anderson v. Celebrezze, 460 U.S. 780).

10.     The Libertarian Plaintiffs assert that the Supreme Court of the United States of
America's precedent "suggest[s] that the excessive bond requirement here, particularly where
there is evidence of fraud, or at least significant error, cannot be sustained."  Motion at 9.  First,
the Libertarian Plaintiffs contend that, in Lubin v. Panish, 415 U.S. 709 (1974), the Supreme Court
held that, "'in the absence of reasonable alternative means of ballot access, a State may not,
consistent with constitutional standards, require from an indigent candidate filing fees he cannot
pay.'"  Motion at 10 (quoting Lubin v. Panish, 415 U.S. at 719).  Second, they argue that, in Morse
v. Republican Party, 517 U.S. 186 (1996), the Supreme Court held that "even private political
parties could not charge a fee to participate in the voting process and have one's vote counted
under the constitution and the Voting Rights Act[, 42 U.S.C. §§ 1973 to 1973q]."  Motion at 10.
The Libertarian Plaintiffs assert that Secretary Oliver's $3,573,400.00 bond requirement for a
recount "infringe[s] on the rights of the voters who cast ballots for Mr. Curtis" -- such as Banks,
"who testified she personally cast a vote for Mr. Curtis, which was not counted" -- and "infringe[s]
on the associational rights of the Libertarian Party of New Mexico, and Mr. Curtis, who are entitled
to have their associational rights as a political party vindicated."  Motion at 10.  The Libertarian
Plaintiffs argue that they have demonstrated a strong likelihood of success on the merits of their
First Amendment claim, because "[c]ourts have never found such requirements to be justified."
Motion at 10 (citing Belitskus v. Pizzingrilli, 343 F.3d 632 (3d Cir. 2003); United Utah Party v.
Cox, 268 F. Supp. 3d 1227, 1254 (D. Utah 2017)(Nuffer, J.)).

11.     The Libertarian Plaintiffs next argue that the bond requirement, which is codified
in N.M. Stat. Ann. § 1-14-15, violates the Equal Protection Clause.  See Motion at 11 (citing

- 30 -

Harper v. Va. State Bd. of Elections, 383 U.S. 663, 666 (1966)("[A] State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.")(alteration added)).   The Libertarian Plaintiffs also contend that "'falsely certifying'" a vote count violates the Equal Protection Clause, Motion at 11 (quoting United States v. Classic, 313 U.S. 299, 310, 315 (1941)), because the "right to vote necessarily includes the right to have the vote fairly counted," Motion at 11 (citing Reynolds v. Sims, 377 U.S. 533, 554 (1964); United States v. Classic, 313 U.S. at 315; United States v. Mosley, 238 U.S. 383, 386 (1915)).   The Libertarian Plaintiffs assert that, in addition to Banks' and other voters' votes, "the Plaintiffs can identify entire precincts that have not been appropriately counted: all through voting machine errors that do not appropriately account write in votes."   Motion at 11. The Libertarian Plaintiffs request an evidentiary hearing at which they may compel County Clerks to testify, which, the Libertarian Plaintiffs contend, will show "that the Defendant was well aware of these voting machine errors, and yet persisted in depriving hundreds of New Mexico voters of their votes."   Motion at 11.   The Libertarian Plaintiffs maintain that they "have demonstrated a strong likelihood of success on this claim."   Motion at 12.

12.   The Libertarian Plaintiffs also argue that Secretary Oliver has violated the Due Process Clause.   See Motion at 12.   The Libertarian Plaintiffs assert that "[d]ue process is implicated '[i]f the election process itself reaches the point of patent and fundamental unfairness.'" Motion at 12 (quoting Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir. 1978), and citing Marks v. Stinson, 19 F.3d 873, 888 (3d Cir. 1993))(first alteration added and second alteration in Motion only).   According to the Libertarian Plaintiffs, Secretary Oliver's "actions have deprived the voters for Mr. Curtis of their right to vote, despite knowledge of voting machine errors that were not

counting votes, and in violation of due process."  Motion at 12.  The Libertarian Plaintiffs maintain

that they "have demonstrated a strong likelihood of success on this claim."  Motion at 12.

13.     Last, the Libertarian Plaintiffs argue that Secretary Oliver's "actions are an abuse

of public office."  Motion at 12 (bold omitted).  The Libertarian Plaintiffs reiterate that Secretary

Oliver certified the ballots, thus excluding Mr. Curtis from the general election ballot, even though

Secretary Oliver knew that many voting machines were experiencing errors and not counting

write-in votes.  See Motion at 12.  The Libertarian Plaintiffs contend that Secretary Oliver "could

have directed a precinct by precinct re-count of Libertarian ballots, in a matter of a few hours, in

the affected counties."  Motion at 12.  The Libertarian Plaintiffs assert that the State's bond

requirement -- over $3,500,000.00 to count fewer than 2,000 ballots -- "strains credulity."  Motion

at 12.  The Libertarian Plaintiffs further accuse Secretary Oliver of "engag[ing] in a game of hide

the ball, characterized by a failure to respond to inquiries regarding the process, to run out the

clock."  Motion at 13.  The Libertarian Plaintiffs conclude by noting that election deadlines are

approaching, and, thus, they request emergency and expedited relief.  See Motion at 13.

         **2.      The Response.**

14.     On August 6, 2020, Secretary Oliver responded to the Motion.  See Response at 1.

Secretary Oliver notes that, if the Court grants the Libertarian Plaintiffs their requested relief

without showing a substantial likelihood of "success on the merits," such a result "would

irrevocabl[y] alter the integrity of the election process in New Mexico."  Response at 1.  Secretary

Oliver argues that the preliminary injunction which the Libertarian Plaintiffs request "requires an

exceedingly high showing to obtain, including clear and unequivocal evidence of the four elements

for preliminary injunction."  Response at 1.  Secretary Oliver asserts that the Libertarian Plaintiffs

neither have established that they are substantially likely to succeed on their claims' merits, nor

have demonstrated that the relief that they seek would not harm New Mexico and the public.  See Response at 1.

15.     Secretary Oliver first summarizes the underlying facts.  See Response ¶¶ 1-22, at 2-5.  She says that Mr. Curtis is an unopposed Libertarian Party write-in candidate for Position 2 on the Court of Appeals of New Mexico, and that he needed 230 votes in the Libertarian Party's primary election for the New Mexico State Canvassing Board to certify his nomination for the general election.  See Response ¶¶ 1-2, at 2 (citing N.M. Stat. Ann. § 1-13-24(C)).  Secretary Oliver notes that, on June 23, 2020, three weeks after the primary elections, the New Mexico State Canvassing Board met and "declared the results of the nomination of each candidate voted upon by the entire state, pursuant to N.M. Stat. Ann. § 1-13-15," Response ¶ 3, and 2, and certified the candidates' nominations for Position 2 on the Court of Appeals of New Mexico, see Response ¶ 4, at 2.  According to Secretary Oliver, the New Mexico State Canvassing Board ordered automatic recounts for four candidate contests pursuant to N.M. Stat. Ann. § 1-14-24.  See Response ¶ 5, at 2.  She says that Mr. Curtis received only 204 votes, which is "26 votes short to qualify for nomination."  Response ¶ 6, at 2.

16.     Secretary Oliver says that her office publishes the 2018 and 2020 election recount cost determinations on her office's website, and that the recount cost determinations have not changed between 2018 and 2020.  See Response ¶ 7, at 2 (citing Recount Cost Determinations).  Secretary Oliver notes that the estimated cost to conduct a recount is $3,400.00 per precinct.  See Response ¶ 8, at 3 (citing Recount Cost Determinations at 3).  Secretary Oliver says that her office received a letter from Mr. Curtis "'constituting' an application of a statewide recount and contesting the published cost determinations for such a recount.'"  Response ¶ 9, at 3 (quoting Curtis June 25 Letter).  Secretary Oliver says that, on June 29, 2020, Deputy Election Director

Alicia Romero responded to an email from Luchini, told him that Mr. Curtis had not qualified as a candidate, told him that the cost of statewide recount for every precinct would cost $3,573,400.00, and provided him with a routing number to submit payment for a recount.  See Response ¶ 10, at 3 (citing Romero June 29 Email).  Secretary Oliver says that, subsequently, on June 29, 2020, Luchini sent Romero an email to amend the application for a statewide recount by requesting recounts for only 182 precincts, because Luchini alleged that "there was a discrepancy between the county canvass report and the state canvass report."  Response ¶ 11, at 3 (citing Luchini June 29 Email).  Secretary Oliver notes that, at a recount cost of $3,400.00 per precinct, it would cost $618,800 to conduct a recount for 182 precincts.  See Response ¶ 12, at 3.

17.     Secretary Oliver says that, on June 30, 2020, Luchini sent Romero an email to "confirm[] that a wire transfer had not yet been received by" Secretary Oliver's office, and to "bring[] up a 'systemic error with a reporting from the machines used to tabulate late absentee ballots.'"  Response ¶ 13, at 3-4 (quoting First Luchini June 30 Email).  Secretary Oliver says that, later on June 30, 2020, Luchini sent another email to confirm that funds had been transferred, but Luchini also "indicate[d] that the full estimated costs have not been submitted and erroneously claim[ed] that the Libertarian party must only pay $3,400 per precinct board instead of per precinct, not the statutory amount based on per precinct recount pursuant to Section 1-14-15(A)."  Response ¶ 14, at 4 (citing Second Luchini June 30 Email).  Secretary Oliver notes that, on July 1, 2020, Mr. Curtis electronically sent a letter "constituting a new recount application from his previous June 25 statewide recount application" and requesting that the recount should be limited to Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County.  See Response ¶ 15, at 4 (citing Curtis July 1 Letter at 1).  Secretary Oliver also notes that, in the Curtis July 1 Letter, Mr. Curtis suggests that election

recounts as a result of voting machine errors are "free."  Response ¶ 15, at 4 (citing Curtis July 1 Letter at 1).  Secretary Oliver says that, on July 1, 2020, Mr. Curtis' campaign wired $23,000.00 to her office, which "constituted $3,400 per county precinct board for which recount was requested."  Response ¶ 16, at 4 (citing Complaint ¶ 32, at 7).  Secretary Oliver notes that, on July 2, 2020, her office sent a letter to Mr. Curtis to inform him that his June 25 recount application "did not include a sufficient cash deposit or surety bond" and that his July 1 recount application was "untimely."  Response ¶ 17, at 4 (citing Herring July 2 Letter at 1).

18.     Secretary Oliver asserts that, on July 23, 2020,[5] the Libertarian Plaintiffs filed their Complaint in federal court, even though New Mexico law allows the Libertarian Plaintiffs to file a mandamus proceeding in the Supreme Court of New Mexico.  See Response ¶ 18, at 4-5 (citing Complaint; Verification, filed July 24, 2020 (Doc. 2); N.M. Stat. Ann. § 1-14-21).  Secretary Oliver notes that, on July 29, 2020, the Libertarian Plaintiffs filed the Motion.  See Response ¶ 20 (citing Motion).  According to Secretary Oliver, a copy of the Complaint was served via certified mail on August 3, 2020.  See Response ¶¶ 19, 21, at 5.  Secretary Oliver also notes that, from August 3, 2020, to August 5, 2020, her office "conducted its statutorily required election training of county clerks on the administration of election officials."  Response ¶ 22, at 5.

19.     Secretary Oliver next provides an overview of relevant New Mexico election law. See Response at 5-7.  Secretary Oliver argues that this case "turns on the interpretation and application of N.M. Stat. Ann. Sections 1-14-14 and 1-14-15."  Response at 5.  According to Secretary Oliver, each New Mexico County "canvasses its own results, approves the report of the

_____

[5]Although Secretary Oliver indicates that the Libertarian Plaintiffs filed the Complaint on July 28, 2020, see Response ¶ 18, at 4, the correct filing date is July 23, 2020, see Complaint at 1.

canvass, and declares the results no later than ten days from the election."  Response at 5 (citing N.M. Stat. Ann. § 1-13-13).  Secretary Oliver says that New Mexico law provides election administrators with guidance on validating ballot markings and votes for write-in candidates.  See Response at 5-6 (citing N.M. Stat. Ann. § 1-1-5.2).  Secretary Oliver says that, on the third Tuesday after each statewide election, her office "prepares the report of the state canvass directly from the county canvass reports," "approves the report of the canvass," "declares the results of the nominations of each candidate voted upon by the entire state," and issues "the certificate of nomination" to qualifying candidates.  Response at 6 (citing N.M. Stat. Ann. §§ 1-13-15, 1-13-16(B)).

20.     Secretary Oliver notes that, under certain circumstances, New Mexico law requires automatic recounts, for which her office must pay.  See Response at 6 (citing N.M. Stat. Ann. §§ 1-14-24(A), 1-14-25).  Secretary Oliver says that candidates can request a discretionary recount of election results "if they submit an application 'within six days after completion of the canvass by the proper canvassing board.'"  Response at 6 (quoting N.M. Stat. Ann. § 1-14-14(A)).  Secretary Oliver says that, to request a discretionary recount, candidates must "'deposit with . . . the Secretary of State sufficient cash, or sufficient surety bond, to cover the cost of the recount for each precinct for which a recount is demanded.'"  Response at 6 (quoting N.M. Stat. Ann. § 1-14-15(A)).  According to Secretary Oliver, the New Mexico State Canvassing Board estimates the costs of recounting votes and rechecking voting machines per precinct, and her office then posts the recount and recheck cost determinations on her office's website.  See Response at 6 (citing N.M. Stat. Ann. § 1-14-15(A)).  Secretary Oliver notes that, if the New Mexico State Canvassing Board conducts a recount and recheck, and determines that there is insufficient error or fraud to change an election's winner, then the applicant must pay the costs and expenses for the

recount or recheck.  See Response at 6 (citing N.M. Stat. Ann. § 1-14-15(D)).  According to Secretary Oliver, a "recount 'pertains to all paper ballots, including absentee ballots, provisional paper ballots, optical scan paper ballots and any other paper ballot and means a verification procedure whereby the voters' selections for an office are retallied and the results compared with the results shown on the official returns.'"  Response at 6 (quoting N.M. Stat. Ann. § 1-1-6). Secretary Oliver says that, after a candidate applies for a vote recount or machine recheck, "the appropriate canvassing board shall issue an order to the county clerk of each county [where] a precinct specified in the application or notice is located commanding the county clerk to convene a recount precinct board."  Response at 7 (citing N.M. Stat. Ann. § 1-14-16(A)).  To challenge a decision or action related to recounts or rechecks, Secretary Oliver says that New Mexico law provides the following procedure for candidates:

> Article 14 of the Election Code further provides a statutory right of action to the New Mexico Supreme Court for mandamus if the "state canvassing board, the county canvassing board, secretary of state, county clerk or any member of a precinct board fails or refuses to do or perform any of the acts required of them pertaining to recounts or rechecks, the applicant for recount or recheck may apply to any district court, the court of appeals or the supreme court of New Mexico for writ of mandamus to compel the performance of the required act and such court shall entertain such application."

Response at 7 (quoting N.M. Stat. Ann. § 1-14-21).

21.    Secretary Oliver contends that "[t]he requirements for a TRO issuance are essentially the same as those for a preliminary injunction order."  Response at 7 (citing Herrera v. Santa Fe. Pub. Sch., 792 F. Supp. 2d at 1181).  Secretary Oliver notes that obtaining a preliminary injunction requires that the movant satisfy four elements: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in

the public interest."  Response at 7 (citing <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d 1203, 1208 (10th Cir. 2009); <u>Resolution Trust Corp. v. Cruce</u>, 972 F.2d 1195, 1198 (10th Cir. 1992); <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d at 1181).    According to Secretary Oliver, "[t]he likelihood-of-success and irreparable-harm factors are 'the most critical' in the analysis."  Response at 8 (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009)).

22.    Secretary Oliver notes that three types of preliminary injunctions "are particularly disfavored" -- those that: "(i) alter the status quo; (2) are mandatory preliminary injunctions; and/or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Response at 8 (citing <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d at 1208).  According to Secretary Oliver, the Motion implicates all three types of disfavored injunctions.  <u>See</u> Response at 8.  First, Secretary Oliver argues that the Libertarian Plaintiffs' requested relief would disrupt the status quo, because, "[s]ince Section 1-14-15 was amended in 2007, the Defendant has been calculating sufficient costs of a recount election pursuant to the cost estimation of the State Canvassing Board for all applicants regardless of party."  Response at 8.  Secretary Oliver asserts that the Libertarian Plaintiffs' requested relief would "alter [the] dynamic between candidates for election."  Response at 8.  Second, Secretary Oliver notes that the Libertarian Plaintiffs' requested preliminary injunction is mandatory, because it requires her office to order a recount of Libertarian Party ballots throughout much of the state.  <u>See</u> Response at 8.  Third, Secretary Oliver argues that granting the requested injunction would decide the dispute's merits, because "an order will be issued and a recount would commence, and any adjudication on the merits would be academic."  Response at 8.  Secretary Oliver argues that the Libertarian Plaintiffs "must meet the extraordinary burden of establishing by clear and unequivocal evidence, that they satisfy all four elements

necessary for a preliminary injunction," and that the Court should resolve any doubts in her favor. Response at 8-9.

23.     Secretary Oliver argues that the Libertarian Plaintiffs have not demonstrated a substantial likelihood of success on the merits.  See Response at 9.  Secretary Oliver notes that the Libertarian Plaintiffs challenge N.M. Stat. Ann. § 1-14-15(A)'s constitutionality under the First and Fourteenth Amendments, but she argues that the Libertarian Plaintiffs "have failed to articulate a constitutional right that has been burdened and have only implicated a state statutory right to a discretionary recount."  Response at 9 (citing Denton, State ex rel. v. Vinyard, 1951-NMSC-030, ¶ 6, 230 P.2d 238, 239 ("The right of recount and contest are purely statutory.")).  Secretary Oliver characterizes the Libertarian Plaintiffs' constitutional claims as attempts "to mask a discretionary statutory right to a recount as a constitutional right related to ballot access."  Response at 9. Secretary Oliver contends that, if the Court determines that New Mexico's recount procedures implicate a constitutional right, then the Court should conclude that "the law is a reasonable post-election discretionary privilege that does not implicate ballot access."  Response at 9. Secretary Oliver also argues that the recount cost determinations are "non-discriminatory" and "reasonably based on the realities of conducting a recount per precinct throughout the state." Response at 10.  Secretary Oliver asserts that, even if the Court concludes that N.M. Stat. Ann. § 1-14-15(A) is unconstitutional, Mr. Curtis's recount application is untimely, and, thus, "there is no redressability this court can grant."  Response at 10.

24.     Secretary Oliver argues that the Libertarian Plaintiffs have not demonstrated that the Court should apply strict scrutiny to their First and Fourteenth Amendment claims, or that N.M. Stat. Ann. § 1-14-15 is unreasonable or discriminatory.  See Response at 10.  Secretary Oliver contends that "this is not a ballot access case," because Mr. Curtis "qualified as a candidate

for the 2020 Primary Election."  Response at 10.  Secretary Oliver asserts that governments can

regulate elections to instill order in the democratic process.  See Response at 10-11 (quoting

Burdick v. Takushi, 504 U.S. 428, 433 (1992)).  According to Secretary Oliver,

> the Supreme Court has instructed that a district court considering a challenge to a
> state election law must weigh "the character and magnitude of the asserted injury
> to the rights protected by the First and Fourteenth Amendments that the plaintiff
> seeks to vindicate" against "the precise interests put forward by the State as
> justifications for the burden imposed by its rule," taking into consideration "the
> extent to which those interests make it necessary to burden the plaintiff's rights. . . .
> But when a state election law provision imposes only reasonable,
> nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of
> voters, the State's important regulatory interests are generally sufficient to justify
> the restrictions."

Response at 11 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983), and citing Tashjian

v. Republican Party of Conn., 479 U.S. 208, 213-14 (1986)).

25.     Secretary Oliver argues that there is no constitutional right to a discretionary

statutory election recount, but that, even if there is such a right, she contends that N.M. Stat. Ann.

§ 1-14-15 is "non-discriminatory and reasonable" and, thus, under Anderson v. Celebrezze, subject

to a "less exacting review."   Response at 11.   Secretary Oliver says that the recount cost

determinations are reasonable and reflect the estimated minimum costs of a recount per precinct.

See Response at 11.  Secretary Oliver notes that the Libertarian Plaintiffs argue that recount costs

should be lower for them, because there are fewer registered Libertarian voters in New Mexico

than there are voters registered with other major political parties, but Secretary Oliver argues that

such "disparate treatment would violate the plain language of Section 1-14-15(A) and implicate

other candidates' Fourteenth Amendment rights."  Response at 12.  Secretary Oliver also argues

that New Mexico has "an important regulatory interest in ensuring" that a recount applicant

deposits an adequate security deposit, because recounts are costly and time-consuming, and

because "there is a need for finality of an election result[]."  Response at 12.  Secretary Oliver

notes that, although the Motion cites cases regarding excessive costs that implicate constitutional

rights related to elections, none of the cases involves statutory discretionary election recount costs

and none involves plaintiffs who, like the Libertarian Plaintiffs, did not "submit a complete and

timely application for recount or pay sufficient cash to conduct a discretionary recount pursuant to

state law."  Response at 12.

      26.    Secretary Oliver argues that N.M. Stat. Ann. § 1-14-15(A) does not violate the

Libertarian Plaintiffs' First Amendment rights.  See Response at 12-13.  According to Secretary

Oliver, "[t]he discretionary recount is a privilege of state law and is applicable only after every

candidate has had their votes in the election canvassed and certified at least once."  Response at 13.

Secretary Oliver contends that the First Amendment cases that the Libertarian Plaintiffs cite in

their Motion are inapposite, because those cases involve "broader rights associated with ballot

access in the first instance, not rights associated with post-election state regulatory interest[s]."

Response at 13.  Secretary Oliver argues that, because the Libertarian Plaintiffs have not

established that the First Amendment guarantees a right to a discretionary recount, their claim is

not substantially likely to succeed on the merits.  See Response at 13.  Secretary Oliver also notes

that the Libertarian Plaintiffs contend that recount cost determinations "should be based on each

county recount precinct board rather than each precinct canvassed," but Secretary Oliver argues

that the Libertarian Plaintiffs "should not be able to substitute their own cost determinations for a

recount when the State Canvassing Board has determined the specific costs for a recount

accounting to state law . . . based on the realities that a recount and canvass is based on a precinct

by precinct review of votes cast."  Response at 13.  Secretary Oliver asserts that the $3,400.00 cost

determination for recounting each precinct's votes "thoughtfully reflects the realities of the work

and cost of an actual recount under the laws of New Mexico and is what the State pays for its canvass of the election."  Response at 14.

27.     Secretary Oliver notes that New Mexico law provides safeguards to protect voters' "First Amendment rights to elective franchise," such as an automatic recount provision that is triggered whenever the margin between two candidates receiving the greatest number of votes for an office is less than one percent of the total votes cast in an election.  Response at 14 (citing N.M. Stat. Ann. § 1-14-24).  Secretary Oliver acknowledges that the Libertarian Plaintiffs' claims do not involve the automatic recount provision, but, rather, the discretionary recount provision, which "is a statutory privilege offered to candidates" who timely request a recount and pay sufficient funds to conduct the recount.  Response at 14.  Secretary Oliver argues that "[s]uch a law is not constitutionally guaranteed and even if there was it is clear that the cost determinations are non-discriminatory and reasonable and are based on important regulatory interest of the state." Response at 14-15.

28.     Turning to the Libertarian Plaintiffs' Equal Protection claim, Secretary Oliver notes that the Libertarian Plaintiffs focus on the recount cost determinations and alleged voting machine errors.  See Response at 15.  Secretary Oliver reiterates that the New Mexico State Canvassing Board establishes the recount cost determinations and that the costs are reasonable and non-discriminatory.  See Response at 15 (citing Recount Cost Determinations at 3).  Secretary Oliver emphasizes that the Recount Cost Determinations document is detailed -- it estimates per-precinct recount costs to conduct a recount by assessing "election set up, vote tabulating system programming certification, vote tabulating system technical support," and personnel costs that are "broken down into hourly and daily rates."  Response at 15.  Secretary Oliver notes that the recount cost determinations are the same for candidates of all parties and are "the type of

reasonable restriction and regulation that Federal Courts have routinely upheld as required regulation by states to conduct uniform application of election law."  Response at 15 (citing Arutunoff v. Okla. State Election Bd., 687 F.2d 1375 (10th Cir. 1982); Parker v. Duran, 180 F. Supp. 3d 851 (D.N.M. 2015)(Vázquez, J.)).

29.     Secretary Oliver says that the Libertarian Plaintiffs' Due Process claim is based on allegations that voting machines erroneously counted write-in ballots for Mr. Curtis.  See Response at 16.  Secretary Oliver "vigorously denies any allegation of voting machine errors that failed to count write-in votes and" says that she has "specific facts to disprove such an irresponsible statement."  Response at 16.  She is confident that New Mexico's process of counting ballots and certifying results ensures elections' integrity, but she argues that, even if voting machine errors existed during the primary elections, such issues "would not stand in the way of Plaintiffs' ability to have requested a timely discretionary recount pursuant to Section 1-14-15(A) or file an election contest."  Response at 16 (citing N.M. Stat. Ann. § 1-14-3).  Secretary Oliver argues that, even if the Court holds an evidentiary hearing, whether she violated the Libertarian Plaintiffs' Fourteenth Amendment rights "has no bearing on whether a recount application may be submitted pursuant to state law."  Response at 16.  Secretary Oliver asserts that, other than N.M. Stat. Ann. § 1-14-15, she is unaware of any state laws that provide other avenues for the Libertarian Plaintiffs to request a discretionary recount.  See Response at 17.

30.     According to Secretary Oliver, federal court is not the proper venue for reviewing the Libertarian Plaintiffs' claims.  See Response at 16-17 (citing ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1188 (10th Cir. 1998)).  Secretary Oliver says that, when her office rejected the Libertarian Plaintiffs' recount application on July 2, 2020, the Libertarian Plaintiffs could have filed a lawsuit in the Supreme Court of New Mexico pursuant to N.M. Stat. Ann. § 1-14-21.  See

Response at 17.  Secretary Oliver asserts that, under Article VI, Section 3 of the Constitution of New Mexico, the Supreme Court of New Mexico "has original jurisdiction in quo warranto and mandamus against all state officers, boards and commissions."  Response at 17.  Secretary Oliver argues that the Supreme Court of New Mexico is the proper court to review the Libertarian Plaintiffs' claims and to command her and the New Mexico State Canvassing Board "to comply with state law and order a discretionary recount."  Response at 17.  Secretary Oliver notes, however, that, by not filing a lawsuit in state court, the Libertarian Plaintiffs have "foreclosed their opportunity to timely adjudicate this matter based on their interpretation of what state law requires of state officers and boards in canvassing an election."  Response at 17.

31.     Secretary Oliver next argues that the Libertarian Plaintiffs' assertion that she has not complied with New Mexico law stems from the Libertarian Plaintiffs' "misinformed belief of what the Election Code allows for."  Response at 17.  Secretary Oliver characterizes Libertarian Plaintiffs' argument as "akin to asking a Federal Court to adjudicate whether a state official did not comply with state law," and Secretary Oliver asserts that the Eleventh Amendment of the Constitution bars such claims.  Response at 17.  Secretary Oliver emphasizes that "'[t]he Eleventh Amendment bars suits for damages against a state or state agency absent congressional abrogation or waiver and consent by the state.'"  Response at 18 (quoting Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d 1114, 1117 (10th Cir. 2010)).  Secretary Oliver acknowledges, however, that a plaintiff may sue an individual state officer in his or her official capacity if the plaintiff "alleges an ongoing violation of federal law and the plaintiff seeks prospective relief."  Response at 18 (citing Ex Parte Young, 209 U.S. 123 (1908); Muscogee (Creek) Nation v. Pruitt, 669 F.3d 1159, 1166 (10th Cir. 2012)).  Secretary Oliver argues that the Libertarian Plaintiffs do not allege that

she acted outside of her delegated authority and that the Eleventh Amendment bars their claim that she did not comply with New Mexico law.  See Response at 18.

32.    Secretary Oliver asserts that the Libertarian Plaintiffs have not established that they will suffer irreparable harm if the Court does not grant them injunctive relief.  See Response at 18. According to Secretary Oliver, "the mere assertion of a First Amendment interest is insufficient to establish irreparable harm for preliminary injunction purposes."  Response at 18 (citing Socialist Workers Party v. Att'y Gen. of U.S., 419 U.S. 1314, 1319 (1974); Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir. 1989)).  Secretary Oliver contends that, although the Libertarian Plaintiffs have suffered harm from Mr. Curtis garnering insufficient votes to qualify for the general election, "they have not plead sufficient concrete evidence that their First or Fourteenth Amendment rights were harmed by either voting machine errors or the cost determinations of a discretionary recount after all of the votes for the primary election were counted and certified once already."  Response at 19. Secretary Oliver argues that the Libertarian Plaintiffs' "conclusory assertions of harm and foul play and the inability to pay for" a recount are "not particularized as required to establish irreparable harm."  Response at 19.  Secretary Oliver asserts that, even if the Court determines that N.M. Stat. § 1-14-15(A) is unconstitutional, the Court cannot redress the Libertarian Plaintiffs' alleged injury, because the Libertarian Plaintiffs did not file a valid recount application.  See Response at 19.

33.    Last, Secretary Oliver argues that granting injunctive relief to the Libertarian Plaintiffs would irreparably harm New Mexico's regulatory interests and would be adverse to the public interest.  See Response at 19.  Secretary Oliver asserts that New Mexico has a "compelling interest in preserving the integrity of its election process."  Response at 19.  Secretary Oliver contends that, if the Court issues a TRO and orders her and the New Mexico State Canvassing

Board to conduct a recount without requiring the Libertarian Plaintiffs to pay sufficient funds to pay for the recount, New Mexico "would be responsible for paying at least $618,800, the cost of the requested discretionary recount."  Response at 19.  Secretary Oliver notes that this "astronomical cost[]" would affect New Mexico and New Mexico taxpayers, and that "federal courts have long held that the 'protection of the public fisc is a matter that is of interest to every citizen.'"  Response at 19-20 (quoting Brock v. Pierce Cty., 476 U.S. 253, 262 (1986)).  Secretary Oliver thus argues that the Court should deny the Motion and not issue a TRO.  See Response at 20.

### 3.      **The Friday, August 7, 2020, Hearing.**

34.     The Court held a hearing at 1:30 p.m. on Friday, August 7, 2020, and all parties appeared via Zoom.  See Aug. 7 Tr. at 1.  The Libertarian Plaintiffs argued that this case arises out of Secretary Oliver's "failure to count write in ballots," and they said that they have identified at least twenty-five or twenty-six voters who cast write-in ballots for Mr. Curtis, and "whose votes were not counted."  Aug. 7 Tr. at 3:14-18 (Wiest).  The Libertarian Plaintiffs noted that one of them -- Banks -- "know[s] that her vote was not counted because of an error."  Aug. 7 Tr. at 3:20-21 (Wiest).  The Libertarian Plaintiffs contended that their constitutional claims "all arise primarily form the failure to count appropriately these votes in the first place" and that, looking at relief, "a recount is one option."  Aug. 7 Tr. at 4:4-6 (Wiest).  The Court asked the Libertarian Plaintiffs what constitutional rights they are asserting.  See Aug. 7 Tr. at 4:8-11 (Court).  The Libertarian Plaintiffs said that one of the rights that they are asserting is the constitutional right of "qualified voters . . . to have their votes counted," which the Supreme Court upheld in Reynolds v. Sims. Aug. 7 Tr. at 4:16-17 (Wiest).  The Libertarian Plaintiffs also noted that, in United States v. Classic, the Supreme Court upheld the right of qualified voters to vote in their state's primary

elections and to have their votes counted.  See Aug. 7 Tr. at 4:17-23 (Wiest).  The Libertarian

Plaintiffs also said that they are asserting their constitutional rights to vote and to associate under

the First Amendment, as well as their constitutional rights under the Equal Protection Clause and

the Due Process Clause.  See Aug. 7 Tr. at 4:25-5:2 (Wiest).  The Libertarian Plaintiffs said that,

as to remedy, a recount might not be necessary, because each County produces tally sheets for

write-in votes, and "the tallies that have already been tallied may yield a sufficient result" to require

Secretary Oliver to add Mr. Curtis' name to the general election ballot.  Aug. 7 Tr. at 5:3-18

(Wiest).  Libertarian Plaintiffs said that, in Bernalillo County alone, there were over one-hundred

machine-counted absentee ballots in the Libertarian Party primary election, but Mr. Curtis

received zero votes, which suggests a "tally sheet issue" in Bernalillo County.  Aug. 7 Tr. at 6:2

(Wiest).  The Libertarian Plaintiffs noted that a recount is another option and that, in the Libertarian

Party primary election, approximately 1,570 voters cast ballots.  See Aug. 7 Tr. at 5:19-23 (Wiest).

35.     The Court said that it sounds like the Libertarian Plaintiffs are arguing that "there's

a constitutional right to make sure that the voting is done flawlessly and I'm not sure I'm seeing

that" in the caselaw.  Aug. 7 Tr. at 6:9-12 (Court).  The Court asked the Libertarian Plaintiffs to

point to evidence in the record that indicates that some votes for Mr. Curtis were not counted.  See

Aug. 7 Tr. at 6:12-13 (Court).  The Libertarian Plaintiffs noted that they filed a verified complaint

to which Banks attested and that Banks voted for Mr. Curtis in a County in which Secretary Oliver

later reported that Mr. Curtis received zero votes from voters who voted "in the method that

[Banks] voted in."  Aug. 7 Tr. at 6:19 (Wiest).  The Libertarian Plaintiffs also said that they are

currently obtaining twenty-five or twenty-six declarations from other voters who believe that their

votes were not counted for similar reasons.  See Aug. 7 Tr. at 6:19-24 (Wiest).  The Libertarian

Plaintiffs explained that there are several Counties in which Secretary Oliver reported that

Mr. Curtis received zero votes from voters who voted using a particular method, such as absentee ballots, but in which the Libertarian Plaintiffs have identified voters who voted for Mr. Curtis using the same method.  See Aug. 7 Tr. at 6:25-7:3 (Wiest).  The Libertarian Plaintiffs argued that "we're not dealing with one or two minor issues.  We're dealing with a systemic problem."  Aug. 7 Tr. at 7:4-5 (Wiest).

36.      The Court noted that, at the moment, the record indicates that one voter believes her vote was not counted.  See Aug. 7 Tr. at 7:6-9 (Wiest).  The Libertarian Plaintiffs asserted that Luchini has verified that "there were 270 votes cast for the Libertarian Party primary for Court of Appeals in Bernalillo County," that "Mr. Curtis is the only write-in candidate," and that Mr. Curtis "received zero" votes from the 170 absentee, machine-tallied votes.  Aug. 7 Tr. at 7:14-17 (Wiest).  The Libertarian Plaintiffs reiterated that there "is substantial evidence of votes not being counted appropriately," and that this issue is not limited to "one or two votes," but is rather a "systemic issue[]."  Aug. 7 Tr. at 7:18-22 (Wiest).  The Libertarian Plaintiffs argued that their Complaint -- which they filed under penalty of perjury in accordance with 28 U.S.C. § 1746 -- is verified and contains "competent evidence."  Aug. 7 Tr. at 7:22-8:1 (Wiest).  The Libertarian Plaintiffs noted that election officials identified a counting error in Los Alamos County, which they corrected before New Mexico certified the results, but that election officials did not correct counting errors in other counties.  See Aug. 7 Tr. at 8:2-7 (Wiest).  The Libertarian Plaintiffs argued that there is "substantial evidence of voters not having their votes counted," and they indicated that, if the Court grants their request for an evidentiary hearing on the preliminary injunction motion, which they plan to file, they will present "more robust evidence."  Aug. 7 Tr. at 8:11-18 (Wiest).

37.      The Court asked the Libertarian Plaintiffs if they still want the current hearing, because, if they do not want a TRO, then the Court could vacate the current hearing and schedule

a preliminary injunction hearing.  See Aug. 7 Tr. at 8:20-25 (Court).  The Libertarian Plaintiffs

said that "setting a preliminary injunction hearing may be the better course here so that [they] can

subpoena some witnesses," but they argued that "the record as it stands is sufficient to grant either

the TRO or the preliminary injunction."  Aug. 7 Tr. at 9:4-11 (Wiest).  The Court pressed the

Libertarian Plaintiffs to tell it what they want to do, see Aug. 7 Tr. at 9:12-16 (Court), and they

responded that they "would like the TRO if the court is willing to grant it," and that "setting this

for [a] preliminary injunction hearing in the very near future where [they] get subpoenas is the

relief [that they are] seeking today," Aug. 7 Tr. at 9:17-21 (Wiest).  The Court reiterated that the

current record indicates that two people believe that their votes were not counted.  See Aug. 7 Tr.

at 9:22-24 (Court).  The Libertarian Plaintiffs disagreed and said that "it's more than that."  Aug. 7

Tr. at 9:25-10:1 (Wiest).

> We know how many ballots were cast for the race in Bernalillo county there were
> 270 write-in votes for Libertarian Party for primary Court of Appeals.   We know
> Mr. Curtis was the only write-in candidate and he has not been counted with the
> credit of the votes in the counts.  We're not looking at one or two votes.  I think
> we're looking at a couple hundred votes.  And again I think the record is that we
> were just a handful short to begin with.

Aug. 7 Tr. at 10:1-10 (Wiest).

38.     The Court again asked the Libertarian Plaintiffs to articulate the constitutional right

that they are alleging Secretary Oliver has violated.  See Aug. 7 Tr. at 10:11-13 (Court).  The

Libertarian Plaintiffs said that they are asserting the "right to vote" and the "right to have that vote

counted."  Aug. 7 Tr. at 10:14-15 (Wiest).  The Libertarian Plaintiffs cited Reynolds v. Sims and

United States v. Classic again, as well as United States v. Mosley.  See Aug. 7 Tr. at 10:16-20

(Wiest).  The Libertarian Plaintiffs argued that the right to vote includes the right of qualified

voters to have their ballots counted and that, because there is "substantial evidence that has not

occurred here," the "question of remedy" emerges.  Aug. 7 Tr. at 10:24-11:1 (Wiest).  The Court asked the Libertarian Plaintiffs "what clause of the Constitution" is the right to have one's vote counted "rooted in."  Aug. 7 Tr. at 11:3-5 (Court).  The Libertarian Plaintiffs said that the right is rooted in the Equal Protection Clause, in the Due Process Clause, and in the First Amendment.  See Aug. 7 Tr. at 11:6-17 (Wiest, Court).  The Libertarian Plaintiffs noted that courts have upheld the right to have one's vote counted under the Due Process Clause of the Fourteenth Amendment in Griffin v. Burns and Marks v. Stinson.  See Aug. 7 Tr. at 11:17-23 (Wiest).  The Libertarian Plaintiffs said that the courts in Griffin v. Burns and Marks v. Stinson do not articulate whether the right to have one's vote counted is procedural or substantive due process right, but the Libertarian Plaintiffs argued that it "may be both" procedural and substantive.  Aug. 7 Tr. at 12:2 (Wiest).  The Libertarian Plaintiffs confirmed that Secretary Oliver's recount denial did not violate a constitutional right and that the recount issue relates only to the remedy for the constitutional violations they have alleged.  See Aug. 7 Tr. at 12:9-15 (Court, Wiest).

39.     Secretary Oliver countered that the Libertarian Plaintiffs "have not met the burden of clear and unequivocal showing of evidence of the four elements that are needed to prevail," and to obtain a TRO or preliminary injunction.  Aug. 7 Tr. at 13:11-13 (Lange).  Secretary Oliver said that she would like to make several arguments and present testimony from the New Mexico Elections Director "regarding the long history and rich law that we have statutorily in the state to protect the right" to vote.  Aug. 7 Tr. at 13:18-19 (Lange).  Secretary Oliver said that she believed that she "needed to present evidence at this particular time because the remedy and the stakes of this case are so high."  Aug. 7 Tr. at 14:19-21 (Lange).  Secretary Oliver said that she will outline New Mexico's voting protections, and she says that she "question[s] why plaintiffs are in this court to begin with if the remedy itself . . . is to command a state officer to comply with state law" and

- 50 -

to compel the New Mexico State Canvassing Board to order a recount.  Aug. 7 Tr. at 14:25-15:5 (Lange).  Secretary Oliver argued that the Court first must decide whether it has jurisdiction to compel her and the New Mexico State Canvassing Board to order a recount.  See Aug. 7 Tr. at 15:5-8 (Lange).  Secretary Oliver noted that the Complaint mainly focuses on New Mexico law's recount provision and the New Mexico State Canvassing Board's recount cost determinations, and she argued that "it is interesting that" the Libertarian Plaintiffs only highlight the right to vote.  Aug. 7 Tr. at 15:12 (Lange).

40.     The Court said that it is "not sure what the jurisdiction argument is," because, although the Court has not yet determined whether the Libertarian Plaintiffs have identified a recognized constitutional right, the Libertarian Plaintiffs have alleged a violation of a federal right, and, thus, it is unclear what would deprive the Court of jurisdiction.  Aug. 7 Tr. at 15:21-22 (Court).  Secretary Oliver said that the Court has jurisdiction over the Libertarian Plaintiffs' alleged constitutional violations only if the Libertarian Plaintiffs establish that they have standing.  See Aug. 7 Tr. at 16:8-12 (Lange).  Secretary Oliver said that, on page ten of the Response, she argues that there is no redressability that the Court can grant, because the Libertarian Plaintiffs did not apply timely for a recount or submit a sufficient cash bond to pay for a recount.  See Aug. 7 Tr. at 16:22-17:1 (Lange).  Secretary Oliver argued that, even if the Court concludes that she violated the Libertarian Plaintiffs' Constitutional rights, the Libertarian Plaintiffs did not properly apply for a recount, and the Court does not have jurisdiction to determine whether she correctly applied New Mexico law when she denied the Libertarian Plaintiffs' recount application.  See Aug. 7 Tr. at 17:7-15 (Lange).  Secretary Oliver contended that the Libertarian Plaintiffs "haven't showed standing in this case because they [did not] abide properly under the statutory" recount provision. Aug. 7 Tr. at 17:19-20 (Lange).

41.     The Court said that it is "uncomfortable with saying that the state of New Mexico or any other state can tell federal courts that there are prerequisites of bringing a [42 U.S.C. §] 1983 action for violation of federal constitutional rights."  Aug. 7 Tr. at 17:23-18:2 (Court).  The Court acknowledged that abstention doctrines could warrant sending some cases to state court but that the Court is "not seeing the standing or the Article III issues" that Secretary Oliver raises.  Aug. 7 Tr. at 18:5-6 (Court).  Secretary Oliver argued that the Libertarian Plaintiffs' claims implicate a "statutory discretionary right to a recount," but their claims "haven't implicated an actual constitutional violation."  Aug. 7 Tr. at 18:16-19 (Lange).  The Court noted that the Libertarian Plaintiffs' "major premise . . . is that they have a constitutional right to have their votes counted."  Aug. 7 Tr. at 18:21-23 (Court).  The Court asked Secretary Oliver whether it would violate the Constitution if she "didn't count the Republican votes in the presidential election," Aug. 7 Tr. at 18:24-25 (Court), and Secretary Oliver responded affirmatively, see Aug. 7 Tr. at 19:2 (Lange).  The Court then asked Secretary Oliver if not counting votes -- whether one vote or a million votes -- would violate the Constitution.  See Aug. 7 Tr. at 19:6-8 (Court).  Secretary Oliver conceded that the "claim definitely stands for itself," but she argued that New Mexico is "just as much interested in the remedy" as it is in "finding a violation," and she added that it is "hard . . . to separate the claim to remedy and the basis for this claim as pled," because Mr. Curtis' campaign incorrectly applied for a recount.  Aug. 7 Tr. at 19:9-17 (Lange).  Secretary Oliver said that New Mexico law allows for candidates to request a discretionary recount, and it also permits candidates to "bring an election challenge," which the Libertarian Plaintiffs have not done.  Aug. 7 Tr. at 20:4-5 (Lange).  Secretary Oliver stressed that the "remedy is very, very concerning" to her, because the general election is approaching.  Aug. 7 Tr. at 20:10-11 (Lange).

42.     The Court asked Secretary Oliver to describe the time constraints and deadlines that her office and New Mexico face with respect to preparing and printing the ballots.  See Aug. 7 Tr. at 20:14-17 (Court).  Secretary Oliver said that N.M. Stat. Ann. § 1-10-4(B) requires her to send ballots "to the printer" sixty days before the election, which is around September 1, 2020.  Aug. 7 Tr. at 20:20-21 (Lange).  Secretary Oliver also said that federal law also requires that her office send ballots in advance to over-seas voters and voters who are in the military.  See Aug. 7 Tr. at 21:1-5 (Lange).  Secretary Oliver argued that the remedy "has to be tethered to the violation" and that there is "no other provision in the election code . . . that would command some sort of recount if plaintiffs haven't followed the" recount provision.  Aug. 7 Tr. at 21:8-11 (Lange).  Secretary Oliver contended that the Libertarian Plaintiffs' invalid recount application impacts their standing, because the remedy they seek is not available.  See Aug. 7 Tr. at 21:14-18 (Lange).  Secretary Oliver asserted that, although "[i]t is true that the right to vote necessarily includes the right to have their vote counted as plaintiffs contend," "the right to have one's [vote] counted does not . . . encompass to have the right verified to a federally ordered recount pursuant to state law."  Aug. 7 Tr. at 21:20-25 (Lange).  Secretary Oliver argued that "the Supreme Court has explained that there must be substantial regulation of elections if they are to be fair and honest and [promote] some sort of order rather than chaos is to accompany the democratic process.  The recount process impose[s] such burden on an individual's right to vote."  Aug. 7 Tr. at 21:6-11 (Lange).  Secretary Oliver said that New Mexico has "extensive laws" that regulate candidates, election day, and the canvassing of election results.  Aug. 7 Tr. at 21 (Lange).  Secretary Oliver noted that, in the Complaint, the Libertarian Plaintiffs question the recount cost determinations and that the Libertarian Plaintiffs "believ[e] that because there's less Libertarian voters their costs should be limited," which indicates that the Libertarian Plaintiffs misunderstand "what New Mexico law

requires." Aug. 7 Tr. at 23:2-6 (Lange). According to Secretary Oliver, "the canvas is done at the precinct level . . . and then the county performs the canvas" at the County level. Aug. 7 Tr. at 23:7-9 (Lange).

43. The Court said that it is concerned that, if New Mexico has not counted all votes in an election, a candidate would have to pay over $3,500,000.00 to compel a recount. See Aug. 7 Tr. at 23:10-20 (Court). Secretary Oliver said that New Mexico has a "robust automatic recount" provision, and that recounts include a precinct canvas, followed by a County canvas and then a State canvas, along with an "independent auditor that also looks at the results before the results are certified." Aug. 7 Tr. at 23:23-24:1 (Lange). Secretary Oliver noted that automatic recounts are triggered when the margin of votes between a winning candidate and the next candidate is very slim, and that New Mexico pays for automatic recounts. See Aug. 7 Tr. at 24:2-12 (Lange). The Court returned to its hypothetical about not counting Republican votes and said that "it doesn't seem . . . that it's a remedy to say, well, if you want them counted, it's $3.5 million" -- "whether it's one or a million votes, it just doesn't seem to me that's a response." Aug. 7 Tr. at 25:3-7 (Court). Secretary Oliver noted that recounts are not the only recourse in such a situation, because candidates can also contest election results under New Mexico law by filing a complaint in state district court "if you believe that your votes weren't counted," and she added that an "election contest allows there to be another election." Aug. 7 Tr. at 25:16-18 (Lange). Secretary Oliver argued that the Libertarian Plaintiffs "could have availed themselves of an election contest if they so desired in state court" by pursuing "the avenue that the legislature" has afforded candidates to contest election results. Aug. 7 Tr. at 25:25-26:5 (Lange).

44. The Court acknowledged that New Mexico law's election regulations might provide candidates with adequate means to contest elections, but the Court said that it is unaware

of any legal doctrine "that says I should just tell [the Libertarian Plaintiffs] that their remedies are in state court when there's a violation of a [federal] constitutional right." Aug. 7 Tr. at 26:13-15 (Court). Secretary Oliver noted that, if the Libertarian Plaintiffs first filed a complaint in state court, Ex Parte Young would apply. See Aug. 7 Tr. at 26:18-27:1 (Lange). Secretary Oliver said that it is not the defendant's burden to articulate its interest or to articulate that a constitutional violation has occurred, and she argued that the Court should apply a "way less exacting review" to New Mexico's discretionary recount provision. Aug. 7 Tr. at 27:8 (Lange). See id. at 27:2-22 (Lange). The Court asked Secretary Oliver whether her answers would "be the same if" Alabama election officials refused to count African-Americans' votes in an election and told candidates challenging such a practice that they would have to follow state law procedures to challenge the practice. Aug. 7 Tr. at 27:23-24 (Court). Secretary Oliver said that, in the Court's Alabama hypothetical, plaintiffs could challenge the constitutionality of such a practice if they can make "a clear and unequivocal showing of evidence showing that votes weren't counted." Aug. 7 Tr. at 28:10-12 (Lange). Secretary Oliver argued, however, that the Libertarian Plaintiffs have not made such a showing and instead make broad allegations of "systemic failure" with voting machines and counting ballots. Aug. 7 Tr. at 28:24 (Lange). Secretary Oliver noted that the Libertarian Plaintiffs say that they may obtain affidavits from other voters before the preliminary injunction hearing, "but at this particular time they don't have it and they had an opportunity to do it." Aug. 7 Tr. at 29:4-5 (Lange). Secretary Oliver further argued that counting write-in votes under N.M. Stat. Ann. § 1-1-5.2 is "much different than African-American votes in Alabama." Aug. 7 Tr. at 29:11-12 (Lange). Secretary Oliver said that discerning "the intent of the voter" is "key" to counting write-in ballots and that write-in ballots are "handled consistently throughout"

the state in accordance with New Mexico law and with guidance that she issues to County Clerks. Aug. 7 Tr. at 29:19-30:4 (Lange).

45.      Secretary Oliver contended that the Court's Alabama hypothetical is not applicable to this case and that, if a plaintiff alleges a constitutional violation and supports the claim with adequate evidence, "the case can move[] forward and move to the preliminary injunction." Aug. 7 Tr. at 30:10-11 (Lange). Secretary Oliver asserted that the Libertarian Plaintiffs have had time to gather evidence, but "still have none," even though they believe that additional evidence exists, and they thus seek to haul her and her office into another hearing. Aug. 7 Tr. at 30:13 (Lange). According to Secretary Oliver, a "write-in voter would never know whether their vote was qualified or not pursuant to [N.M. Stat. Ann. §] 1-1-5.2 because of the inherent nature of the election [in] which ballots are separated from the voter and especially absentee voters." Aug. 7 Tr. at 30:18-22 (Lange). Secretary Oliver said that voters submit ballots using an outer envelope which identifies the voter, and the outer envelope is later separated from the inside ballot "to protect the privacy of the ballot." Aug. 7 Tr. at 31:1-2 (Lange).

46.      The Court asked whether there is any evidence in the record to support two allegations in the Complaint and in the Motion: (i) "[t]he counting errors that the Los Alamos County voting machines experienced permeated throughout the state"; and (ii) "Secretary Oliver did not direct New Mexico county clerks to recount ballots even though she was aware that voting machine errors throughout the state caused machines to undercount Mr. Curtis' votes." Aug. 27 Tr. at 31:9-15 (Court). Secretary Oliver said there is "[a]bsolutely" no evidence to support either allegation, and she argued that "it is very irresponsible to make such a claim without evidence." Aug. 27 Tr. at 31:17-19 (Lange). Secretary Oliver also argued that there is no evidence supporting that voting machines experienced errors. See Aug. 7 Tr. at 32:1-2 (Lange). She noted that, under

New Mexico law, Mr. Curtis and Luchini could "gather evidence to be in the room" during canvassing of votes to observe the process if they thought there were machine errors. Aug. 7 Tr. at 32:3-4 (Lange). Secretary Oliver also said that machine write-in votes are hand-tallied, and she argued that "the machines worked fine and there is no evidence in the record that alleges anything else or proves anything else." Aug. 7 Tr. at 32:12-14 (Lange).

47. Secretary Oliver next argued that, even if there has been a constitutional violation, the Court should apply "a less exacting [re]view because" the discretionary recount provision is reasonable and non-discriminatory. Aug. 7 Tr. at 32:25-33:2 (Lange). Secretary Oliver said that the Libertarian Plaintiffs have notice of the recount cost determinations. See Aug. 7 Tr. at 33:4-11 (Lange). Secretary Oliver emphasized that the election code and the Office of the Secretary of State of New Mexico's purpose "is to ensure uniformity and the integrity of the ballot." Aug. 7 Tr. at 33:17-18 (Lange)(citing N.M. Stat. Ann. §§ 1-1-1.1 and 1-2-1). Secretary Oliver argued that New Mexico has

> a long and dedicated and extensive law here in New Mexico and to throw that out and to subject the secretary of state[']s office and the State of New Mexico to conduct a recount statewide or otherwise would be very troubling for the future of how the New Mexico can handle elections and the general election in 2020 that would subject the secretary of state[']s office to unrelenting sore loser challenges. And the expense of that would be to the public, the State of New Mexico.

Aug. 7 Tr. at 34:4-12 (Lange).

48. Secretary Oliver then offered Vigil, the New Mexico State Election Director for the Office of the Secretary of State of New Mexico, as a witness. See Aug. 7 Tr. at 34:14-35:4 (Lange, Court, Vigil). Vigil said that she has worked for the Office of the Secretary of State of New Mexico for nine years, and her job duties include overseeing the New Mexico Bureau of Elections, "which is responsible for administering the election code." Aug. 7 Tr. at 35:10-11 (Vigil). Vigil testified

- 57 -

that she has participated in ten statewide canvasses, and that, during statewide canvasses, the New Mexico Bureau of Elections receives election results from New Mexico Counties, audits the results, enlists an independent auditor to review the results, and then certifies the results and presents a report to the New Mexico State Canvassing Board.  See Aug. 7 Tr. at 35:19-36:5 (Vigil, Lange).  Vigil testified that the Recount Cost Determinations document is on the Office of the Secretary of State of New Mexico's website and that its purpose is to provide notice to candidates about the costs for conducting a recount.  See Aug. 7 Tr. at 37:19-22 (Vigil).  The Court admitted the Recount Cost Determinations document into evidence and marked it as Defendant's Hearing Exhibit A.  See Aug. 7 Tr. at 37:13-16 (Court).  Vigil said that the Recount Cost Determinations document "provides an estimate of the minimum cost to conduct an election, and it is . . . broken up by precinct as required by state law."  Aug. 7 Tr. at 38:7-10 (Vigil).  Vigil testified that the estimated figures are "reasonable costs," because they are based on: (i) "what [New Mexico has] paid for an election"; (ii) "programming costs which are brought through a vendor"; and (iii) the cost to employ five election officials who oversee the recount.  Aug. 7 Tr. at 38:15-23 (Vigil).  Vigil testified that, on election night, the Office of the Secretary of State of New Mexico website posts "unofficial results" for an election, which do not become official until the statewide canvass is complete.  Aug. 7 Tr. at 38:24-39:16 (Lange, Vigil).  Vigil said that the unofficial results sometimes change during the canvas, which "provides for an opportunity for the election administrators to review all of the returns and to ensure that there's an appropriate accounting of ballots and results."  Aug. 7 Tr. at 39:19-22 (Vigil).

49.     Vigil testified that, during the primary elections, she received no complaints about voting machine errors.  See Aug. 7 Tr. at 40:5-8 (Lange, Vigil).  Vigil said, however, that the Los Alamos County Clerk raised concerns about "some outreach done by the canvassing team."  Aug. 7

Tr. at 40:12-13 (Vigil).  According to Vigil, the issue involved training election officials on "the necessary requirement to hand tally write-in votes," so she followed up with the Los Alamos County Clerk and vendors to resolve the issue, and the Los Alamos County Clerk ultimately provided the state canvassing team "with the necessary hand tallies, and they had entered as required those results into the state wide system."  Aug. 7 Tr. at 40:24-41:1 (Vigil).  Vigil testified that she reviewed all inquiries across the State and determined that the training issue was "isolated within" Los Alamos County.  Aug. 7 Tr. at 41:13 (Vigil).  Vigil said that the training issue in Los Alamos County did not affect write-in vote counting.  See Aug. 7 Tr. at 41:18-21 (Lange, Vigil).  Vigil testified that she did not receive any other concerns about voting issues.  See Aug. 7 Tr. at 41:22-42:6 (Lange, Vigil).  Vigil said that the Office of the Secretary of State of New Mexico provides New Mexico County Clerks with guidance about "what constitutes a vote" and about "qualifying write-in votes."   Aug. 7 Tr. at 42:8-12 (Lange).  See id. at 42:7-21 (Lange, Vigil).  Vigil testified that, if you cast a vote for a write-in candidate in the New Mexico primary elections, there is no way to determine if your vote was "qualified" or counted, because "once the ballot is inserted into the tabulator it is no longer associated with a voter.  And that's very specific to protect the [secrecy] of the ballot."  Aug. 7 Tr. at 42:21-43:9 (Lange, Vigil).

50.     The Libertarian Plaintiffs asked Vigil whether the precinct board members who conduct a recount for a precinct often serve as precinct board members for other precincts in the same County, and Vigil said that assigning board members to precincts is "at the discretion of the county clerk and that is something they would have to determine based on the recount."  Aug. 7 Tr. at 43:24-44:13 (Wiest, Vigil).  Vigil testified that the programming costs for a recount are entirely separate from the programming costs associated with the initial vote count, because the programming "that's required [is] detailed and technical and it's essentially an entirely separate

election."  Aug. 7 Tr. at 45:7-9 (Vigil).  Asked about what programming is associated with

conducting a recount of write-in votes, Vigil said that write-in vote recounts entail "programming

required to ensure that ballot[s] can be read by a machine, that cards are programmed to read them

valid[ly] and in this case, it was asked for a state recount so that is essentially a Libertarian

statewide election."  Aug. 7 Tr. at 45:12-17 (Vigil).  Vigil testified that write-in ballots for

Libertarian Party candidates are not segregated from other ballots during a recount, because such

ballots are spread out in ballot boxes, or tabulators, across the state.  See Aug. 7 Tr. at 45:18-46:6

(Wiest, Vigil).  According to Vigil, segregating out write-in ballots for Libertarian Party candidates

would require reopening each ballot box that contains at least one ballot for a Libertarian Party

candidate and "search[ing] through all ballots that were submitted through that one machine."

Aug. 7 Tr. at 46:20-21 (Vigil).

    51.    Turning to the Los Alamos County training error, Vigil confirmed that, before the

error was detected, some votes for Mr. Curtis in Los Alamos County had not been counted.  See

Aug. 7 Tr. at 46:25-47:4 (Wiest, Vigil).  Vigil testified that, after the Los Alamos County training

error was detected, she did not email other County Clerks to ask whether their Counties had

experienced the same training error.  See Aug. 7 Tr. at 47:10-15 (Wiest, Vigil).  Vigil testified that

she met with a vendor who trains election officials, and they concluded that the training error was

limited to Los Alamos County.  See Aug. 7 Tr. at 47:16-48:4 (Wiest, Vigil).  The Libertarian

Plaintiffs asked Vigil whether, if a County reports that a candidate received zero absentee votes in

the County, a voter in that County who knows that he or she voted via absentee ballot for that

candidate could thus conclude that his or her vote was not counted.  See Aug. 7 Tr. at 48:22-49:2

(Wiest).  Vigil said that a voter cannot determine whether his or her vote has been qualified,

because a "ballot is not tied to a specific voter," but she conceded that, if a voter knows that he or

she voted for a candidate in a County, and the County reports that the candidate received zero votes, the voter could conclude that his or her vote was not counted.  Aug. 7 Tr. at 49:11-12 (Vigil). See id. at 49:13-16 (Wiest, Vigil).

52.    Vigil testified that, when a voting machine scans an absentee ballot that contains a vote for a write-in candidate, the voting machine flags the ballot, which is then sent to an election worker who "complete[s] a handwritten tally sheet."  Aug. 7 Tr. at 50:1 (Vigil).  Vigil said that County Clerks submit handwritten tally sheets from each precinct to the New Mexico State Canvassing Board to review.  See Aug. 7 Tr. at 50:2-19 (Wiest, Vigil).  Vigil testified that all tally sheets had been "accounted for."  Aug. 7 Tr. at 50:25 (Vigil).  The Libertarian Plaintiffs asked Vigil why the Bernalillo County website indicates that 270 votes were cast in the Libertarian Party primary election for the Court of Appeals of New Mexico -- 170 of which were absentee write-in ballots -- and that Mr. Curtis received zero votes from the 170 absentee ballots.  See Aug. 7 Tr. at 52:10-14 (Wiest).  Vigil responded that she does not "have any of that information," and that the Libertarian Plaintiffs probably would have to ask the Bernalillo County Clerk or a Bernalillo County election official to find an answer to their question.  Aug. 7 Tr. at 52:15 (Vigil).  See id. at 52:15-20 (Wiest, Vigil).  Vigil testified that she has not verified with County Clerks aside from the Los Alamos County Clerk whether their Counties experienced training errors similar to the one in Los Alamos County, because "[t]here was no reason to believe" the training error extended beyond Los Alamos County.  Aug. 7 Tr. at 53:5 (Vigil).  Vigil said that the Office of the Secretary of State of New Mexico receives recount applications and helps facilitate recounts, but the New Mexico State Canvassing Board is responsible for ordering the recount.  See Aug. 7 Tr. at 53:7-25 (Wiest, Vigil).

53.     Vigil testified that, of Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County, all use a high-speed scanner to count ballots except for Chaves County, and they "have been utilizing [high-speed scanners] for several elections and training and the process related to hand tallies has not changed in that window of time."  Aug. 7 Tr. at 55:6-9 (Vigil).  Vigil reiterated that the New Mexico State Canvassing Board was able to resolve the training error in Los Alamos County during the statewide canvas.  See Aug. 7 Tr. at 55:10-13 (Lange, Vigil).  Finally, Vigil testified that New Mexico's election laws and processes are designed to protect individuals' right to vote.  See Aug. 7 Tr. at 55:14-16 (Lange, Vigil).

54.     Secretary Oliver argued that New Mexico laws protect the right to vote, and that the training error in Los Alamos County was limited and not systemic.  See Aug. 7 Tr. at 56:19-24 (Lange).  Secretary Oliver contended that the Libertarian Plaintiffs "clearly and unequivocally haven't provided any evidence" to support their claims.  Aug. 7 Tr. at 57:3-4 (Lange).  Secretary Oliver asserted that the Libertarian Plaintiffs allege "metaphysical beliefs" that some votes for Mr. Curtis were not counted, but Vigil's testimony establishes that a voter who casts a write-in vote cannot determine whether his or her vote was qualified.  Aug. 7 Tr. at 57:5 (Lange).  Secretary Oliver argued that the Libertarian Plaintiffs have not satisfied their burden of proving a substantial likelihood of success on the merits.  See Aug. 7 Tr. at 57:9-12 (Lange).  Secretary Oliver noted that the Libertarian Plaintiffs tether their claims to the constitutional right to vote, and Secretary Oliver asserted that "candidates [for] office [] don't have a constitutional right to be voted for." Aug. 7 Tr. at 57:17-19 (Lange).  Secretary Oliver reiterated that New Mexico law's discretionary recount provision is reasonable and non-discriminatory, and that Mr. Curtis is not entitled to pay less than other political parties' candidates on the basis that the Libertarian Party is smaller than

other parties.  See Aug. 7 Tr. at 57:23-58:11 (Lange).  Secretary Oliver again said that standing is questionable, because she does not "believe that there's been a constitutional claim pled in this case."  Aug. 7 Tr. at 58:15-16 (Lange).  Secretary Oliver noted that there is no constitutional right to a recount and that the discretionary recount provision does not implicate the right to vote or any rights under the First and Fourteenth Amendments.  See Aug. 7 Tr. at 58:19-59:1 (Lange). Secretary Oliver argued that unofficial results on the Office of the Secretary of State of New Mexico website are always subject to change and that, although she cannot speak to statistics posted on Bernalillo County's website, there is no evidence in the record about Bernalillo County. See Aug. 7 Tr. at 59:7-11 (Lange).

55.     Secretary Oliver averred that the Libertarian Plaintiffs are requesting a vote recount, even though the Libertarian Plaintiffs did not comply with the discretionary recount provision and have not established a violation of a constitutional right.  See Aug. 7 Tr. at 59:12-17 (Lange).  Secretary Oliver then summarized the evidence in the record that undermines the Libertarian Plaintiffs' claims: (i) there is testimony "that there was no widespread fraud"; (ii) the training error in Los Alamos County was "limited to Los Alamos"; (iii) the Office of the Secretary of State of New Mexico "provides guidance on how to count a write-in vote during an election and during a primary election"; and (iv) the Libertarian Plaintiffs did not file this case until about thirty days after the Secretary Oliver's office certified the results, and the Libertarian Plaintiffs "could have started developing their case then."  Aug. 7 Tr. at 59:18-60:5 (Lange).  Secretary Oliver noted that, in the Complaint, the Libertarian Plaintiffs expressed concern "about the election starting on election night," but they nevertheless "procrastinate[d]" and did not request to observe the vote canvas process.  Aug. 7 Tr. at 60:7-11 (Lange).  Secretary Oliver argued that a TRO and preliminary injunction are unwarranted, because the Libertarian Plaintiffs have not offered any

evidence to support their "unsubstantiated constitutional claims."  Aug. 7 Tr. at 60:23-24 (Lange).

Secretary Oliver noted that the discretionary recount provision has been "litigated multiple times

in State court," but "they have never had a problem with" the provision.  Aug. 7 Tr. at 61:5-7

(Lange).  Secretary Oliver asserted that the discretionary recount provision is reasonable, because

a recount election "constitute[s] a whole new election for the State of New Mexico and that's why

the costs are so much."  Aug. 7 Tr. at 61:11-13 (Lange).  Secretary Oliver said that the most recent

election cost $6,000,000.00 to conduct and that the recount that the Libertarian Plaintiffs request

is essentially a statewide recount.  See Aug. 7 Tr. at 61:14-16 (Lange).  Secretary Oliver argued

that a vote recount is a "privilege under state law and not a federally constituted right."  Aug. 7 Tr.

at 61:19-20 (Lange).  Secretary Oliver said that she would like the Court to issue an opinion soon,

because "[t]ime is of the essence."  Aug. 7 Tr. at 62:2-3 (Lange).

56.     The Libertarian Plaintiffs countered Secretary Oliver's assertion that they should

have contested the election results, by arguing that they are not contesting the winner of an election,

but, rather, the "qualification for the general election."  Aug. 7 Tr. at 62:16-17 (Wiest).  The

Libertarian Plaintiffs said that there is no state court proceeding pending in state court, so Younger

v. Harris, 401 U.S. 37 (1971)("Younger"), abstention does not apply.  See Aug. 7 Tr. at 62:19-21

(Wiest).  The Libertarian Plaintiffs argued that they have standing, because their Complaint alleges

a particularized injury that the Court can redress, see Aug. 7 Tr. at 62:20-63:2 (Wiest)(citing Lujan

v. Defs. of Wildlife, 504 U.S. 555 (1992)), and that the Court has jurisdiction under 42 U.S.C.

§ 1983 and 28 U.S.C. § 1331, see Aug. 7 Tr. at 63:3-6 (Wiest).  The Libertarian Plaintiffs next

argued that the Eleventh Amendment does not bar their claims, because they are not seeking to

compel New Mexico to enforce its own statutes, but, rather, they are "challenging the application

and constitutionality of the" discretionary recount provision, so New Mexico is not immune under

Ex Parte Young.  Aug. 7 Tr. at 63:9-10 (Wiest).  The Libertarian Plaintiffs argued that "it's almost absurd that you somehow have to comply with a procedure that you're contesting to have standing."  Aug. 7 Tr. at 63:17-19 (Wiest).  The Libertarian Plaintiffs argued that it is "a problem" that training errors were identified in Los Alamos County, but Vigil did not email other County Clerks to ensure that their counties did not experience or detect the same error.  Aug. 7 Tr. at 64:7 (Wiest).  The Libertarian Plaintiffs also argued that "the evidence from the Bernalillo County website was put in the record by verified complaint and its competent evidence that the website was what it was and it revealed what it revealed."  Aug. 7 Tr. at 64:12-15 (Wiest).

57.     The Libertarian Plaintiffs argued that the discretionary recount provision burdens them with paying over $3,500,000.00 to request a recount and that the Supreme Court has held that governments "cannot condition fundamental rights on fees."  Aug. 7 Tr. at 65:11-12 (Wiest)(citing Anderson v. Celebrezze, 460 U.S. 780; Lubin v. Panish, 415 U.S. 709; Morse v. Republican Party, 517 U.S. 186).  The Libertarian Plaintiffs noted that Banks voted for Mr. Curtis, and they argue that her vote was not counted, which violates her right to vote and her associational rights under the First Amendment.  The Court said that there is no constitutional right to a recount, but there is a right to vote and to have one's vote counted, and, thus, States do not have to implement recount procedures.  See Aug. 7 Tr. at 66:7-14 (Court).  The Libertarian Plaintiffs agreed, and they argued that federal courts can order a recount, and, thus, their recount arguments address the remedy.  See Aug. 7 Tr. at 66:15-20 (Wiest).  The Court asked whether the cost of a discretionary recount -- whether $1.00 or $10,000,000.00 -- matters, because States do not have to permit discretionary recounts.  See Aug. 7 Tr. at 66:21-25 (Court).  The Libertarian Plaintiffs said that States are "allowed to do that," but they argued that, if States do not count all votes and thus violate individuals' right to vote, a court may order a recount as the proper remedy.  Aug. 7 Tr.

at 67:2 (Wiest).  The Libertarian Plaintiffs' counsel also said that he represented a candidate in a recent federal case in which the court ordered that the candidate be placed on the ballot as the remedy.  See Aug. 7 Tr. at 67:7-16 (Wiest).

58.     The Court noted that the Recount Cost Determinations document does not appear to be "discriminatory or preferential or arbitrary," and it asked the Libertarian Plaintiffs if they agree.  Aug. 7 Tr. at 67:19-20 (Court).  The Libertarian Plaintiffs said that they disagree with the Court's characterization, because the non-nominal bond requirement is "inherently suspect."  Aug. 7 Tr. at 68:1 (Wiest).  The Libertarian Plaintiffs noted that the Supreme Court has held that "in the absence of reasonable alternative means of ballot [access] the state may not consistent with constitutional standards require from the individual candidate filing fees" that he cannot pay.  Aug. 7 Tr. at 68:7-10 (Wiest)(citing Lubin v. Panish, 415 U.S. at 719).  The Libertarian Plaintiffs argued that the bond requirement is "enormous" and that it affects the right to vote and to have one's vote counted.  Aug. 7 Tr. at 68:11 (Wiest).  The Libertarian Plaintiffs argued that the bond requirement is discriminatory, because it is "beyond the means of any reasonable person."  Aug. 7 Tr. at 69:3-4 (Wiest).  According to the Libertarian Plaintiffs, "what makes [the discretionary recount provision] unconstitutional" is that it "imping[es] on fundamental rights and specifically the right to vote."  Aug. 7 Tr. at 69:20-23 (Wiest).  The Libertarian Plaintiffs argued that courts have repeatedly held that cost-based requirements for a candidate to run for office do not promote a sufficient state interest.  See Aug. 7 Tr. at 69:23-70:16 (Wiest)(citing Belitskus v. Pizzingrilli, 343 F.3d 632; United Utah Party v. Cox, 268 F. Supp. 3d 1227).  The Libertarian Plaintiffs then summarized the evidence that supports their claims: (i) they are certain that Banks' vote for Mr. Curtis was not counted; (ii) Vigil did not ensure that Counties other than Los Alamos County had not experienced errors similar to the errors that the Los Alamos County Clerk detected;

(iii) they believe there are other voters whose votes were not counted, and they are currently trying to obtain declarations from twenty to thirty-five voters who believe their votes for Mr. Curtis were not counted; and (iv) 170 absentee ballots Libertarian Party primary election for the Court of Appeals of New Mexico in Bernalillo County yielded zero votes for Mr. Curtis, even though he was the only Libertarian Party candidate for that position.  See Aug. 7 Tr. at 70:17-71:7 (Wiest).  The Libertarian Plaintiffs said that they would like to subpoena elections officials from several New Mexico Counties to testify.  See Aug. 7 Tr. at 71:7-10 (Wiest).  The Libertarian Plaintiffs argued that the Court has considerable discretion in fashioning a remedy if the Court concludes that Secretary Oliver has violated the Libertarian Plaintiffs' constitutional rights.  See Aug. 7 Tr. at 71:11-16 (Wiest).  The Libertarian Plaintiffs said that the Court could order a recount or the Court could order some County Clerks to produce ballots that are in issue and, if necessary, the Court could order that Mr. Curtis' name be added to the general election ballot.  See Aug. 7 Tr. at 71:16-22 (Wiest).  The Libertarian Plaintiffs argued that they have made a sufficient showing that their Constitutional rights have been violated such that the Court should grant them injunctive relief.  See Aug. 7 Tr. at 71:22-72:2 (Wiest).

59.     The Libertarian Plaintiffs said that they would like the Court to hold an evidentiary hearing on their preliminary injunction request by August 17, 2020, which would give them time to subpoena potential witnesses for the hearing.  See Aug. 7 Tr. at 74:16-75:2 (Wiest).  Secretary Oliver said that New Mexico will finalize the ballot around September 1, 2020, and that it takes about two weeks to finalize the ballot, so setting the preliminary injunction hearing for Monday, August 17, 2020, should work.  See Aug. 17 Tr. at 76:14-77:19 (Lange).  Secretary Oliver said that this date would give her and her office two weeks to finalize the ballots before printing them.  See Aug. 7 Tr. at 77:5-18 (Lange).  The Court said that it will not rule on the TRO request at the

moment and instead will take it under advisement.  See Aug. 7 Tr. at 79:10-13 (Court).  The Court

further said that it would issue an opinion on the Libertarian Plaintiffs' TRO request by 2:00 p.m.

MDT -- or 4:00 p.m. EDT -- on Friday, August 14, 2020, so the parties will have the weekend to

process the Court's reasoning and shape their arguments before the preliminary injunction hearing

on Monday, August 17, 2020.  See Aug. 7 Tr. at 79:2-7 (Court).  The Libertarian Plaintiffs said

that this date will give them time to subpoena County Clerks to testify.  See Aug. 7 Tr. at 80:4-7

(Wiest).  The hearing ended at 3:46 p.m.  See Aug. 7 Tr. at 83:24.

     **4.**     **The Reply.**

     60.     On August 12, 2020, the Libertarian Plaintiffs replied to the Response.  See

Plaintiffs' Reply in Support of their Emergency Motion for Temporary Restraining Order and/or

Preliminary Injunction with Verified Complaint in Support at 1, filed August 12, 2020

(Doc. 14)("Reply").  The Libertarian Plaintiffs argue that, contrary to Secretary Oliver's

characterization, this case is not "about New Mexico's recount law," but rather, "[t]his case is

about the failure of New Mexico officials to appropriately count the absentee and write-in ballots

for Mr. Curtis."  Reply at 1.  The Libertarian Plaintiffs reiterate that the "'right to have one's vote

counted' is of the same importance as 'the right to put a ballot in a box.'"  Reply at 1 (quoting

United States v. Mosley, 238 U.S. at 386, and citing United v. Classic, 313 U.S. 299; Swafford v.

Templeton, 185 U.S. 487 (1902); Wiley v. Sinkler, 179 U.S. 58; Ex Parte Yarbrough, 110 U.S.

651 (1884)).  According to the Libertarian Plaintiffs, the "*right to vote is protected against the

diluting effect of ballot-box stuffing*."  Reply at 1 (citing United States v. Saylor, 322 U.S. 385

(1944); Ex Parte Siebold, 100 U.S. 371 (1880))(emphasis in original).  The Libertarian Plaintiffs

contend that the Supreme Court has "emphasized that the right at issue belongs to 'all qualified

voters' and includes the right to have one's vote 'counted once' and protected against dilution."

Reply at 1 (quoting <u>Gray v. Sanders</u>, 372 U.S. 368, 380 (1963)).  The Libertarian Plaintiffs note that the Supreme Court has held that "'the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections . . . and to have their votes counted.'"  Reply at 2 (quoting <u>Reynolds v. Sims</u>, 377 U.S. at 554-55, and citing <u>United States v. Mosley</u>, 238 U.S. 383).

61.     The Libertarian Plaintiffs contend that Mr. Curtis' and Luchini's attempts to use the discretionary recount procedure to compel Secretary Oliver to count Mr. Curtis' votes is "of little moment."  Reply at 2.  According to the Libertarian Plaintiffs, "what is at issue is the right to vote and have it counted in the first place."  Reply at 2.  The Libertarian Plaintiffs assert that Secretary Oliver cites no caselaw to support her argument that the Libertarian Plaintiffs should have "vindicated their federal constitutional rights through one of the state processes."  Reply at 2. The Libertarian Plaintiffs argue that the § 1983 remedy is an "'independent federal remedy'" and that the Supreme Court has held that § 1983 does not "'require a litigant to pursue state judicial remedies prior to commencing an action under this section.'"  Reply at 2 (quoting <u>Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio</u>, 446 U.S. 478, 490-91 (1980)).  The Libertarian Plaintiffs add that "'it is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'"  Reply at 2 (quoting <u>Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio</u>, 446 U.S. at 491).  The Libertarian Plaintiffs also note that "'exhaustion of state administrative remedies should not be required as a prerequisite to brining an action pursuant to § 1983.'"  Reply at 3 (quoting <u>Patsy v. Bd. of Regents of the State of Fla.</u>, 457 U.S. 496, 516 (1982), and citing <u>Tonkovich v. Kan. Bd. of Regents</u>, 159 F.3d 504, 519 (10th Cir. 1998)).

62.     The Libertarian Plaintiffs contend that they have standing under Article III of the Constitution.  See Reply at 3 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983)).  The Libertarian Plaintiffs note that a plaintiff must demonstrate that they have suffered an injury in fact, that there is a causal connection between the defendant's conduct and the plaintiff's injury, and that a court can grant relief that will redress the plaintiff's injury.  See Reply at 3 (citing Steel Co. v. Citizens For a Better Env't, 523 U.S. 83, 102-03 (1998)).  According to the Libertarian Plaintiffs, they "have standing to raise their claims herein and the relief requested will redress their injuries."  Reply at 3 (citing Hunter v. Hamilton Cty. Bd. of Elections, 850 F. Supp. 2d 795 (S.D. Ohio 2012)(Dlott, C.J.).

63.     The Libertarian Plaintiffs argue that the Eleventh Amendment does not immunize Secretary Oliver from this suit, because the Libertarian Plaintiffs "seek prospective declaratory and injunctive relief, and the claims and relief at issue are covered by Ex Parte Young."  Reply at 3-4 (citing League of Women Voters v. Brunner, 548 F.3d 463 (6th Cir. 2008); Gallagher v. N.Y. State Bd. of Elections, 20 Civ. 5504 (AT), 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020)(Torres, J.); Hunter v. Hamilton Cty. Bd. of Elections, 850 F. Supp. 2d 795).  The Libertarian Plaintiffs note that Gallagher v. New York State Board of Elections and Hunter v. Hamilton County Board of Elections both involve "the failure to count valid votes," and, in both cases, the district courts awarded the plaintiffs relief "due to the failure to properly count votes."  Reply at 4.  The Libertarian Plaintiffs argue that the Court should adopt the district courts' analysis in both cases.  See Reply at 4.  In a footnote, the Libertarian Plaintiffs note the following:

> We have issued subpoenas to the Clerks for Bernalillo, Sandoval, and Dona Ana Counties to testify this coming Monday.  We have also subpoenaed from them copies of the Libertarian ballots and tally sheets for these counties.  We anticipate that this evidence will conclusively show the undercounts.  It may also change the sought-after relief: if the required 26 vote difference is demonstrated (as we expect

it will be), this Court can merely order that Mr. Curtis to be placed on the general election ballot, obviating the need for a recount.

Reply at 4 n.1.

64.     Last, the Libertarian Plaintiffs contend that, beyond the likelihood-of-success-on-the-merits factor, the remaining factors that they must satisfy to obtain injunctive relief weigh in their favor.  See Reply at 4.  First, the Libertarian Plaintiffs assert that "'[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury.'"  Reply at 4 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 805, and citing Elrod v. Burns, 427 U.S. at 373-74)(alteration in Reply only).  According to the Libertarian Plaintiffs, "'[a]ny deprivation of any constitutional right fits that bill.'"  Reply at 4 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 806)(alteration added).  Second, the Libertarian Plaintiffs contend that, as to "the weighing of harms, '[w]hen a constitutional right hangs in the balance, [] even a temporary loss usually trumps any harm to the defendant.'"  Reply at 5 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 806)(first alteration in Reply only and second alteration added).  Third, the Libertarian Plaintiffs argue that "the Government 'has no interest in keeping an unconstitutional book on the books,'" and that "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'"  Reply at 4 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 807).  The Libertarian Plaintiffs thus request that the Court issue a TRO and/or preliminary injunction.  See Reply at 5.

## LAW REGARDING RULE 52 FINDNGS BY THE COURT

Rule 52(a) of the Federal Rules of Civil Procedure provides:

(a)     Findings and Conclusions.

(1)     In General.  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

(2)     For an Interlocutory Injunction.  In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

(3)     For a Motion.  The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion.

(4)     Effect of a Master's Findings.  A master's findings, to the extent adopted by the court, must be considered the court's findings.

(5)     Questioning the Evidentiary Support.  A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings.

(6)     Setting Aside the Findings.  Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

Fed. R. Civ. P. 52(a).  "Appellate courts must accept findings of fact that substantial evidence supports and that are not clearly erroneous."  United States v. Metric Const., Inc., No. CIV 02-1398 JB/LAM, 2007 WL 1302606, at *11 (D.N.M. March 1, 2007)(Browning, J.)(citing Stoody Co. v. Royer, 374 F.2d 672, 678 (10th Cir. 1967);  Fed. Sec. Ins. Co. v. Smith, 259 F.2d 294, 295 (10th Cir. 1958)).  As the Supreme Court recently has explained,

a district court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. Rule Civ. Proc. 52(a)(6).  In "'applying [this] standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.'"  Anderson v. Bessemer City, 470

- 72 -

> U.S. 564, 573 . . . (1985)(quoting <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 123 . . . (1969)).  Where "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  <u>Anderson</u>, 470 U.S. at 573-574 . . . .  "A finding that is 'plausible' in light of the full record -- even if another is equally or more so -- must govern."  <u>Cooper v. Harris</u>, . . . 137 S. Ct. 1455, 1465 . . . (2017).

<u>June Medical Servs. L.L.C. v. Russo</u>, --- S. Ct. ---, 2020 WL 3492640, at *11 (June 29, 2020)(plurality).  "Substantial evidence means more than a mere scintilla, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Stoody Co. v. Royer</u>, 374 F.2d at 678.  "'The Federal Rules of Evidence do not apply to preliminary injunction hearings.'"  <u>Firebird Structures, LCC v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1505</u>, 252 F. Supp. 3d at 1140 (quoting <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1188).

> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

<u>Anderson v. Bessemer City</u>, 470 U.S. 564, 575 (1985).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse."  <u>Anderson v. Bessemer City</u>, 470 U.S. at 573-74.  "That proposition holds true, not only when the district court's factual findings are predicated upon assessments of witness credibility, but also when they arise from consideration of documentary evidence."  <u>Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation</u>, 599 F.3d 1165, 1175 (10th Cir. 2010)(citing <u>La Resolana Architects, PA v. Reno, Inc.</u>, 555 F.3d 1171, 1177 (10th Cir. 2009)).

## LAW REGARDING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has construed Eleventh Amendment immunity to prohibit federal courts from entertaining suits against States brought by their own citizens or citizens of another state without their consent.  See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990).  State agencies and state officials are likewise provided immunity as "an arm of the state."  Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).

Exceptions to a State's Eleventh Amendment immunity are few.  See, e.g., Ex Parte Young, 209 U.S. at 159-60 ("If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.").  A State may, however, voluntarily waive its immunity.  See Edelman v. Jordan, 415 U.S. 651, 673 (1974).  Congress may also abrogate Eleventh Amendment immunity pursuant to Section 5 of the Fourteenth Amendment to the Constitution of the United States, where the statute explicitly manifests Congress' intent to do so.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 340 (1979).  Consequently, Eleventh Amendment immunity extends to defendants under that statute, and claims against the state pursuant to § 1983 in the federal courts are barred as a matter of law.

Although not properly characterized as an exception to a State's Eleventh Amendment immunity, the doctrine that the Supreme Court announced in Ex Parte Young, 209 U.S. at 128, allows for suits against state officials under certain circumstances.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state.").  In Ex Parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply in federal court to state officials defending against suit which seeks only prospective relief from violations of federal law.  See Ex Parte Young, 209 U.S. at 28.  The Ex Parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609.

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must

"allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

   1. **Article III Standing.**

   "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d at 1241 (quoting Massachusetts v. EPA, 549 U.S. at 539 (internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty., Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  See 416 F.3d at 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege

an inhibiting effect on constitutionally protected conduct that the statute prohibits.  See Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement."  Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

### 2.    Prudential Standing.

 "Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory

provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 527 U.S. at 130.

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974); Chavez v. Kincaid, 15 F. Supp. 2d at 1119. A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.

§ 1331.  There is a federal question if the case arises under the Constitution, laws, or treatises of the United States.  See 28 U.S.C. § 1331.  Whether a case arises under a federal law is determined by the "wellpleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)).  The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26.  The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986).  See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("*Merrell Dow* is the controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law).  District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)).  If the resolution turns on a substantial question of federal law, the federal question must also be "contested."  Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  542 U.S. at 313.  Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  542 U.S. at 313.  See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court articulated in Younger, 401 U.S. 37, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.  Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)).  Younger abstention is

not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court.  The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."  Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)).  This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all of the elements mandating abstention clearly exist in the record, courts may and should address application of the Younger abstention doctrine sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair

hearing on their federal claims." Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted). See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise."). When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 198, 202 (1988). For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action. See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding. In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights. See 242 F. App'x at 613. The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages

recompensing him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the state court officials adjudicating his state custody case.  242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger.  See Wideman v. Colorado, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## LAW REGARDING 42 U.S.C. § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute.  See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive

rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second

alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186,

1197 (10th Cir. 1998))).   Section 1983 authorizes an injured person to assert a claim for relief

against a person who, acting under color of state law, violated the claimant's federally protected

rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i)

a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted

under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent

in his or her individual capacity, "a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal,

556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See

Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens*[6] and

---

[6]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388
(1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth
Amendment of the Constitution of the United States "by a federal agent acting under color of his
authority gives rise to a cause of action for damages consequent upon his unconstitutional
conduct." 403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal
officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See
Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions
are the "federal analog" to § 1983 actions).

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-

> supervisor or her subordinates) of which "subjects, or causes to be subjected" that
> plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983). The Tenth Circuit has noted, however, that "*Iqbal*

may very well have abrogated § 1983 supervisory liability as we previously understood it in this

circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d

at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously

enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d

at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link

. . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy

. . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds

v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v.

Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials

liable under § 1983 for constitutional violations that unnamed individual police officers

committed. See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at

371). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between

the police misconduct and the city officials' conduct, because there was a deliberate plan by some

of the named defendants to "'crush the nascent labor organizations.'" Dodds v. Richardson, 614

F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING 42 U.S.C. § 1988

Section 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys

to litigate civil rights violations." Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012

WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.). Section 1988(b) provides: "[T]he

court, in its discretion, may allow the prevailing party, other than the United States, a reasonable

attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  "[T]here are two elements in deciding

whether to award attorney's fees.  First, the party seeking fees must qualify as a 'prevailing party.'

Second, the fee itself must be 'reasonable.'"  Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir.

1997)(quoting 42 U.S.C. § 1988(b)).

For the purpose of determining attorney's fees, a court may determine that plaintiffs are

"prevailing parties . . . if they succeed on any significant issue in litigation which achieves some

of the benefit the parties sought in bringing suit."  Hensley v. Eckerhart, 461 U.S. at 433 (internal

quotation marks omitted)(citation omitted).  In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme

Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least
> some relief on the merits of his claim.  The plaintiff must obtain an enforceable
> judgment against the defendant from whom fees are sought, or comparable relief
> through a consent decree or settlement.  Whatever relief the plaintiff secures must
> directly benefit him at the time of the judgment or settlement.  Otherwise the
> judgment or settlement cannot be said to affect the behavior of the defendant toward
> the plaintiff.  Only under these circumstances can civil rights litigation effect the
> material alteration of the legal relationship of the parties and thereby transform the
> plaintiff into a prevailing party.  In short, a plaintiff prevails when actual relief on
> the merits of his claim materially alters the legal relationship between the parties
> by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted).  The

Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across

the statutory threshold."  Hensley v. Eckerhart, 461 U.S. at 433.  See Copar Pumice Co., Inc. v.

Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party

under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart).  The district

court must then determine what fee is "reasonable."  Hensley v. Eckerhart, 461 U.S. at 433;

Obenauf   v.   Frontier   Fin.   Grp.,   Inc.,   785   F.   Supp.   2d   1188,   1210   (D.N.M.

2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

"To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433).  This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433.  While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214.  The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed.  See Hensley v. Eckerhart, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36).  "In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success." Jane L. v. Bangerter, 61 F.3d at 1511.  The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a

qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar.  Jane L. v. Bangerter, 61 F.3d at 1511.  "There is no precise rule or formula" for making such determinations.  Hensley v. Eckerhart, 461 U.S. at 436.  In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim.  See Hensley v. Eckerhart, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512.  Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435.  In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award.  See Jane L. v. Bangerter, 61 F.3d at 1512.  The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts."  Jane L. v. Bangerter, 61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)).  The Tenth Circuit has also recognized that "[l]itigants in

good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435).

### LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order. See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days. See Fed. R. Civ. P. 65(b)(1)-(2). In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)). See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181. The Supreme Court and the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a temporary restraining order under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed. R. Civ. P. 65(b). "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." Salt Lake Tribune Pub. Co., LLC v. AT

& T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).  It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm.  Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné").  In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States and its officers and agencies are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and preliminary injunctions.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("UDV").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See 286 F. Supp. 3d

Case 1:20-cv-00748-JB-JHR   Document 24   Filed 08/14/20   Page 94 of 173

at 1264. UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated. See 286 F. Supp. 3d at 1264. The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money. See 286 F. Supp. 3d at 1264. The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested. See 286 F. Supp. 3d at 1265-66. The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation. See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200. It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation. Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98. The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the defendants faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits. See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

- 94 -

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating all four prongs' satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).  "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.  "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'"  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil

Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963) ).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro II")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v.

> Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has
> thus disclaimed -- or at least augmented -- the simpler and more intuitive way of
> defining these terms, i.e., that a prohibitory injunction is one in which the court
> orders the enjoined party not to do something, and a mandatory injunction is one in
> which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the

issuance of a requested injunction would alter the status quo between the parties, the court should

look at "the reality of the existing status and relationships between the parties, regardless of

whether the existing status and relationships may ultimately be found to be in accord or not in

accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100

(10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975).  "The meaning of

this category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With

respect to preliminary injunctions that will change the status quo, "the movant has an even heavier

burden of showing that the four factors listed above weigh heavily and compellingly in movant's

favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT & T Corp.,

320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc.

v. Visa USA, Inc., 936 F.2d at 1098-99).

   "[I]n an action for money damages, the district court does not have the power to issue a

preliminary injunction[.]"  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-

96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527

U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir.

1987)(concluding that a preliminary injunction should not issue where a remedy of money

damages was available).  Federal courts have the inherent equitable power to issue a preliminary

injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.

See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l,

Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING 28 U.S.C. §§ 2201-02

Section 2201 of Title 28 of the United States Code provides that:

> In a case of actual controversy within its jurisdiction, except with respect to
> Federal taxes other than actions brought under section 7428 of the Internal Revenue
> Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil
> action involving an antidumping or countervailing duty proceeding regarding a
> class or kind of merchandise of a free trade area country (as defined in section
> 516A(f)(10) of the Tariff Act of 1930), as determined by the administering
> authority, any court of the United States, upon the filing of an appropriate pleading,
> may declare the rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.   Any such
> declaration shall have the force and effect of a final judgment or decree and shall
> be reviewable as such.

28 U.S.C. § 2201(a).  The Supreme Court, in Maryland Casualty Co. v. Pacific Coal & Oil Co.,

312 U.S. 270 (1941), announced the test for determining whether, as contemplated by the

Declaratory Judgment Act, an actual controversy exists: "Basically, the question in each case is

whether . . . there is a substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  312 U.S. at

273.  Accord United States v. Fisher–Otis, Inc., 496 F.2d 1146, 1151 (10th Cir. 1974).  "'A

declaratory judgment is meant to define the legal rights and obligations of the parties in

anticipation of some future conduct, not simply proclaim liability from a past act.'"  Copar Pumice

Co., Inc. v. Morris, No. CIV 07–0079 JB/ACT, 2009 WL 5201799, at *17 (D.N.M. Oct. 23,

2009)(Browning, J.)(quoting Lawrence v. Kuenhold, 271 F. App'x 763, 766 (10th Cir. 2008)),

aff'd, 639 F.3d 1025 (10th Cir. 2011).  See Utah Animal Rights Coal. v. Salt Lake City Corp., 371

F.3d 1248, 1266 (10th Cir. 2004)(McConnell, J., concurring)("[A] declaratory judgment action

involving past conduct that will not recur is not justiciable.").

The Tenth Circuit has stated that a district court should consider the following factors when deciding whether to entertain a request for declaratory relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994).  Additionally, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.  Thus, "declaratory relief is alternative or cumulative and not exclusive or extraordinary."  Fed. R. Civ. P. 57 advisory committee's note.

## LAW REGARDING THE ASSEMBLY CLAUSE

The First Amendment to the Constitution of the United States guarantees that "Congress shall make no law . . . abridging . . . the  right of the people peaceably to assemble."  U.S. Const. amend. I.  The right to assemble was not a controversial addition to the Bill of Rights -- the only controversy concerning its passage concerned whether it even needed enumeration.  See Tabatha Abu El-Haj, The Neglected Right of Assembly, 56 U.C.L.A. L. Rev. 543, 564-65 (2009)(noting that this right was a traditional right in England).[7]  The proposed assembly right that James Madison first proposed in the House of Representatives looks slightly different, and more expansive, than the version adopted in the Bill of Rights.  Madison proposed: "The people shall

---

[7]The Bill of Rights 1689, which William III of Orange agreed to accept upon ascension to the throne in the Glorious Revolution, states that "it is the right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal."  Bill of Rights, 1689, 1 W. & M., 2d Sess., c.2.

not be restrained from peaceably assembling and consulting for their common good; nor from applying to the legislature by petitions, or remonstrances for redress of their grievances."  John D. Inazu, The Forgotten Freedom of Assembly, 84 Tul. L. Rev. 565, 572 (2010)("Forgotten Freedom")(citing The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 129 (Neil H. Cogan ed., 1997)).  The House of Representative eventually debated condensed language which incorporated speech rights: "The freedom of speech and of the press, and the right of the people peaceably to assemble and consult for their common good, and to apply to the government for redress of grievances shall not be infringed."  The Congressional Register, August 15, 1789. Theodore Sedgwick, representative from Massachusetts, spoke to oppose including the freedom of assembly, because he thought it diminished the other enumerated rights, and he argued that:

> [s]hall we secure the freedom of speech, and think it necessary at the same time to allow the right of assembling?  If people freely converse together, they must assemble for that purpose; it is self-evident unalienable right which the people possess; it is certainly a thing that never would be called in question; it is derogatory to the dignity of the house to descend to such minutiae.

The Congressional Register, August 15, 1789.  Sedgwick's proposal "lost by a considerable majority."  The Congressional Register, August 15, 1789.  Those opposed to Sedgwick's amendment noted that North Carolina and Virginia had recommended this amendment, that state constitutions had similar provisions, and that this freedom had been suppressed in the past and was therefore in need of express enumeration.[8]

---

[8]The debate concerning Sedgwick's amendment contains a notable parallel to the problem before the Court.  Congressman Sedgwick, in defense of his amendment, sarcastically said that the committee might just as well "have declared that a man should have a right to wear his hat if he pleased," or "could go to bed when he thought proper," as these rights were just as in need of enumeration as the right to assemble.  Congressman John Page, from Virginia, responded that not only had people "been prevented from assembling together on their lawful occasions," but that "a man has been obliged to pull off his hat when he appeared before the face of authority."

As noted during the House floor debate, State constitutions at the time had robust assembly and petition protections.  These protections linked the freedom of assembly to the democratic process; the right to assemble was closely linked to the right to petition the government.  Massachusetts' 1780 Constitution, for example, stated that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or

---

Page was referring William Penn and his trial for violating the 1664 Conventicle Act, "a *cause celebre* in America." Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.  On August 14, 1670, William Penn and other Quakers attempted to gather at their meeting-house in London.  See Forgotten Freedom at 575.  Soldiers prevented his entrance, and so Penn conducted his sermon outside on the street.  See Forgotten Freedom at 575.  As he began to speak, Penn was arrested for violating the 1664 Conventicle Act.  This Act forbade religious gatherings of groups of five or more people, other than immediate family, not associated with the Church of England.  See Forgotten Freedom at 575.  Parliament justified the 1664 Conventicle Act and its prohibition against gatherings of five or more people based on its concerns over the threats these meetings posed to the government itself rather than the public welfare.  It cited the "growing and dangerous Practices of Seditious Sectaryes and other disloyall persons who under pretence of Tender Consciencies doe at their Meetings contrive Insurrections as late experience hath shewed," as a reason for the act,  1664 Conventicle Act, § I, and it granted local officials the power to stop all such meetings to prevent "the mischeifes which may grow by such Seditious and Tumultuous Meetings under pretence of Religious Worship," 1664 Conventicle Act, § VIII.

Although he essentially confessed, Penn was ultimately acquitted for violating the Act the jury repeatedly refused to follow jury instructions and find him guilty.  See Kenneth Hoyt, What Jurors Know: a Trial Judge's Perspective, 40 S. Tex. L. Rev. 907, 911-12 (1999); David Dorfman & Chris Iijima, Fictions, Fault, and Forgiveness: Jury Nullification in a New Context, 28 Mich. J. L. Reform 861, 868 (1995).  This was one of the earliest and still one of the most famous examples of that other traditional democratic right: jury nullification.  See United States v. Courtney, 960 F. Supp. 2d 1152, 1189-90 (D.N.M. 2013)(Browning, J.).  The United States has since forbidden jury nullification, and parties are therefore forbidden from appealing directly to jurors in the same way William Penn could.  See United States v. Courtney, 960 F. Supp. 2d at 1173.  Despite escaping the charge of violating the Conventicle Act, the government still punished Penn for his religious principles.  Penn arrived in court without wearing a hat, "but knowing his religious scruple, the judge ordered a court official to place a hat on his head."  Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.  When Penn refused to remove the hat in respect to the court, as Quaker faith dictates, the court held him in contempt and imprisoned him.  See Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.

remonstrances, redress of the wrongs done them, and of the grievances they suffer."   New Hampshire's 1780 Constitution contains very similar language.   North Carolina, Pennsylvania, and Vermont meanwhile, protected the people's "right to assemble together, to consult for their common good, to instruct their representatives, and to apply to the legislature for redress of grievances."[9]   Delaware's 1776 Declaration of Rights and Maryland's 1776 Declaration of Rights stated that "every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner."   That the right to assemble is closely linked to democratic government is also evident from the legislative history surrounding the right to assemble.   The proposal to qualify the freedom of assembly with the requirement that it be "to instruct their representatives," although defeated, garnered significant debate.   See Baylen J. Linnekin, "Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns, 39 Hastings Const. L.Q. 593, 614-15 (2012).   And until it was dropped without explanation from the final draft, both the House and the Senate had approved versions of the right which qualified the right to assemble as the right "to peaceably assemble and to consult for their common good."   Forgotten Freedom at 572-73.   The assembly right thus derives in spirit, at least, from the democratic government the founders envisioned, and the ability of all citizens under that government to seek change.   See The Neglected Right of Assembly, 56 U.C.L.A. L. Rev. at 565 ("The right was understood primarily to protect a democratic practice.").   In this vein, Georgia Congressman James Jackson noted that the freedom "to assemble and consult for the common good, . . . had been used in this country as one of the best checks on the British

---

[9]Pennsylvania and Vermont's Declaration of Rights added that citizens could apply for redress of grievances "by address, petition, or remonstrance."  Pennsylvania Declaration of Rights 1776, § XVI; Vermont Declaration of Rights 1777, § XVIII.

legislature in their unjustifiable attempts to tax the colonies without their consent."  1 Annals of Congress 139-40 (1791).

The Supreme Court concluded in De Jonge v. Oregon, 299 U.S. 353 (1937), that the right to assemble is applicable to state action, because the Due Process Clause of the Fourteenth Amendment incorporates the right to assemble.  See John D. Inazu, The Forgotten Freedom of Assembly, 84 Tul. L. Rev. 565, 599 (2010)("Forgotten Freedom").   The Supreme Court emphasized the importance of the right to assemble, declaring that it "cannot be denied without violating those fundamental principles which lie at the base of all civil and political institutions." De Jonge v. Oregon, 299 U.S. at 364 (citing Herbert v. Louisiana, 272 U.S. 312, 216 (1926); Powell v. Alabama, 287 U.S. 45, 67 (1932)).

Despite the importance of the right to assemble, it, like other constitutional rights, is still subject to restrictions. The Supreme Court in Jacobson v. Massachusetts, 197 U.S. 11 (1905), stated that constitutional rights "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand."  197 U.S. at 29.  The Court of Appeals for the Fifth Circuit has noted that this "settled rule allows the state to restrict, for example, one's right to assemble." In re Abbott, 2020 WL 1685929, at *1.

The Supreme Court has all but forgotten the right to assemble in the modern era.  See Forgotten Freedom at 610-11 (noting that, as of 2010, the Supreme Court had not heard a right-to-assemble claim in over twenty years); Emmanuel Hiram Arnaud, Note, The Dismantling of Dissent: Militarization and the Right to Peaceably Assemble, 101 Cornell L. Rev. 777, 812 (2016)("Dismantling of Dissent")(noting that, as of 2016, the Supreme Court had not heard a right-to-assemble claim in over thirty years).  Instead, the freedom of association has largely subsumed the freedom of assembly.  See Timothy Zick, Recovering the Assembly Clause, 91 Tex. L. Rev.

375, 377 (2012)("[T]he freedom of assembly was transformed into a right of association.")(citing John D. Inazu, Liberty's Refuge: The Forgotten Freedom of Assembly, (2010)).  In the 1980s, the Supreme Court "swept the remnants of association within the ambit of free speech law," culminating in its opinion about a freedom-of-assembly claim that did not include any reference to the freedom of assembly, but included several references to freedom of association. Recovering the Assembly Clause at 396 (quoting John D. Inazu, Liberty's Refuge: The Forgotten Freedom). See Forgotten Freedom at 611 (citing Boos v. Barry, 485 U.S. 312 (1985).  Since then, the Supreme Court has applied the freedom-of-association standard to freedom of assembly cases, rendering them one and the same.  See Dismantling of Dissent (noting that "the standard for assessing freedom of assembly cases is now the one applies for freedom of association" and that "freedom of assembly is standardless because the [Supreme] Court conflates the two freedoms")

The Tenth Circuit similarly has conflated the freedom of association with the freedom of assembly by generally treating them as a single claim and analyzing them together.  See, e.g., McCook v. Spriner Sch. Dist., 44 F. App'x 896, 910 (10th Cir. 2002)(unpublished)(repeating throughout the opinion that the plaintiffs brought a "freedom of assembly and association claim"); Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 658 (10th Cir. 2006)(stating that "[t]he First Amendment protects associational and assembly rights in two distinct ways," and then quoting a Supreme Court case that mentions only freedom of association)(citing Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987)).  In the past thirty-two years, the Tenth Circuit's lengthiest discussion of freedom of assembly is a dissent analogizing churches in the free exercise context to public forums in the free speech context.  See Messiah Baptist Church v. Cty. of Jefferson, State of Colo., 859 F.2d 820, 830 (10th Cir. 1988)(McKay, J., dissenting).  The dissent, discussing a zoning ordinance's restriction of buildings for religious

worship, notes that "the right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions." Messiah Baptist Church v. Cty. of Jefferson, State of Colo., 859 F.2d at 830.  Beyond that case, the Tenth Circuit generally has folded freedom of assembly into freedom of association[10] -- specifically expressive association.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

Expressive association is the "'right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion.'"  Schalk v. Gallemore, 906 F.2d 491, 498 (10th Cir. 1990)(quoting Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984)).   The First Amendment protects political expression manifested through conduct as well as through speech. See Texas v. Johnson, 491 U.S. 397, 406 (1989)(holding that the burning of an American flag is conduct "sufficiently imbued with elements of communication to implicate the First Amendment")(citation omitted)(internal quotation marks omitted).  Expressive association is not, however, an absolute right, because "'there may be countervailing principles that prevail over the

---

[10]The   Tenth Circuit uses different terminology for expressive association in different cases.  In Grace v. United Methodist Church v. City of Cheyenne, 451 F.3d 643, 658 (2006), and Schalk v. Gallemore, 906 F.2d 491, 499 (1990), the Tenth Circuit appears to label "freedom of association" as "freedom of expressive association," which it breaks down into "intimate association" and "political association."   What it calls "political association" is actually "expressive association."  It corrects the labels in Vigil v. South Valley Academy, 247 F. App'x 982, 988 (10th Cir. 2007)(unpublished)("treating the "freedom of expressive association" and "the right to familial association" as two separate freedoms, as opposed to treating the right of familial association as a subtype of freedom of expressive association).  The Court relies on this case for the appropriate labels, because it accords with generally accepted terms.  John D. Inazu, The Unsettling "Well-Settled" Law of Freedom of Association, 43 Ct. L. Rev. 149, 149 (2010)(noting that the Supreme Court stated two categories -- expressive association and intimate association – in Roberts v. United States Jaycees, 468 U.S. 609 (1984)).

- 105 -

right of association.'"   Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658

(quoting Walker v. City of Kansas City, 911 F.2d 80, 89 n.11 (8th Cir. 1990)).   The Supreme Court

has cautioned that "[i]nfringements on that right may be justified by regulations adopted to serve

compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

means significantly less restrictive of associational freedoms."   Roberts v. United States Jaycees,

468 U.S. at 623.   See Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d 1521, 1531 (10th Cir.

1994)(quoting Roberts v. United States Jaycees, 468 U.S. at 623).   Although an opportunity "might

be described as 'associational' in the common parlance," it does not necessarily follow that it

involves "the sort of expressive association that the First Amendment has been held to protect."

City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989).   Because "there is no generalized right of free

association," courts only "recognize[] a right to associate for the purpose of engaging in those

activities protected by the First Amendment -- speech, assembly, petition for the redress of

grievances, and the exercise of religion."   Roberts v. United States Jaycees, 468 U.S. at 618.

As is evident in several states' early Constitutions and the legislative history surrounding

the freedom of assembly, the freedom of assembly is closely linked to other rights protected by

the First Amendment -- such as freedom of speech and the right to petition the legislature for the

redress of grievances -- which are central to the democratic process.   See Linnekin, 39 Hastings

Const. L.Q. at 614-15.   The Supreme Court has explained that, "[f]rom the [nation's] outset, the

right of assembly was regarded not only as an independent right but also as a catalyst to augment

the free exercise of the other First Amendment rights with which it was deliberately linked by the

draftsmen."   Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 577 (1980).   See De Jonge v.

Oregon, 299 U.S. at 364 ("The right of peaceable assembly is a right cognate to those of free

speech and free press and is equally fundamental.").   Thus, as with many freedom-of-speech cases,

- 106 -

the Supreme Court has applied a time, place, and manner test to governmental restrictions in freedom-of-assembly cases.  See, e.g., Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 578 (1980)(analyzing a freedom-of-assembly challenge to a Virginia trial judge's decision to prohibit reporters from entering the courtroom during a trial, and reasoning that, "[s]ubject to the traditional time, place, and manner restrictions . . . streets, sidewalks, and parks are places traditionally open, where First Amendment rights may be exercised . . . ; a trial courtroom also is a public place where the people generally -- and representatives of the media -- have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place" (citations omitted)); Cox v. New Hampshire, 312 U.S. 569, 576 (1941).  Similarly, the Honorable Monroe G. McKay, former United States Court of Appeals for the Tenth Circuit, dissented in Messiah Baptist Church v. County of Jefferson, State of Colorado, where he wrote that "[t]he right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions."  859 F.2d at 828-29 (McKay, J., dissenting).  Judge McKay observed that "churches serve much the same function as public forums do in the free speech context."  859 F.2d at 828 (McKay, J., dissenting).[11]  Judge McKay further explained that "the place of worship is central to the first amendment concept of

---

[11]In a footnote, Judge McKay downplayed the public forum/private space distinction for the purposes of First Amendment protection.  Judge McKay wrote:

> Although traditional time, place and manner analysis has taken place in the context of cases involving public property, it is not the public/private distinction that is crucial for present purposes, but the nature of the protected activity. It is activity involving speech, assembly, and free exercise which falls under the rubric of first amendment protection.

Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 831 n.8 (McKay, J., dissenting).

free exercise as essentially the only place of religious 'assembly' and the central place for the expression of religious 'speech.'" 859 F.2d at 829.

Judge McKay objected to the majority opinion's application of rational basis review to zoning regulations that prohibited land in one district of a county from being "used for schools, community buildings, and churches." Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 821. See 859 F.2d at 831 (McKay, J., dissenting). The majority opinion reasoned that "[t]he record contains no evidence that the zoning regulations infringe upon *any* protected liberty. The [] zoning regulations affect only property interests and, therefore, need only bear a substantial relationship to the general welfare." 859 F.2d at 823 (citing Vill. of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 391 (1926))(emphasis in original). Judge McKay disagreed, noting that "zoning cases involving places of worship . . . implicate[] at a minimum three different and cumulative interests recognized by the first amendment itself: speech, assembly, and religious exercise." 859 F.2d at 829 (McKay, J., dissenting). According to the dissent, "[t]he rational basis standard. . . trivializes the burdening role which zoning can and does play in the exercise of religious expression." 859 F.2d at 831 (McKay, J., dissenting). Judge McKay thus distilled a four-step analysis for applying the time, place, and manner test to laws that implicate First Amendment interests.

> The first step is to determine whether the challenged regulation does indeed infringe upon a first amendment interest. . . . The second step is to determine whether the ordinance is content-neutral. . . . The third step is to determine the governmental interest at stake. . . . Finally, under this analysis the state must carry the burden in the first instance to prove that the means it has chosen are narrowly tailored to achieve the state's legitimate ends.

Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 833 (McKay, J., dissenting).

In <u>Roberts v. United States Jaycees</u>, the Supreme Court extended First Amendment protection to the United States Jaycees, a civic organization, because it engaged in "the advocacy of political and public causes." <u>Roberts v. United States Jaycees</u>, 468 U.S. at 622. The Boy Scouts of America similarly qualified for First Amendment protection, because the organization "engaged in instilling its system of values in young people." <u>Boy Scouts of Am. v. Dale</u>, 530 U.S. at 643. In addition to civic or political causes, courts also often recognize the freedom of expressive association for organizations that "'associate for the purpose of engaging in . . . religious activities.'" <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d at 658 (<u>quoting</u> <u>Bd. of Dirs. v. Rotary Club of Duarte</u>, 481 U.S. at 544).[12]

The four-part framework that Judge McKay articulated in his <u>Messiah Baptist Church v. County of Jefferson, State of Colorado</u> dissent closely echoes the Supreme Court's formula for evaluating laws that regulate the freedom of expressive association. <u>See</u> <u>Roberts v. United States</u>

---

[12]Professor Eugene Volokh has noted that:

[i]n addition to the general First Amendment expressive association right that [<u>Boy Scouts of Am. v. </u>]<u>Dale</u> recognized, religious groups might have a special "freedom of religious association" right under the Free Exercise Clause. This could either be a narrow church autonomy right recognized even after <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990), <u>see</u> Eugene Volokh, <u>A Common-Law Model for Religious Exemptions</u>, 46 UCLA L. Rev. 1465, 1506-07 (1999)(so suggesting), or a "hybrid" of the expressive association right and the Free Exercise Clause right, <u>compare</u> <u>Smith</u>, 494 U.S. at 881-82 (so suggesting), <u>with</u> <u>Kissinger v. Bd. of Trs. of the Ohio State Univ.</u>, 5 F.3d 177, 180 (6th Cir. 1993) (criticizing the hybrid rights doctrine, in my view persuasively), <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520 (1993)(Souter, J., concurring) (likewise), and Bertrand Fry, Note, B<u>reeding Constitutional Doctrine: The Provenance and Progeny of the "Hybrid Situation" in Current Free Exercise Jurisprudence</u>, 71 Tex. L. Rev. 833 (1993)(likewise).

Eugene Volokh, <u>Freedom of Expressive Association and Government Subsidies</u>, 58 Stan. L. Rev. 1919, 1968 (2006).

Jaycees, 468 U.S. at 623.  In <u>Roberts v. United States Jaycees</u>, the Supreme Court held that infringements on the freedom of expressive association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  468 U.S. at 623 (citing <u>Brown v. Socialist Workers '74 Campaign Comm.</u>, 459 U.S. 87, 91-92 (1982); <u>Democratic Party of United States v. Wisconsin</u>, 450 U.S. 107, 124 (1981); <u>Buckley v. Valeo</u>, 424 U.S. 1, 25 (1976)(per curiam); <u>Cousins v. Wigoda</u>, 419 U.S. 477, 489 (1975); <u>Am. Party of Tex. v. White</u>, 415 U.S. 767, 780-81 (1974); <u>NAACP v. Button</u>, 371 U.S. 415, 438 (1963); <u>Shelton v. Tucker</u>, 364 U.S. 479, 486 (1960)).  Indeed, in her concurrence, the Honorable Sandra Day O'Connor, then-Associate Justice to the Supreme Court of the United States of America, underscored the overlap between the time, place, and manner test and the Supreme Court's expressive-association test: "Reasonable, content-neutral state regulation of the time, place, and manner of an organization's relations with its members or with the State can pass constitutional muster, but only if the regulation is 'narrowly drawn' to serve a 'sufficiently strong, subordinating interest' 'without unnecessarily interfering with First Amendment freedoms.'"  <u>See Roberts v. United States Jaycees</u>, 468 U.S. at 634 (O'Connor, J., concurring)(quoting <u>Vill. of Schaumburg v. Citizens for a Better Env't</u>, 444 U.S. 620, 636-37 (1980), and citing <u>Sec'y of State of Md. V. Joseph H. Munson Co.</u>, 467 U.S. 947, 960-61 (1984)).

The primary difference between the time, place, manner test and the expressive-association test in <u>Roberts v. United States Jaycees</u> is that the latter framework requires that the government articulate a "compelling" interest for restricting the freedom of expressive association.  <u>Roberts v. United States Jaycees</u>, 468 U.S. at 623.  In contrast, time, place, and manner restrictions must "'serve a significant governmental interest'" to comport with the First Amendment.  <u>Evans v.</u>

Sandy City, 944 F.3d 847 (10th Cir. 2019)(quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  In her concurrence, Justice O'Connor targets the majority opinion's "mechanical application of a 'compelling interest' test" as a "fundamental flaw in its analysis."  468 U.S. at 634 (O'Connor, J., concurring).  According to Justice O'Connor, the majority "entirely neglects to establish at the threshold that the Jaycees is an association whose activities or purposes should engage the strong protections that the First Amendment extends to expressive associations."  468 U.S. at 634 (O'Connor, J., concurring).  Justice O'Connor notes that some associations are more expressive than others, and, accordingly, the Supreme Court's "case law recognizes radically different constitutional protections for expressive and nonexpressive associations."  468 U.S. at 634 (O'Connor, J., concurring).  Relatedly, Judge McKay's dissent in Messiah Baptist Church v. County of Jefferson, State of Colorado acknowledged that "applying the most rigid compelling state interest test [to a zoning regulation] would be improvident," but he suggested that the standard should be more searching than rational basis review.  859 F.2d at 831 (McKay, J., dissenting).

Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  City of Dallas v. Stanglin, 490 U.S. at 25.  Courts generally refuse to extend First Amendment protection to individuals or organizations that assert the freedom of association in a context that does not include the assertion of a separate First Amendment right.  See City of Dallas v. Stanglin, 490 U.S. at 24.  In City of Dallas v. Stanglin, the Supreme Court declined to recognize a First Amendment right of association for dance-hall patrons seeking to overturn a municipal regulation creating age-restricted dance halls.  See 490 U.S. at 24.  The Supreme Court listed four reasons that "chance encounters in dance halls" do not involve "the sort of expressive association that the First Amendment has been held to protect": (i) the dance hall

patrons were not "members of any organized association"; (ii) "most [were] strangers to one another"; (iii) the dance hall admitted all who paid the admission fee; and (iv) "[t]here [was] no suggestion that these patrons take positions on public questions." City of Dallas v. Stanglin, 490 U.S. at 24-25.

> "To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.' The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private."

A.M. ex rel. Youngers v. NM Dep't of Health, 117 F. Supp. 3d 1220, 1258 (D.N.M. 2015)(quoting Boy Scouts of Am. v. Dale, 530 U.S. at 648). If the First Amendment's expressive associational right protects the group, courts next determine whether "'[i]nfringements on that right [are] justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" Roberts v. United States Jaycees, 468 U.S. at 623.

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). "The Clause 'creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007)(unpublished)(quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class.  See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012).  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons."  SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."  SECSYS, LLC v. Vigil, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249–51 (10th Cir. 1999).  The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted).  The failure to prevent discrimination before it occurs is not actionable.  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token,

- 114 -

the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v.

> Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that
> are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands." <u>Mathews</u>

<u>v. Eldridge</u>, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings.  In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

<u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542, 545(footnote omitted).

> The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process." <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507,
> [529] . . . (2004)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335, 96 S. Ct. 893).  A
> court must carefully balance these competing concerns, analyzing "'the risk of an
> erroneous deprivation' of the private interest if the process were reduced and the
> 'probable value, if any, of additional or substitute safeguards.'" <u>Id.</u> (quoting
> <u>Mathews v. Eldridge</u>, 424 U.S. at 335. . . .).

<u>United States v. Abuhamra</u>, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might

impose.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. at 335.  For example, "[w]here . . . the state must act

quickly, a meaningful postdeprivation hearing is adequate."  <u>Clark v. City of Draper</u>, 168 F.3d

at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  For example, in See A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See A.M. through Youngers v. N.M. Dep't of Health, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").   See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 197). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.    Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115,

1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d

1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.    **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an

individual cannot trigger liability under the due process clause is the special-relationship doctrine.

A plaintiff must show that he or she was involuntarily committed to state custody to establish a

duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d

274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an

individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g.

when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder,

64 F.3d 567, 572 (10th Cir. 1995).

### 3.    **Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions

rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-

creation exception to this rule applies only when "a state actor affirmatively acts to create, or

increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242

F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials

can be liable for the acts of private parties where those officials created the very danger that caused

the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm"

or "an intent to place a person unreasonably at risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A

plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff

in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth.,

672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his

- 120 -

or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

## 4.   **What Shocks the Conscience**.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or

- 121 -

recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three

- 122 -

inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a

§ 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion,

stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is

not enough to satisfy the danger-creation theory's conscience shocking standard."   265 F.3d

at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent,

principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process

rights when they did not take sufficient action to prevent a student at the school from "racking"[13]

the plaintiffs' son. 716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct

did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants
> were aware of three instances of an unknown eighth-grade student racking various
> sixth-grade students within the span of a month, and failed to implement policies
> to improve hallway monitoring and stop this conduct from occurring in time to
> prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the
> Defendants indicated to the sixth graders that it had policies in place to punish
> individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps
> worthy of punishment in the form of punitive damages, the Court's conscience is
> not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the
> problem, but the Court's conscience is not shocked by the Defendants' failure to
> consider or implement such a policy.  Even if the Defendants knew that students

---

[13]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75.

## ANALYSIS

The Court grants the Motion in part, and denies it in part, and the Court orders that Secretary Oliver direct the New Mexico State Canvassing Board to count the votes cast in Bernalillo County, but not other Counties, in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico.  The Eleventh Amendment does not bar the Libertarian Plaintiffs federal constitutional claims, because the Libertarian Plaintiffs sue a State official in her official capacity and seek prospective relief, but, to the extent that the Libertarian Plaintiffs allege that Secretary Oliver abused her authority and violated New Mexico law, such claims are barred, because plaintiffs cannot sue State officials for violating State law.  The Libertarian Plaintiffs have established standing, because: (i) the Court is capable of redressing alleged deprivations of their constitutional rights; (ii) § 1983 does not require a litigant to pursue state judicial remedies before commencing an action in federal court; and (iii) there are no parallel proceedings brought by the Libertarian Plaintiffs are pending in State court.  Next, the Court concludes that the right to vote is a fundamental right that the Equal Protection Clause and Due Process Clause protect, and Supreme Court precedent confirms that the right to vote encompasses the corollary right to have one's vote counted.  The Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their claim that Secretary Oliver violated their rights to vote under the Equal Protection Clause, because the facts do not support that Secretary Oliver intended not to count some of Mr. Curtis' votes.  The Libertarian Plaintiffs have established, however, that they are substantially likely to succeed on the merits of their claim that Secretary Oliver violated their

- 124 -

rights to vote under the Due Process Clause, because the facts in the record before the Court indicate that Banks' vote and a significant number of votes in the Libertarian Party primary election in Bernalillo County for Position 2 on the Court of Appeals of New Mexico have not been counted and accounted for and, if some of the uncounted votes are for Mr. Curtis -- who is the only candidate for the position for which he ran in the Libertarian Party primary election -- then the primary election reached a point of fundamental unfairness that deprived the Libertarian Plaintiffs of the right to have their votes counted.  The Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their claim that the discretionary recount provision violates the First Amendment, because: (i) there is no constitutional right to a recount; (ii) the discretionary recount provision is a privilege that New Mexico election law affords electoral candidates; and (iii) the discretionary recount provision is rationally related to New Mexico's interest in ensuring the accuracy and integrity of elections.   Finally, the Court concludes that, on the facts in the record before it, the Libertarian Plaintiffs are entitled to a TRO, because: (i) they are substantially likely to succeed on their right-to-vote claim under the Due Process Clause; (ii) they very likely will suffer irreparable harm if the Court does not grant injunctive relief, because many of Mr. Curtis' votes will not be counted, and he thus will not qualify to have his name added to the general election ballot; (iii) the Libertarian Plaintiffs' interest in vindicating their rights to vote outweighs Secretary Oliver and New Mexico's interest in regulating elections; and (iv) ensuring that all votes have been counted serves the public's interest by ensuring that the June 2, 2020, primary elections were fair.  Accordingly, the Court grants the Motion in part, and denies it in part, and the Court orders that Secretary Oliver direct the New Mexico State Canvassing Board to count the votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in Bernalillo County, but not in other Counties.  Accordingly,

the Court grants the TRO request and limits the relief to a count of the votes cast in Bernalillo

County in the Libertarian Party primary election for Position 2 on the Court of Appeals of New

Mexico.

I.   **THE ELEVENTH AMENDMENT DOES NOT BAR THE LIBERTARIAN PLAINTIFFS' CONSTITUTIONAL CLAIMS AGAINST SECRETARY OLIVER, BECAUSE THE LIBERTARIAN PLAINTIFFS SUE SECRETARY OLIVER IN HER OFFICAL CAPACITY AND SEEK PROSPECTIVE RELIEF, BUT THE ELEVENTH AMENDMENT BARS THE LIBERTARIAN PLAINTIFFS' CLAIMS SECRETARY OLIVER VIOLATED NEW MEXICO LAW.**

In the Complaint, the Libertarian Plaintiffs assert that the Court has subject-matter

jurisdiction over their claims under 42 U.S.C. §§ 1983, 1988, and 28 U.S.C. §§ 1331, 1343,

2201-02.  <u>See</u> Complaint ¶ 7, at 3.  Secretary Oliver argues that "'[t]he Eleventh Amendment bars

suits for damages against a state or state agency absent congressional abrogation or waiver and

consent by the state.'"  Response at 18 (quoting <u>Ross v. Bd. of Regents of the Univ. of N.M.</u>, 599

F.3d at 1117).  Secretary Oliver acknowledges, however, that a plaintiff may sue an individual

state officer in his or her official capacity if the plaintiff "alleges an ongoing violation of federal

law and the plaintiff seeks prospective relief."  Response at 18 (citing <u>Ex Parte Young</u>, 209 U.S.

123; <u>Muscogee (Creek) Nation v. Pruitt</u>, 669 F.3d at 1166).  At the August 7, 2020, hearing, the

Libertarian Plaintiffs countered that the Eleventh Amendment does not bar their claims, because

they are not seeking to compel New Mexico to enforce its own statutes, but, rather, they are

"challenging the application and constitutionality of the" discretionary recount provision, so New

Mexico is not immune under <u>Ex Parte Young</u>.  Aug. 7 Tr. at 63:9-10 (Wiest).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any foreign state."  U.S.

Const. amend. XI.  The Supreme Court has interpreted state sovereign immunity broadly.  As Justice Kennedy, writing for the Supreme Court in Alden v. Maine, 527 U.S. 706 (1999), asserted: State "sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."  527 U.S. at 728.  The Supreme Court has also interpreted the Eleventh Amendment's text broadly, concluding that, despite the Eleventh Amendment's text, States are immune from suit in federal courts that their own citizens bring, see Hans v. Louisiana, 134 U.S. 1, 15 (1890), and suits by their own citizens in their own courts without their consent, see Alden v. Maine, 527 U.S. 706.  Accordingly, the Supreme Court has articulated only three ways for private plaintiffs to circumvent sovereign immunity: (i) suits against state officials for injunctive relief, see Ex Parte Young, 209 U.S. at 159; (ii) suits to which states consent, see Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. at 304; Edelman v. Jordan, 415 U.S. at 673; and (iii) suits in federal court invoking Congressional statutes pursuant to the Fourteenth Amendment, see Fitzpatrick v. Bitzer, 427 U.S. at 456.  Moreover, the Ex Parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609.  The Eleventh Amendment permits federal courts to grant injunctions against state officials, even when compliance will cost the state great expense in the future.  See, e.g., Quern v. Jordan, 440 U.S. 332.

New Mexico has not waived its immunity in this instance.  An explicit waiver requires the state to expressly agree to be sued in federal court.  New Mexico's consent to be sued in its own

courts is not enough.  See Fla. Dep't of Health and Rehabilitative Servs. v. Fla. Nursing Home Ass'n, 450 U.S. 299, 305-06 (1990).  Nor is a general waiver enough; for a state statute or constitutional provision to validly waive Eleventh Amendment immunity, "it must specify the State's intention to subject itself to suit in *federal court*."  Atascadero Copper Corp. v. State Tax Comm'n, 473 U.S. 241, 241 (1990)(emphasis in original).  For example, in Port Authority Trans-Hudson Corp. v. Feeney, the Supreme Court concluded that New Jersey and New York consented to suit in federal court via a statute that consented to suit "on the condition that venue . . . shall be within a county or judicial district, established by one of said States or by the United States . . . ."  495 U.S. at 307 (quoting N.J. Stat. Ann. § 32:1-162, N.Y. Unconsol. Laws § 7106 (1979)).  The Supreme Court has also indicated that constructive consent, such as by failing to object to a federal court's jurisdiction, is not enough.  See Edelman v. Jordan, 415 U.S. at 653.

Because the Libertarian Plaintiffs sue Secretary Oliver in her official capacity -- and not New Mexico -- for injunctive relief, the Eleventh Amendment does not bar the Libertarian Plaintiffs' federal constitutional claims.  The Libertarian Plaintiffs have alleged allegations that Secretary Oliver has violated their federal Constitutional rights, and the suit does not implicate special sovereignty interests.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609.  Although the Libertarian Plaintiffs' claims involve New Mexico election law, the Libertarian Plaintiffs challenge the constitutionality of the discretionary recount provision under 42 U.S.C. § 1983.  The Libertarian Plaintiffs also allege that Secretary Oliver "abused the authority of her office," Complaint ¶ 54, at 11, and, in the Motion, the Libertarian Plaintiffs argue that Secretary Oliver ignored several of their requests for a recount pursuant to the discretionary recount provision by "engag[ing] in a game of hide the ball, characterized by a failure to respond to inquiries regarding the process, to run out the clock."  Motion at 12-13.  Secretary Oliver equates

the Libertarian Plaintiffs' claim to a suit "asking a Federal Court to adjudicate whether a state official did not comply with state law" and argues that "such claims are barred by the Eleventh Amendment." Response at 17. The Supreme Court has held that the Eleventh Amendment bars claims "that a state official has violated *state* law," regardless whether a plaintiff sues a State official and seeks prospective injunctive relief. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)(emphasis in original). See id. ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty . . . ."). Accordingly, to the extent that the Libertarian Plaintiffs allege that Secretary Oliver violated New Mexico election law, the Eleventh Amendment bars the Libertarian Plaintiffs' claim. The Eleventh Amendment does not, however, bar the Libertarian Plaintiffs' federal constitutional claims.

II.   **THE LIBERTARIAN PLAINTIFFS HAVE STANDING TO VINDICATE THEIR RIGHT TO VOTE AND TO HAVE THEIR VOTES COUNTED, AND TO CHALLENGE THE DISCRETIONARY RECOUNT PROVISION'S CONSTITUTIONALITY, BECAUSE THE COURT CAN ORDER RELIEF THAT WOULD REDRESS THE LIBERTARIAN PLAINTIFFS' ALLEGED INJURY.**

At the August 7, 2020, hearing, Secretary Oliver argued that the Libertarian Plaintiffs lack standing, because the Libertarian Plaintiffs did not comply with the discretionary recount provisions' procedure for requesting a recount. See Aug. 7 Tr. at 17:19-20 (Lange). According to Secretary Oliver, there is no redressability for the Libertarian Plaintiffs' alleged injuries, because the Libertarian Plaintiffs did not timely apply for a recount or submit a sufficient cash bond to pay for a recount. See Aug. 7 Tr. at 16:22-17:1 (Lange). Moreover, in the Response, Secretary Oliver contends that, even if the Court concludes that the discretionary recount provision is unconstitutional, "there is no redressability this court can grant." Response at 10. See id. at 19.

At the hearing, the Libertarian Plaintiffs briefly addressed Secretary Oliver's standing argument by arguing that "it's almost absurd that you somehow have to comply with a procedure that you're contesting to have standing."  Aug. 7 Tr. at 63:17-19 (Wiest).  The Court noted that the Libertarian Plaintiffs' "major premise . . . is that they have a constitutional right to have their votes counted."  Aug. 7 Tr. at 18:21-23 (Court).  The Court also expressed discomfort "with saying that the state of New Mexico or any other state can tell federal courts that there are prerequisites" -- such as seeking a recount that costs several million dollars -- to "bringing a [42 U.S.C. §] 1983 action for violation of federal constitutional rights."  Aug. 7 Tr. at 17:23-18:2 (Court).

The Court concludes that the Libertarian Plaintiffs have Article III standing to bring their Constitutional claims.  "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d at 1171.  See U.S. Const. art. III, § 2.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d at 1298 (internal quotation marks omitted).  The Libertarian Plaintiffs have alleged that many votes for Mr. Curtis were not counted, which prevented him from having his name appear on the general election ballot, and they provide specific facts to support their allegations.  See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 (2013)(explaining that plaintiffs must allege specific facts and more than a speculative harm to establish standing).  This alleged injury is actual, concrete, and particularized to Mr. Curtis, his voters, and the Libertarian Party, because it affects their rights to vote and to associate "in a personal and individual way," and because it is not "'conjectural or hypothetical'" that Mr. Curtis' name will not appear on the general election ballot as a result, Lujan v. Defs. of Wildlife, 504 U.S.

at 560 (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)).  Secretary Oliver contends that

the Libertarian Plaintiffs have suffered harm from Mr. Curtis garnering insufficient votes to

qualify for the general election, but she attributes this harm to voters' choices not to vote for him.

The Libertarian Plaintiffs allege, however, that Secretary Oliver's malfeasance caused their injury,

and the Court concludes that the Libertarian Plaintiffs have demonstrated sufficient causation for

Article III purposes.  <u>See</u> <u>Lujan Defs. of Wildlife</u>, 504 U.S. at 560 (explaining that "the injury has

to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of]

the independent action of some third party not before the court'" (quoting <u>Simon v. E. Ky. Welfare</u>

<u>Rights Org.</u>, 426 U.S. 26, 41-42 (1976))).

Finally, the Court can redress the Libertarian Plaintiffs' injury.  Secretary Oliver contends

that the Libertarian Plaintiffs have forfeited their statutory privilege to seek a recount, and, thus,

there is no relief available that the Court could grant the Libertarian Plaintiffs, even if the Court

determines that Secretary Oliver violated the Libertarian Plaintiffs' constitutional rights.  <u>See</u>

Response at 10.  The Court is unaware of -- and Secretary Oliver does not cite -- any caselaw to

support Secretary Oliver's assertion that there are prerequisites that election candidates and voters

must satisfy before bringing a 42 U.S.C. § 1983 action to vindicate their constitutional rights.  To

the contrary, as the Libertarian Plaintiffs assert in the Reply, the Supreme Court "has not

interpreted § 1983 to require a litigant to pursue state judicial remedies prior to commencing an

action under this section."  <u>Bd. of Regents of Univ. of State of N.Y. v. Tomanio</u>, 446 U.S. at 491.

<u>See</u> <u>id.</u> ("The federal remedy is supplementary to the state remedy, and the latter need not be first

sought and refused before the federal one is invoked." (quoting <u>Monroe v. Pape</u>, 365 U.S. 167,

183 (1967))); Reply at 2-3.  That the Libertarian Plaintiffs unsuccessfully availed themselves of

the discretionary recount provision under New Mexico law does not foreclose their ability to pursue a remedy under § 1983.[14]

The Libertarian Plaintiffs have alleged facts indicating that some of Mr. Curtis' votes were not counted and that a significant number of votes in the Libertarian Party primary election in Bernalillo County have not been counted, because Secretary Oliver and election officials did not properly tally the election results for the Libertarian Party primary elections, therefore preventing Mr. Curtis' name from appearing on the upcoming general election ballot. This allegation is enough to establish Article III standing. The Court's power to grant relief that redresses the Libertarian Plaintiffs' injury does not hinge on whether the Libertarian Plaintiffs timely applied for a recount and submitted sufficient funds to secure a recount. New Mexico law does not dictate the range of relief that the Court can grant -- the Court could order a recount of some or all

_____

[14]The Court also concludes that Younger v. Harris, 401 U.S. (1971)("Younger"), abstention does not apply. The Younger abstention doctrine provides that abstention is mandatory if: (i) "[t]here is an ongoing state proceeding"; (ii) "[t]he state court provides an adequate forum for the claims raised in the federal complaint"; and (iii) "[t]he state proceedings 'involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.'" Columbian Fin. Corp. v. Stork, 811 F.3d 390, 394-95 (10th Cir. 2016)(quoting Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d 1160, 1163 (10th Cir. 1999)). In Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69 (2013), the Supreme Court instructed that, "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" 571 U.S. at 81-82 (quoting Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 236 (1984)). The Libertarian Plaintiffs did not file a complaint in state court, so there is no parallel proceeding. Moreover, although New Mexico election law allows candidates to contest election results in state court and request discretionary recounts, see FOF, supra, ¶ 86, at 19 (citing N.M. Stat. Ann. §§ 1-14-3 and 1-14-21), New Mexico election law does not purport to maintain exclusive jurisdiction over election matters, see N.M. Stat. Ann. §§ 1-14-3 and 1-14-21. Furthermore, although Secretary Oliver contends that the Supreme Court of New Mexico is the proper court to review the Libertarian Plaintiffs' claims and to command her and the New Mexico State Canvassing Board "to comply with state law and order a discretionary recount," Response at 17, she does not assert that Younger abstention -- or any other abstention doctrine -- applies. The Court thus concludes that Younger abstention does not require the Libertarian Plaintiffs to bring their federal constitutional claims by first proceeding in state court.

precincts' ballots, or it could order that Secretary Oliver add Mr. Curtis' name to the general

election ballot if the Libertarian Plaintiffs demonstrate that Mr. Curtis received over 230 votes in

the Libertarian Part primary election.  The Court concludes that the Libertarian Plaintiffs have

established that the Court can redress their alleged injury, and, thus, the Libertarian Plaintiffs have

standing to bring their constitutional claims.

### III.   THE RELIEF THAT THE LIBERTARIAN PLAINTIFFS REQUEST FALLS UNDER THREE CATEGORIES OF DISFAVORED INJUNCTIONS.

The Tenth Circuit disfavors some injunctive relief and requires "more of the parties who

request them."   Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d 1221, 1232 (10th Cir.

2019)(citing Schrier v. Univ. of Colo., 427 F.3d at 1258-59).   There are three disfavored

injunctions: (i) mandatory (rather than prohibitory) injunctions; (ii) injunctions that change the

status quo; and (iii) injunctions that grant all the relief that the moving party could expect to win

at trial.  See Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232; Logan v. Pub. Emps.

Ret. Ass'n, 163 F. Supp. 3d 1007, 1026 (D.N.M. 2016)(Browning, J.).   Movants for these

injunctions need not make their showing "heavily and compellingly," but the district court should

"more closely scrutinize[] to assure that the exigencies of the case support the granting of a remedy

that is extraordinary even in the normal course."  O Centro II, 389 F.3d at 975.  A district court

can determine whether a requested injunction is disfavored by looking at the relief it seeks.  See O

Centro II, 389 F.3d at 1003.  The Libertarian Plaintiffs request that the Court either: (i) order

Secretary Oliver to direct the New Mexico State Canvassing Board to conduct a vote recount; or

(ii) order Secretary Oliver to add Mr. Curtis' name to the upcoming general election ballot.  See

Aug. 7 Tr. at 71:16-22 (Wiest).  Both remedies are mandatory, would change the status quo, and

would provide the Libertarian Plaintiffs with all the relief they could expect to win at trial, and, thus, the Libertarian Plaintiffs request relief that the Tenth Circuit commonly disfavors.

The first disfavored category is "mandatory preliminary injunctions." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro II, 389 F.3d at 977)(internal quotation marks omitted). The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro II, 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to act in some manner, and a mandatory injunction is one in which the court orders the enjoined party to act. See Schrier v. Univ. of Co., 427 F.3d at 1261. It does so because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it. See O Centro II, 389 F.3d at 1006 (Seymour, J., dissenting)("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."). An injunction directing a party to act is not fundamentally different from an injunction prohibiting action -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction. On the other hand, vague injunctions enjoining parties to "depopulate the jail system to constitutionally compliant levels," or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor. Diné Citizens Against Ruining Our Env't v. Jewell, 2015 WL 4997207, at *33 (D.N.M. Aug. 14, 2015)(Browning, J.).

- 134 -

The Libertarian Plaintiffs' requested injunction is mandatory rather than prohibitory. They seek an order that directs Secretary Oliver to order the Country Clerks in Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County to recount votes in the Libertarian Party primary election. See Motion at 2, 3, 13. If the Court were to grant such relief, Secretary Oliver and election officials would be forced to act affirmatively. See Schrier v. Univ. of Colo., 427 F.3d at 1261 (noting that requiring a University to rehire a professor where future monitoring is possible constitutes a mandatory injunction); Legacy Church, Inc. v. Kunkel, No. CIV 20-0327 JB\SCY, 2020 WL 1905586, at *29 (D.N.M. April 17, 2020)(Browning, J.). Moreover, granting could require the Court to monitor Secretary Oliver's compliance.

The second disfavored category is "preliminary injunctions that alter the status quo." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro II, 389 F.3d at 977)(internal quotation marks omitted). The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155. When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975.

The Libertarian Plaintiffs' requested injunction would alter the status quo. The Tenth Circuit instructs that "mandatory injunctions also *generally* alter the status quo," although "that is not always the case." Schrier v. Univ. of Colo., 427 F.3d at 1260 (emphasis in original). Here,

- 135 -

"the last uncontested status between the parties which preceded the controversy" was when Mr. Curtis was running for Position 2 on the Court of Appeals of New Mexico in the Libertarian Party primary election.  Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.  Forcing a recount would disrupt this status quo, because the Libertarian Parties had notice that a discretionary recount would cost Mr. Curtis' campaign significant money, see Findings of Fact ("FOF"), supra, ¶ 54, at 14, but ordering a recount at the expense of the Office of the Secretary of State of New Mexico would alter New Mexico's procedure for conducting recounts and place pressure on Secretary Oliver only two weeks for her office starts printing general election ballots.  Furthermore, ordering Secretary Oliver to add Mr. Curtis' name to the general election ballot would disrupt the status quo, because, before the controversy, Mr. Curtis' name was not slated to appear on the general election ballot.

The third and final disfavored category is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro II, 389 F.3d at 977)(internal quotation marks omitted).  The Tenth Circuit has stated that this preliminary injunction is "similar to the 'Sentence first -- Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991).  See GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir. 1984)(stating in a copyright case that "[t]he burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits").

The Libertarian Plaintiffs seek an injunction that will supply them with all the relief they could hope to win from a full trial.  The Libertarian Plaintiffs ask the Court to order Secretary

Oliver to direct a recount or to add Mr. Curtis' name to the general election ballot.  Accordingly, the Court will "more closely scrutinize[]" the Libertarian Plaintiffs' case "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  O Centro II, 389 F.3d at 975.

IV.     **THE LIBERTARIAN PLAINTIFFS HAVE ESTABLISHED THAT THEY ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR RIGHT-TO-VOTE CLAIM UNDER THE DUE PROCESS CLAUSE, BUT THEIR CONSTITUTIONAL CHALLENGES TO THE DISCRETIONARY RECOUNT PROVISION AND BOND REQUIREMENT ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED.**

In the Motion, the Libertarian Plaintiffs raise several constitutional challenges to Secretary Oliver's alleged failure to count some of Mr. Curtis' votes in the Libertarian Party primary election, and to New Mexico's discretionary recount provision, N.M. Stat. Ann. § 1-14-15, and its bond requirement to secure a recount.  See Motion at 9-13.  First, the Libertarian Plaintiffs argue that the bond requirement violates voters' First Amendment rights to vote for Mr. Curtis as well as Mr. Curtis' and the Libertarian Party's associational rights.  See Motion at 9-10.  Second, the Libertarian Plaintiffs contend that the bond requirement violates the Equal Protection Clause and that "'falsely certifying'" a vote count also violates the Equal Protection Clause.  Motion at 11 (quoting United States v. Classic, 313 U.S. at 310, 315).  Last, the Libertarian Plaintiffs assert that Secretary Oliver violated the Due Process Clause by depriving Mr. Curtis' voters of their rights to vote.  See Motion at 12.  Despite the Motion's focus on the discretionary recount provision and bond requirement's constitutionality, at the August 7, 2020, hearing, the Libertarian Plaintiffs conceded that Secretary Oliver's recount denial does not violate a constitutional right.  See Aug. 7 Tr. at 12:9-15 (Court, Wiest).  Moreover, the Libertarian Plaintiffs agreed that there is no constitutional right to a recount and that a recount becomes relevant only in the context of remedy.

- 137 -

See Aug. 7 Tr. at 10:24-11:1 (Wiest); id. 12:9-15 (Court, Wiest).  At the hearing, the Libertarian Plaintiffs almost exclusively focused on their right to have their votes counted, which the Libertarian Plaintiffs said is rooted in the Equal Protection Clause, in the Due Process Clause, and in the First Amendment.  See Aug. 7 Tr. at 11:6-17 (Wiest, Court).

The Court first analyzes the right to vote's scope and constitutional basis, and it concludes that the right to vote encompasses the right to have one's vote counted, and that this right is a fundamental right that the Due Process Clause and Equal Protection Clause protect.  The Court concludes that the evidence supports that the Libertarian Plaintiffs are substantially likely to prove that Secretary Oliver violated their right to vote under the Due Process Clause by not accounting for a significant number of votes cast in the Libertarian Party primary election -- particularly absentee write-in votes in Bernalillo County.  The Court also concludes that New Mexico's discretionary recount provision does not violate the Equal Protection Clause, the Due Process Clause, or the First Amendment, because: (i) there is no constitutional right to a recount; (ii) the discretionary recount provision is a privilege that New Mexico law affords electoral candidates; and (iii) the discretionary recount provision is rationally related to New Mexico's interest in ensuring the accuracy, integrity, and finality of elections.

A. **THE EQUAL PROTECTION CLAUSE AND THE DUE PROCESS CLAUSE BOTH PROTECT THE RIGHT TO VOTE, WHICH IS A FUNDAMENTAL RIGHT THAT ENCOMPASSES THE RIGHT TO HAVE ONE'S VOTE COUNTED AND THAT DERIVES PARTLY FROM THE FIRST AMENDMENT RIGHT OF EXPRESSIVE ASSOCIATION, AND THE EVIDENCE SUPPORTS THAT THE LIBERTARIAN PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PROVE THAT SECRETARY OLIVER VIOLATED THEIR RIGHT TO VOTE TO VOTE UNDER THE DUE PROCESS CLAUSE, BUT NOT UNDER THE EQUAL PROTECTION CLAUSE.**

The Court concludes that Supreme Court precedent unequivocally affirms that voters have a constitutional right to vote and to have their vote counted, but not every voting irregularity and regulatory decision implicates this constitutional right. In Reynolds v. Sims, the Supreme Court noted that "[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, . . . and to have their votes counted." 377 U.S. at 554 (citing United States v. Mosley, 238 U.S. 383; Ex Parte Yarbrough, 110 U.S. 651). Furthermore, the Supreme Court clarified that it is "'as equally unquestionable that the right to have one's vote counted is as open to protection . . . as the right to put a ballot in a box.'" Reynolds v. Sims, 377 U.S. at 554 (quoting United States v. Mosley, 238 U.S. at 386). The Supreme Court then expounded on the importance of voting to democratic self-governance:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

Reynolds v. Sims, 377 U.S. at 555. In Reynolds v. Sims, 377 U.S. at 555, the Supreme Court listed numerous voting restrictions and regulations that the Supreme Court had declared unconstitutional in previous cases: (i) the right to vote cannot be denied outright, see Lane v. Wilson, 307 U.S. 268 (1939); Guinn v. United States, 238 U.S. 347 (1915); (ii) the right to vote

cannot be destroyed by altering ballots, see United States v. Classic, 313 U.S. at 315; (iii) the right to vote cannot be diluted by stuffing ballot boxes, see United States v. Saylor, 322 U.S. 385; Ex Parte Siebold, 100 U.S. 371; (iv) state legislatures cannot gerrymander electoral districts based on race, see Gomillion v. Lightfoot, 364 U.S. 339 (1960); and (v) electoral parties may not conduct white primaries, see Terry v. Adams, 345 U.S. 461 (1953); Smith v. Allwright, 321 U.S. 649 (1944); Nixon v. Condon, 286 U.S. 73 (1932); Nixon v. Herndon, 273 U.S. 536 (1927).

Although the Supreme Court in Reynolds v. Sims did not specify the right to vote's textual basis in the Constitution, it explained that "history has seen a continuing expansion of the scope of the right of suffrage in this country." 377 U.S. at 555. For instance, the Fifteenth Amendment to the Constitution prohibits denying the right to vote based on a citizen's "race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1; the Seventeenth Amendment to the Constitution provides that United States Senators for each State are to be "elected by the people thereof," U.S. Const. amend. XVII, § 1; the Nineteenth Amendment to the Constitution prohibits denying or abridging the right to vote "on account of sex," U.S. Const. amend. XIX, § 1; the Twenty-Fourth Amendment to the Constitution prohibits denying or abridging the right to vote "by reason of failure to pay any poll tax or other tax," U.S. Const. amend. XXIV, § 1; and Congress has enacted federal legislation to prohibit racial discrimination and to enforce the voting rights that the Fourteenth and Fifteenth Amendments guarantee, see, e.g. Voting Rights Act of 1965, 52 U.S.C. §§ 10101-10702. See Reynolds v. Sims, 377 U.S. at 555 n.28. Moreover, in Reynolds v. Sims, the Supreme Court held "that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. at 577. See Baker v. Carr, 369 U.S. 186 (1962).

Supreme Court cases from the late nineteenth and early twentieth centuries "held that [Section 2 of Article I of the Constitution] give persons qualified to vote a constitutional right to vote and to have their votes counted" in federal elections. Wesberry v. Sanders, 376 U.S. 1, 17 (1964)(citing United States v. Mosley, 238 U.S. 383; Ex Parte Yarbrough, 110 U.S. 651).[15]  In Logan v. Public Employees Retirement Association, 163 F. Supp. 3d 1007 (D.N.M. 2016)(Browning, J.), the Court recognized that the "'right to vote is a fundamental right, preservative of all other rights.'"  163 F. Supp. 3d at 1034 (quoting Warf v. Bd. of Elections of

---

[15]The relevant portion of this provision reads:

The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature.

No person shall be a Representative who shall not have attained to the age of twenty five years, and been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of that state in which he shall be chosen.

U.S. Const. art. I, § 2.  In Harper v. Virginia State Board of Elections, the Supreme Court noted:

While the right to vote in federal elections is conferred by Art. I, s 2, of the Constitution . . . the right to vote in state elections is nowhere expressly mentioned. It is argued that the right to vote in state elections is implicit, particularly by reason of the First Amendment and that it may not constitutionally be conditioned upon the payment of a tax or fee.  Cf. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 113 . . . [(1943)].  We do not stop to canvass the relation between voting and political expression.  For it is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.  That is to say, the right of suffrage "is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed."  Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51 . . . [(1959)].  We were speaking there of a state literacy test which we sustained, warning that the result would be different if a literacy test, fair on its face, were used to discriminate against a class.

Harper v. Va. State Bd. of Elections, 383 U.S. at 665-66.

Green Cty., Ky., 619 F.3d 553 (6th Cir. 2010)).  See Yick Wo v. Hopkins, 118 U.S. 356, 370

(1886)("The case of the political franchise of voting is . . . regarded as a fundamental political

right, because [it is] preservative of all rights.").  Similarly, the Supreme Court admonished in

Reynolds v. Sims that, because "the right to exercise the franchise in a free and unimpaired manner

is preservative of other basic civil and political rights, any alleged infringement of the right of

citizens to vote must be carefully and meticulously scrutinized."  377 U.S. at 562.  The Supreme

Court has recognized that the right to vote lies also at the bedrock of the First Amendment, because

"rights of expression and assembly may be 'illusory if the right to vote is undermined.'"  William

v. Rhodes, 393 U.S. 23, 38-39 (quoting Wesberry v. Sanders, 376 U.S. at 17).  In Harper v. Virginia

State Board of Elections, the Supreme Court noted that "[i]t is argued that the right to vote in state

elections is implicit, particularly by reason of the First Amendment," but the Supreme Court

declined "to canvass the relation between voting and political expression."  Harper v. Va. State

Bd. of Elections, 383 U.S. at 665.  Moreover, the Honorable William J. Brennan, then-Associate

Justice of the Supreme Court of the United States of America, has reasoned that "[t]he right to vote

derives from the right of association that is at the core of the First Amendment, protected from

state infringement by the Fourteenth Amendment."   Storer  v.  Brown, 415  U.S.  724,  756

(1974)(Brennan, J., dissenting)(citing NAACP v. Button, 371 U.S. 415, 430 (1963); Bates v. Little

Rock, 361 U.S. 516, 522-23 (1960); NAACP v. Alabama, 357 U.S. 449, 460-61 (1958)).

Regardless of the right to vote's enigmatic basis in the Constitution, because the States

administer elections, the Equal Protection Clause and the Due Process Clause are the primary

vehicles for enforcing, protecting, and shaping the right to vote.  The Equal Protection Clause

"confers the substantive right to participate on an equal basis with other qualified voters whenever

the State has adopted an electoral process for determining who will represent any segment of the

State's population."  Lubin v. Panish, 415 U.S. at 713.  Likewise, when States confer the right to

vote, the "Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional

case where a state's voting system is fundamentally unfair."  League of Women Voters of Ohio v.

Brunner, 548 F.3d at 478 (citing Griffin v. Burns, 570 F.2d at 1078-79).  See Logan v. Pub. Emps.

Ret. Ass'n, 163 F. Supp. 3d at 1034 (explaining that a voting system implicates the Due Process

Clause and "§ 1983 relief is appropriate only 'in the exceptional case where a voting system is

fundamentally unfair'" (quoting Warf v. Bd. of Elections of Green Cty., Ky., 619 F.3d at 559);

Black v. McGuffage, 209 F. Supp. 2d 889, 900 (N.D. Ill. 2002)(Guzman, J.)("[I]t would appear

that the right to vote, the right to have one's vote counted, and the right to have ones vote given

equal weight are basic and fundamental constitutional rights incorporated in the due process clause

of the Fourteenth Amendment to the Constitution of the United States.").  Moreover, the

"Constitution guarantees procedural and substantive due process when a liberty interest is at

stake."  Cook v. Randolph Cty., Ga., 573 F.3d 1143, 1152 (11th Cir. 2009)(citing Grayson v. King,

460 F.3d 1328, 1340 (11th Cir. 2006)(stating that "'procedural due process imposes constraints on

governmental decisions which deprive individuals of liberty or property interests within the

meaning of the Due Process Clause of the Fifth or Fourteenth Amendment'" (quoting Mathews v.

Eldridge, 424 U.S. 319, 335 (1976))); Duncan v. Poythress, 657 F.2d 691, 705 (5th Cir.

1981)(stating that substantive due process guarantees "the right to be free from the purposeful

decision of state officials to deny the citizens of a state the right to vote in an election mandated

by law")).

   The Libertarian Plaintiffs argue that "'falsely certifying'" a vote count violates the Equal

Protection Clause, Motion at 11 (quoting United States v. Classic, 313 U.S. at 310, 315), because

the "right to vote necessarily includes the right to have the vote fairly counted," Motion at 11

(citing Reynolds v. Sims, 377 U.S. at 554; United States v. Classic, 313 U.S. at 315; United States v. Mosley, 238 U.S. at 386).  At the hearing, the Libertarian Plaintiffs did not elaborate on how Secretary Oliver's actions violate the Equal Protection Clause, other than to note that the right to vote is rooted partly in the Equal Protection Clause.  See Aug. 7 Tr. at 11:6-17 (Wiest, Court).  In Reno v. Bossier Parish School Board, 520 U.S. 471 (1997), the Supreme Court held that, "a plaintiff bringing a constitutional vote dilution challenge" under the Equal Protection Clause must "establish that the State or political subdivision acted with a discriminatory purpose."  520 U.S. at 481 (citing City of Mobile v. Bolden, 446 U.S. 55, 62 (1980)(plurality)(holding that "only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment"); Arlington Heights v. Metro. Hous. Dev., 429 U.S. 252, 265 (1977)("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")).  Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class.  See SECSYS, LLC v. Vigil, 666 F.3d at 688.  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons."  SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."  SECSYS, LLC v. Vigil, 666 F.3d at 685.

Although the Libertarian Plaintiffs allege some facts indicating that Secretary Oliver -- and the election officials whom she directs -- did not count votes, the Libertarian Plaintiffs are not

substantially likely to succeed on the merits of their right-to-vote claim under the Equal Protection

Clause, because the facts do not support that Secretary Oliver intended not to count Mr. Curtis'

votes.  The Tenth Circuit has explained that the "challenged state action [must] intentionally

discriminate[] between groups of persons."  SECSYS, LLC v. Vigil, 666 F.3d at 685 (citing

McCleskey v. Kemp, 481 U.S. 279, 292 (1987); Pers. Adm'r of Mass. v. Feeney, 442 U.S.

at 271-73; Washington v. Davis, 426 U.S. 229, 240 (1976); Snowden v. Hughes, 321 U.S. 1, 8

(1944)).  "Discriminatory intent, however, 'implies more than intent as volition or intent as

awareness of consequences.'"  SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of

Mass. v. Feeney, 442 U.S. at 279).  The Libertarian Plaintiffs allege that some of Mr. Curtis' votes

were not counted, because machines did not combine absentee write-in votes with in-person write-

in votes, and that Secretary Oliver was "aware of these voting machine errors," but nevertheless

"deliberately ignored these errors statewide."  Motion at 5 (citing Complaint ¶ 21, at 6).  According

to the Libertarian Plaintiffs, counting errors "permeated throughout the state," and "Secretary

Oliver did not direct New Mexico county clerks to recount ballots even though she was aware that

voting machine errors throughout the state caused machines to undercount Mr. Curtis' votes."

Aug. 27 Tr. at 31:9-15 (Court).  See Motion at 11 (arguing that Secretary Oliver "was well aware

of these voting machine errors, and yet persisted in depriving hundreds of New Mexico voters of

their votes").  The Libertarian Plaintiffs do not, however, offer any evidence to support their bare

allegations that Secretary Oliver was aware that some of his votes were not being counted or that

she deliberately ignored this issue.  Moreover, Vigil's testimony supports that, when the Los

Alamos County Clerk detected the counting error in Los Alamos County, the County Clerk quickly

notified Vigil, who rectified the problem and assured herself that this counting was limited to Los

Alamos County.  See FOF, supra, ¶¶ 43-47, at 13.  There is thus no evidence of the discriminatory

intent to support that Secretary Oliver violated the Equal Protection Clause.  Based on the evidence before the Court, the Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their right-to-vote claim under the Equal Protection Clause.

The Libertarian Plaintiffs have established, however, that they are substantially likely to succeed on the merits of their right-to-vote claim under the Due Process Clause, because the evidence before the Court about not counting all absentee write-in ballots for Mr. Curtis indicates that fundamental unfairness infected vote-counting in the Libertarian Party primary election in Bernalillo County.  The Libertarian Plaintiffs assert that "[d]ue process is implicated '[i]f the election process itself reaches the point of patent and fundamental unfairness.'"  Motion at 12 (quoting Griffin v. Burns, 570 F.2d at 1077, and citing Marks v. Stinson, 19 F.3d at 888)(first alteration added and second alteration in Motion only).  Secretary Oliver "vigorously denies any allegation of voting machines errors that failed to count write-in votes and" says that she has "specific facts to disprove such an irresponsible statement."  Response at 16.  Secretary Oliver says that she is confident that New Mexico's process of counting ballots and certifying results ensures elections' integrity, but she argues that, even if voting machine errors existed during the primary elections, such issues "would not stand in the way of Plaintiffs' ability to have requested a timely discretionary recount pursuant to Section 1-14-15(A) or file an election contest."  Response at 16 (citing N.M. Stat. Ann. § 1-14-3).

In Logan v. Public Employees Retirement Association, the Court noted that, "[i]n general, federal courts must use great caution when interfering with state elections."  163 F. Supp. 3d at 1033-34 (citing Bush v. Gore, 531 U.S. 98, 123 (2000)(Stevens, J., dissenting)("On rare occasions . . . either federal statutes or the Federal Constitution may require federal judicial intervention in state elections.")).  Although New Mexico has decided to hold elections for the

Court of Appeals of New Mexico, federal courts will interfere only in a limited number of exceptional situations.  See Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1034.  The United States Court of Appeals for the Sixth Circuit has noted the limits on federal intervention with state elections:

> The Constitution, however, "'leaves the conduct of state elections to the states.'" Shannon v. Jacobowitz, 394 F.3d 90, 94 (2d Cir. 2005)(quoting Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980)).  The "[p]rinciples of federalism," therefore, "limit the power of federal courts to intervene in state elections." Id. at 94 (quoting Burton v. Georgia, 953 F.2d 1266, 1268 (11th Cir. 1992))(internal quotation marks omitted).  Courts "have long recognized that not every state election dispute implicates federal constitutional rights."  Burton, 953 F.2d at 1268.  As such, "'[o]nly in extraordinary circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation.'"  Shannon, 394 F.3d at 94 (quoting Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986))(alteration in original).

Warf v. Bd. of Elections of Green Cty., Ky., 619 F.3d at 559.  The Court, relying on Griffins v. Burns and Warf v. Board of Elections of Green County, Kentucky, has reasoned that a state's voting system implicates the Due Process Clause such that § 1983 relief is "appropriate only 'in the exceptional case where a state's voting system is fundamentally unfair.'"  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1034 (quoting Warf v. Bd. of Elections of Green Cty., Ky., 619 F.3d at 559, and citing Griffin v. Burns, 570 F.2d at 1078).  In Warf v. Board of Elections of Green County, Kentucky, the Sixth Circuit gave several examples of possible conduct that would render an election fundamentally unfair:

> Such an exceptional case may arise, for example, if a state employs "non-uniform rules, standards and procedures," that result in significant disenfranchisement and vote dilution, Brunner, 548 F.3d at 478, or significantly departs from previous state election practice, see Roe v. Alabama, 43 F.3d 574, 580-81 (11th Cir. 1995) (intervening where failure to exclude contested absentee ballots constituted a post-election departure from previous state practice); Griffin, 570 F.2d at 1079 (intervening where state court disrupted seven-year practice of voting by absentee and shut-in ballot).  Federal courts, however, "have uniformly declined to endorse action[s] under [§] 1983 with respect to garden variety election irregularities." Griffin, 570 F.2d at 1076; see also Brunner, 548 F.3d at 478 ("[T]he federal courts

should not be asked to count and validate ballots and enter into the details of the administration of the election." (citation and internal quotation marks omitted)).

Warf v. Bd. of Elections of Green Cty., Ky., 619 F.3d at 559.  See Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d at 1034 (same).

The Libertarian Plaintiffs cite two pieces of evidence to support their argument that the Libertarian Party primary election was fundamentally unfair.  First, the Libertarian Plaintiffs assert that Los Alamos County initially reported that Mr. Curtis received only four write-in votes, but the New Mexico State Canvassing Board later revised that figure to eighteen write-in votes for Mr. Curtis in Los Alamos County after detecting a voting machine error.  See Motion at 4-5 (citing Complaint ¶¶ 19-20, at 5-6).  The Libertarian Plaintiffs argue that the "voting errors with the machines in Los Alamos County permeated throughout the state."  Motion at 5 (citing Complaint ¶ 21, at 6).  Based on Vigil's testimony at the hearing, however, the Court finds that issue in Los Alamos County was not a voting machine error, but rather a training-related error,[16] and Vigil responded to the Los Alamos County Clerk's concerns, met with independent vendors, rectified the problem, and ensured that the issue was "isolated within" Los Alamos County.  Aug. 7 Tr. at 41:13 (Vigil).  See FOF, supra, ¶¶ 44, 45, 47, at 13.  The Libertarian Plaintiffs offer no evidence supporting their assertion that this training error "permeated throughout the state."  Motion at 5 (citing Complaint ¶ 21, at 6).  Based on the evidence before the Court, the Court concludes that this alleged error alone does not support that fundamental unfairness impacted the Libertarian Party primary election.

---

[16]The issue in Los Alamos County involved training about "the necessary requirement to hand tally write-in votes."  Aug. 7 Tr. at 40:24-41:1 (Vigil).  See FOF, supra, ¶ 44, at 13.

Second, the Libertarian Plaintiffs contend that Secretary Oliver did not count all of the votes that Mr. Curtis received in Bernalillo County.  See Motion at 4 (citing Complaint ¶ 18, at 5). Secretary Oliver does not address this alleged discrepancy in the Response, and, at the hearing, Vigil testified that she does not "have any . . . information" about the purported discrepancies in Bernalillo County.  Aug. 7 Tr. at 52:15 (Vigil).  See id. at 52:15-20 (Wiest, Vigil); FOF, supra, ¶ 39, at 12.  In Bernalillo County, 270 voters cast write-in ballots in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico -- 175 voters voted by submitting absentee ballots, thirty voters voted early, and sixty-five voters voted in-person on election day. See FOF, supra, ¶ 37, at 11-12 (citing Bernalillo County Primary Election Results; Complaint ¶ 18, at 5; Motion at 4).  Moreover, in Bernalillo County, forty-one of the 270 voters cast write-in ballots for Mr. Curtis.  See FOF, supra, ¶ 38, at 12 (citing Curtis Primary Election Results by County; Complaint ¶ 18, at 5; Motion at 4).[17]  Meanwhile, approximately 1,570 ballots were cast in the Libertarian Party primary election for President of the United States of America in New Mexico, see FOF, supra, ¶ 31, at 11 (citing Official Results -- President; Complaint ¶ 13, at 4; Motion

---

[17]The Libertarian Plaintiffs allege, without providing support, that, of the forty-one ballots cast for Mr. Curtis in Bernalillo County, forty votes came from voters who voted in-person -- either by voting early or voting on election day -- and one vote came from an absentee ballot that was hand-counted.  See Motion at 4 (citing Complaint ¶ 18, at 5).  The Libertarian Plaintiffs allege that, in Bernalillo County, of the 175 absentee, write-in ballots cast in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico, 170 ballots were machine-processed, and Mr. Curtis received zero of those 170 absentee, machine-counted, write-in ballots. See Motion at 4 (citing Complaint ¶ 18, at 5).  The Court cannot find evidence to substantiate these two allegations, but if the Libertarian Plaintiffs were able to provide sufficient evidence, their claims would be significantly strengthened, because such evidence would indicate that Secretary Oliver and the County Clerks' system for counting absentee write-in ballots and combining their totals with the total of in-person write-in ballots is likely flawed.

at 3),[18] and Mr. Curtis received only 204 votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico, see FOF, supra, ¶ 27, at 10 (citing Complaint ¶¶ 16, 22, at 5-6; Response ¶ 6, at 2; Official Results).  The official results that the Office of the Secretary of State of New Mexico posts on its website indicate that, of Mr. Curtis' 204 votes, 122 voters voted by absentee ballot, fifty-four voters voted in-person on election day, and twenty-eight voters voted in-person through early voting.  See FOF, supra, ¶ 28, at 10 (citing Statewide Results Spreadsheet).  The Court takes these statistics to indicate that a significant number of votes in the Libertarian Party primary election for Position 2 of the Court of Appeals of New Mexico did not go toward Mr. Curtis, even though Mr. Curtis was the only write-in candidate for that position.  See FOF, supra, ¶ 32, at 11 (citing Official Results -- Statewide; Complaint ¶ 18, at 5; Motion at 4).  At the hearing, Vigil said that she does not "have any . . . information" about the purported discrepancies in Bernalillo County.  Aug. 7 Tr. at 52:15 (Vigil).  See id. at 52:15-20 (Wiest, Vigil); FOF, supra, ¶ 39, at 12.

The discrepancies in Bernalillo County -- 270 votes in the Libertarian Party primary for Position 2 of the Court of Appeals of New Mexico, but only forty-one votes for Mr. Curtis, the only candidate for the position -- remain unanswered.  Based on the evidence before the Court, the Court concludes, by a preponderance of the evidence in the record before it, that this discrepancy is sufficient for the Libertarian Plaintiffs to establish that they are substantially likely to succeed on the merits of their right-to-vote claim under the Due Process Clause.  In Griffin v. Burns, the United States Court of Appeals for the First Circuit held that the State of Rhode Island primary

---

[18]The Libertarian Plaintiffs assert that 1,570 ballots were cast in the Libertarian Party primary election in New Mexico, see Complaint ¶ 13, at 4; Motion at 3, but the Court can find evidence supporting only that 1,570 ballots were cast for President in the Libertarian Party primary election in New Mexico, see Official Results -- President.

elections were fundamentally unfair, because Rhode Island, relying on a candidate's petition that

the Supreme Court of Rhode Island to invalidate 123 absentee ballots in the primary election,

changed the primary election's results.  See Griffin v. Burns, 570 F.2d at 1077-80.  The First

Circuit concluded that, given "the closeness of the election was such that, [and] the retroactive

invalidation of a potentially controlling number of the votes cast, a new primary was warranted."

Griffin v. Burns, 570 F.2d at 1080.  Years later, the First Circuit affirmed Griffin v. Burns' holding

"that, in those few cases in which organic failures in a state or local election process threaten to

work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due

process," and it noted that other Courts of Appeals have adhered to the same holding.  Bonas v.

Town of N. Smithfield, 265 F.3d 69, 75 (1st Cir. 2001)(citing Marks v. Stinson, 19 F.3d at 888-

89; Hennings v. Grafton, 523 F.3d 861, 864 (7th Cir. 1975)).

      Although the Court's factual findings do not evidence systemic failure to count every vote

throughout New Mexico, the unexplained discrepancy in Bernalillo County's election results,

Mr. Curtis' lack of only twenty-four votes to have his name added to the general election ballot,

and that Mr. Curtis was the only write-in candidate in the Libertarian Party primary election for

Position 2 on the Court of Appeals of New Mexico, lead the Court to conclude, by a preponderance

of the evidence in the record before it, that fundamental unfairness in how New Mexico tabulates

write-in ballots changed the election outcome for Mr. Curtis.  Furthermore, that Vigil, the New

Mexico State Election Director for the Office of the Secretary of State of New Mexico, could not

proffer an explanation for the discrepancy in Bernalillo County requires the Court to draw a

reasonable conclusion about what happened.  There were over 229 ballots in the Libertarian Party

primary election for Position 2 on the Court of Appeals of New Mexico that were not tallied as

votes for New Mexico, but Secretary Oliver Vigil do not say for whom these votes were cast or why they were not tallied for New Mexico.

There might be alternative explanations why 229 of the 270 votes in Bernalillo County went toward someone other than Mr. Curtis, the only Libertarian Party candidate for the position, or toward no one at all, but the Court is not aware of what the explanations might be, and, so far, Secretary Oliver and Vigil have been unable to provide a reasonable explanation as well.  The Libertarian Plaintiffs provide evidence in the verified Complaint that some votes, such as that of Banks, were not counted, which also leads the Court to infer that some of the votes in Bernalillo County were not voted.  If as few as twenty-six of the 229 votes in Bernalillo County that the Office of the Secretary of State of New Mexico website reports did not go toward Mr. Curtis went toward him, New Mexico's ballot counting errors represent far more than "garden variety election irregularities."  Griffin v. Burns, 570 F.2d at 1076.  Such error rises to the level of fundamental unfairness, because, unless the Libertarian Plaintiffs' vindicate their rights to vote and all votes are counted, Mr. Curtis' name will not appear on the general election ballot as the Libertarian Party candidate for Position 2 on the Court of Appeals of New Mexico.  The Libertarian Plaintiffs make "'a prima facie case showing a reasonable probability that [they] will ultimately be entitled to the relief sought.'"  Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417 JB/LF, 2016 WL 335447, at *29 n.22 (D.N.M. Jan. 15, 2016)(Browning, J.)(quoting Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972)).[19]  While evidence in the record indicates fundamental

_____

[19]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits.  43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than

actual success."). It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success." 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2948.3 (footnotes omitted). The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

At a trial on the merits, a plaintiff bears two burdens of proof. The first burden is the burden of production, which is sometimes called the burden of going forward. If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury. Second is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied the ultimate standard of proof -- usually the preponderance-of-the-evidence standard. There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presented evidence of such great extent and one-sidedness that he or she is entitled to a verdict as a matter of law. Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.). The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant.

Moreover, satisfying the initial burden of production is known as presenting a "prima facie case." Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor"). The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion. See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." (footnotes omitted)). The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result. See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage. As for where in between those two quanta of proof the

- 153 -

unfairness in the Libertarian Party primary election in Bernalillo County, there is insufficient evidence to indicate that the Libertarian Party primary election was systemically flawed throughout the entire State or in other Counties, and, therefore, the Libertarian Plaintiffs have not established that their claim is substantially likely to succeed with respect to other Counties and, at this time, relief is not warranted for a statewide vote count or seven-County vote count. Accordingly, on the evidence before the Court, the Court concludes that the Libertarian Plaintiffs are likely to succeed on the merits of their right-to-vote claim under the Due Process Clause with respect to vote-counting in Bernalillo County.[20]

---

Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest.  Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

[20]At the hearing, the Libertarian Plaintiffs argued that the right to vote is also rooted in the First Amendment, thus implying that Secretary Oliver not counting all their votes also violates the First Amendment, and, in particular, their right to associate, but they did not explain in detail how the First Amendment protects the right to vote.  See Aug. 7 Tr. at 11:6-17 (Wiest, Court).  As the Court discusses above, courts recognize the Equal Protection Clause and Due Process Clause as the primary vehicles for enforcing the fundamental right to vote, but several courts recognize the nexus between the right to vote and First Amendment principles, such as political speech and expressive association.  The Supreme Court has emphasized, however, that "there is no generalized right of free association," and courts only "recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion."  Roberts v. United States Jaycees, 468 U.S. at 618.  To the extent that the Libertarian Plaintiffs argue that the First Amendment protects their rights to vote separately or differently from the Equal Protection Clause and the Due Process Clause, the Court concludes that they are not substantially likely to succeed on the merits of such a claim.  Several courts have concluded that the First Amendment "offers no protection of voting rights beyond that afforded by the fourteenth or fifteenth amendments."  Washington Finlay, 664 F.2d 913, 928 (4th Cir. 1981).  See Burton v. City of Belle Glade, 178 F.3d 1175, n.9 (11th Cir. 1999)(holding that "the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments"); Lucas v. Townsend, 783 F. Supp. 605, 618 (M.D. Ga. 1992)(Owens, C.J.)(same).  Furthermore, the right to expressive association "does not carry with it any right to be listened to, believed or supported in one's views."  Washington v. Finlay, 664 F.2d at 928.  See Initiative and Referendum Institute v.

**B.      THE EVIDENCE DOES NOT SUPPORT THAT THE LIBERTARIAN PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PROVE THAT THE DISCRETIONARY RECOUNT PROVISION AND BOND REQUIREMENT VIOLATE THE FIRST AMENDMENT, THE EQUAL PROTECTION CLAUSE, OR THE DUE PROCESS CLAUSE.**

At the August 7, 2020, hearing, the Libertarian Plaintiffs conceded that Secretary Oliver's recount denial did not violate a constitutional right.  See Aug. 7 Tr. at 12:9-15 (Court, Wiest).  Moreover, the Libertarian Plaintiffs agreed that there is no constitutional right to a recount and that a recount becomes relevant only in the context of remedy.  See Aug. 7 Tr. at 10:24-11:1 (Wiest); id. 12:9-15 (Court, Wiest).   In the Motion, however, the Libertarian Plaintiffs argue that the discretionary recount provision and bond recount violate the First Amendment, the Equal Protection Clause, and the Due Process Clause.  See Motion at 9-12.  The Court concludes that the Libertarian Plaintiffs are not substantially likely to succeed on the merits of any of these claims, because: (i) there is no constitutional right to a recount; (ii) the discretionary recount provision is a privilege that New Mexico law affords electoral candidates; and (iii) the discretionary recount provision is rationally related to New Mexico's interest in ensuring the accuracy and integrity of elections.

The Libertarian Plaintiffs assert that Secretary Oliver has violated their First Amendment rights, because "the requirement of post[ing] a multi-million-dollar bond or cash[] to obtain a recount to vindicate [Mr. Curtis'] and voters' interests, particularly with substantial evidence of error, imposes a severe burden on the Plaintiffs' associational interests, and the rights of voters to

_____

Walker, 450 F.3d 1082, 1102 (10th Cir. 2006)(noting that "no one has a right under the First Amendment to be taken seriously").  Accordingly, the Libertarian Plaintiffs have not established any expressive conduct -- that the Supreme Court or the Tenth Circuit recognize as protected conduct -- upon which not counting their votes would infringe, and, thus, their claim that Secretary Oliver has violated their rights to vote under the First Amendment is not substantially likely to succeed.

cast ballots." Motion at 9 (citing Burdick v. Takushi, 504 U.S. 428; Anderson v. Celebrezze, 460 U.S. 780). The Libertarian Plaintiffs contend, in the alternative, that, even if the Court concludes that the bond requirement is not a severe burden on their rights, the bond requirement "constitute[s] more than a minimal burden, and do[es] not pass muster under the flexible analysis that weighs the burdens of Plaintiffs against the State's asserted interest and chosen means of asserting it." Motion at 9 (citing Burdick v. Takushi, 504 U.S. 428; Anderson v. Celebrezze, 460 U.S. 780). Secretary Oliver counters that N.M. Stat. Ann. § 1-14-15(A) does not violate the Libertarian Plaintiffs' First Amendment rights. See Response at 12-13. According to Secretary Oliver, "[t]he discretionary recount is a privilege of state law and is applicable only after every candidate has had their votes in the election canvassed and certified at least once." Response at 13. Secretary Oliver contends that the First Amendment cases that the Libertarian Plaintiffs cite in their Motion are inapposite, because those cases involve "broader rights associated with ballot access in the first instance, not rights associated with post-election state regulatory interest." Response at 13. Secretary Oliver argues that, because the Libertarian Plaintiffs have not established that the First Amendment guarantees a right to a discretionary recount, their claim is not substantially likely to succeed on the merits. See Response at 13.

The Court concludes that the discretionary recount provision does not violate the First Amendment, because the discretionary recount provision is a privilege and not a federal constitutional right, and the bond requirement does not substantially burden "voters' rights to make free choices and to associate politically through the vote." Burdick v. Takushi, 504 U.S. at 439. As Secretary Oliver notes, the Libertarian Plaintiffs' cited cases involve ballot access and the right to vote in the first instance -- not the ability to request a vote recount. See Morse v. Republican Party of Va., 517 U.S. at 234 (holding that individuals can challenge a party's nominating

convention requirement that delegates pay a registration fee as an impermissible poll tax under § 10 of the Voting Rights Act of 1965, see 52 U.S.C. § 10306); Burdick v. Takushi, 504 U.S. at 438-39 (upholding a state's prohibition on write-in voting in primary and general elections); Anderson v. Celebrezze, 460 U.S. at 795 (invalidating a state's filing deadline for independent Presidential candidates); Lubin v. Panish, 415 U.S. at 718 (holding that, "in the absence of reasonable alternative means of ballot access," States cannot require indigent candidates to pay a filing fee that they cannot afford).  In Burdick v. Takushi, the Supreme Court upheld the State of Hawaii's write-in vote prohibition in its primary and general elections, because the prohibition "imposes only a limited burden" on voters' First Amendment rights to espouse support for a candidate or to associate politically.  504 U.S. at 438-39.  The Supreme Court emphasized that it has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."  504 U.S. at 438 (citing Munro v. Socialist Workers Party, 479 U.S. 189, 199 (1986)).  Having found that the write-in voting ban imposes a limited burden on voters, the Supreme Court turned to Hawaii's purported state interests that justify the ban.  See Burdick v. Takushi, 504 U.S. at 439.  The Supreme Court observed several state interests, with main one being Hawaii's interest in "'avoid[ing] the possibility of unrestrained factionalism at the general election,'" which the Supreme Court determined is a "legitimate means of averting divisive sore-loser candidacies" and avoiding intraparty feuds.  504 U.S. at 439 (quoting Munro v. Socialist Workers Party, 479 U.S. at 196)(alteration in Burdick v. Takushi only).

In Anderson v. Celebrezze, the Supreme Court invalidated Ohio's filing deadline for independent Presidential candidates, because it "places a significant state-imposed restriction on a nationwide electoral process."  460 U.S. at 795.  The Court reasoned that "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the

outcome of the former will be largely determined by voters beyond the State's boundaries." 460 U.S. at 795.  According to the Supreme Court, "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." 460 U.S. at 795.

The Libertarian Plaintiffs assert that Secretary Oliver's $3,573,400.00 bond requirement for a recount "infringe[s] on the rights of the voters who cast ballots for Mr. Curtis" -- such as Banks -- and "infringe[s] on the associational rights of the Libertarian Party of New Mexico, and Mr. Curtis, who are entitled to have their associational rights as a political party vindicated." Motion at 10.  Although the cost for a discretionary recount is the same for each political party, this cost does not stand in a candidate's way from qualifying for a primary election or general election.  The Libertarian Plaintiffs cite cases involving only ballot access, and the discretionary recount provision affects neither ballot access nor voting counting in the first instance.  The discretionary recount provision's burden of First Amendment rights is at most very limited, and it is reasonably related to New Mexico's interest in ensuring election fairness and accuracy.  As discussed above, New Mexico's election laws and processes are designed to protect individuals' right to vote.  See FOF, supra, ¶ 85, at 19 (citing Aug. 7 Tr. at 55:14-16 (Lange, Vigil)).  Under certain circumstances, New Mexico law requires automatic recounts, for which the Office of the Secretary of State of New Mexico must pay.  See FOF, supra, ¶ 91, at 20 (citing Response at 6; N.M. Stat. Ann. §§ 1-14-24(A), 1-14-25).  Candidates may also request for discretionary recounts by submitting an application and cash bond, and the candidate must pay only if the New Mexico State Canvassing Board conducts a recount and determines that there is insufficient error or fraud to change an election's winner.  See FOF, supra, ¶ 96, at 22 (citing Response at 6; N.M. Stat. Ann. § 1-14-15(D)).  New Mexico need not offer candidates the ability to request recounts, and

Secretary Oliver has demonstrated that the recount cost determinations are tied to the New Mexico State Canvassing Board's estimates of what conducting a recount would cost. See FOF, supra, ¶¶ 57-58, at 15. Although the Court concludes above that the Libertarian Plaintiffs' decision not to avail themselves of a discretionary recount does not foreclose their standing to challenge the discretionary recount provision's constitutionality, the provision does not burden the Libertarian Plaintiffs' First Amendment rights, and it is rationally related to New Mexico's interest in having fair and secure elections. Accordingly, the Libertarian Plaintiffs have not established that they are substantially likely to succeed on their claim that the discretionary recount provision and bond requirement violate the First Amendment.

The Libertarian Plaintiffs next argue that the bond requirement violates the Equal Protection Clause. See Motion at 11. According to the Libertarian Plaintiffs, a "'State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.'" Motion at 11 (quoting Harper v. Va. State Bd. of Elections, 383 U.S. at 666). Secretary Oliver counters that the New Mexico State Canvassing Board establishes the recount cost determinations, and that the costs are reasonable and non-discriminatory. See Response at 15 (citing Recount Cost Determinations at 3). Secretary Oliver emphasizes that the Recount Cost Determinations document is detailed -- it estimates per-precinct recount costs to conduct a recount by assessing "election set up, vote tabulating system programming certification, vote tabulating system technical support," and personnel costs that are "broken down into hourly and daily rates." Response at 15. Secretary Oliver notes that the recount cost determinations are the same for candidates of all parties and that they are "the type of reasonable restriction and regulation that Federal Courts have routinely upheld as required

regulation by states to conduct uniform application of election law." Response at 15 (citing Arutunoff v. Okla. State Election Bd., 687 F.2d 1375; Parker v. Duran, 180 F. Supp. 3d 851).

The Court concludes that the discretionary recount provision and bond requirement do not violate the Equal Protection Clause. To state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class. See SECSYS, LLC v. Vigil, 666 F.3d at 688. The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons." SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279). The Tenth Circuit has held that "a state practice that distinguishes among classes of people will typically survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." Vasquez v. Cooper, 862 F.2d 250, 251-52 (10th Cir. 1988)(citing Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450 (1988)). A state practice will not, however, "require strict judicial scrutiny unless it interferes with a 'fundamental right' or discriminates against a 'suspect class' of individuals." Vasquez v. Cooper, 862 F.2d at 252 (quoting Kadrmas v. Dickinson Pub. Schs., 487 U.S. at 457).

The discretionary recount provision does not interfere with a fundamental right or discriminate against a suspect class. The Libertarian Plaintiffs contend that the discretionary recount provision is discriminatory, because it makes a voter's "'affluence'" an "'electoral standard.'" Motion at 11 (quoting Harper v. Va. State Bd. of Elections, 383 U.S. at 666). The Libertarian Plaintiffs conceded at the hearing that there is no constitutional right to a recount and that a recount becomes relevant only in the context of remedy. See Aug. 7 Tr. at 10:24-11:1

- 160 -

(Wiest); id. 12:9-15 (Court, Wiest).  Unlike the poll tax that the Supreme Court invalidated in Harper v. Virginia State Board of Elections, the discretionary recount provision does not affect the Libertarian Plaintiffs' right to vote or any other fundamental right.  Instead, the provision is a privilege afforded to candidates who wish to request a recount.  Moreover, the Libertarian Plaintiffs have not demonstrated that the discretionary recount provision discriminates against a suspect class.  The Supreme Court has "rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny." Kadrmas v. Dickinson Pub. Schs., 487 U.S. at 458.  See Petrella v. Brownback, 787 F.3d 1242, 1263 (10th Cir. 2015)(noting that "wealth is not grounds for heightened scrutiny" (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 27-28 (1973)).  Although very wealthy candidates can afford more easily a discretionary recount, this distinction alone does not subject the discretionary recount provision to strict scrutiny.

The discretionary recount provision and bond requirement thus are not subject to strict scrutiny but rather to rational basis review.  While the over-$3,500,000.00 cost to request a statewide recount is far from a nominal price, the bond requirement is rationally related to a legitimate governmental purpose -- ensuring election fairness and accuracy.  As discussed above, New Mexico's election laws and processes are designed to protect individuals' right to vote.  See FOF, supra, ¶ 85, at 19 (citing Aug. 7 Tr. at 55:14-16 (Lange, Vigil)).  Candidates may request discretionary recounts by submitting an application and a cash bond, and the candidate must pay only if the New Mexico State Canvassing Board conducts a recount and determines that there is insufficient error or fraud to change an election's winner.  See FOF, supra, ¶ 96, at 22 (citing Response at 6; N.M. Stat. Ann. § 1-14-15(D)).  New Mexico need not offer candidates the ability to request recounts, and New Mexico has shown that its cost is tied to the New Mexico State

Canvassing Board's estimates of what conducting a recount would cost.  See FOF, supra, ¶¶ 57-58, at 15.  Recounting votes is costly for New Mexico; it need not be cheap for candidates, at least where the State does not discriminate against a suspect class.  The Recount Cost Determinations document gives candidates notice about how much a recount costs per precinct, see Aug. 7 Tr. at 33:4-11 (Lange), and it explains in great detail for each delineated cost, see Recount Cost Determinations at 1-5.  See FOF, supra, ¶¶ 57-58, at 15.  Accordingly, the Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their challenge to the discretionary recount provision and bond requirement under the Equal Protection Clause.

Last, the Libertarian Plaintiffs argue that the discretionary recount provision violates the Due Process Clause.  See Motion at 12.  The Libertarian Plaintiffs' arguments focus, however, on the election and on their allegations that Secretary Oliver's "actions have deprived the voters for Mr. Curtis of their right to vote, despite knowledge of voting machine errors that were not counting votes, and in violation of due process."  Motion at 12.  Secretary Oliver argues that whether she violated the Libertarian Plaintiffs' rights under the Due Process Clause "has no bearing on whether a recount application may be submitted pursuant to state law."  Response at 16.  The Court concludes above, by a preponderance of the evidence in the record before it, that the Libertarian Plaintiffs are substantially likely to succeed on the merits of their right-to-vote claim under the Due Process Claim.  As the Libertarian Plaintiffs concede, there is no constitutional right to a recount, and, thus, the discretionary recount provision avails candidates in New Mexico with a privilege that does not interfere with any fundamental rights.  Moreover, the discretionary recount provision does not render New Mexico's election process fundamentally unfair.  See Griffin v. Burns, 570 F.2d at 1077; Marks v. Stinson, 19 F.3d at 888.  To the extent that the Libertarian Plaintiffs challenge the discretionary recount provision under the Due Process Clause, the

Libertarian Plaintiffs have not established that they are substantially likely to succeed on the merits of their claim.[21]

## V.    OTHER FACTORS IN THE TRO AND PRELIMINARY INJUNCTION ANALYSIS WEIGH IN THE LIBERTARIAN PLAINTIFFS' FAVOR.

The Libertarian Plaintiffs have established a substantial likelihood of success on the merits for their right-to-vote claim under the Due Process Clause.  They also must show that they will suffer irreparable harm without a TRO, that the balance of equities weighs in their favor, and that the restraining order is in the public interest.  See Winter, 555 U.S. at 20.  The Court concludes that the Libertarian Plaintiffs have demonstrated that the remaining three factors support a TRO.

### A.    BY NOT COUNTING ALL OF MR. CURTIS' VOTES, SECRETARY OLIVER'S ACTIONS IRREPARABLY HARM THE LIBERTARIAN PLAINTIFFS.

The Libertarian Plaintiffs argue that "'[m]ost courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury.'"  Reply at 4 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 805, and citing Elrod v. Burns, 427 U.S. at 373-74)(alteration in Reply only).  According to the Libertarian Plaintiffs,

---

[21]The Libertarian Plaintiffs also allege that Secretary Oliver "abused the authority of her office," Complaint ¶ 54, at 11, and, in the Motion, the Libertarian Plaintiffs argue that Secretary Oliver ignored several of their requests for a recount pursuant to the discretionary recount provision by "engag[ing] in a game of hide the ball, characterized by a failure to respond to inquiries regarding the process, to run out the clock."  Motion at 12-13.  Secretary Oliver equates the Libertarian Plaintiffs' claim to a suit "asking a Federal Court to adjudicate whether a state official did not comply with state law" and argues that "such claims are barred by the Eleventh Amendment."  Response at 17.  The Supreme Court has held that the Eleventh Amendment bars claims "that a state official has violated *state* law," regardless whether a plaintiff sues a State official and seeks prospective injunctive relief.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. at 106 (emphasis in original).  As the Court discusses above, to the extent that the Libertarian Plaintiffs allege that Secretary Oliver violated New Mexico election law, the Eleventh Amendment bars the Libertarian Plaintiffs' claim.  Because the Eleventh Amendment bars any claim by the Libertarian Plaintiffs that Secretary Oliver violated New Mexico election law, such a claim would not result in success on the merits.

"'[a]ny deprivation of any constitutional right fits that bill.'"  Reply at 4 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d at 806)(alteration added).  Secretary Oliver counters that, although the Libertarian Plaintiffs have suffered harm from Mr. Curtis garnering insufficient votes to qualify for the general election, "they have not plead sufficient concrete evidence that their First or Fourteenth Amendment rights were harmed by either voting machine errors or the cost determinations of a discretionary recount after all of the votes for the primary election were counted and certified once already."  Response at 19.  Secretary Oliver argues that the Libertarian Plaintiffs' "conclusory assertions of harm and foul play and the inability to pay for" a recount are "not particularized as required to establish irreparable harm."  Response at 19.

The Tenth Circuit has reasoned that, "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," suggesting that merely alleging a constitutional violation satisfies the irreparable harm factor per se.  <u>Planned Parenthood Ass'n of Utah v. Herbert</u>, 828 F.3d 1245, 1263 (10th Cir. 2016)(citing <u>Kikumura v. Hurley</u>, 242 F.3d 950, 963 (10th Cir. 2001); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2948.1 (2d ed. 1995)).  <u>See</u> <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 342 F.3d 1170, 1187 (10th Cir. 2003), <u>aff'd en banc</u> 389 F.3d 973 (10th Cir. 2004), <u>aff'd sub nom.</u> <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, (2006)("<u>O Centro I</u>")("Because 'a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA,' we conclude the irreparable harm requirement for a preliminary injunction is satisfied." (quoting <u>Kikumura v. Hurley</u>, 242 F.3d at 963)).  On the other hand, in a 2013 case, <u>Hobby Lobby Stores, Inc. v. Sebelius</u>, 723 F.3d 1114 (10th Cir. 2013), <u>aff'd sub nom.</u> <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682 (2014), the Tenth Circuit characterized its precedent as holding "that establishing a *likely* RFRA violation satisfies the irreparable harm factor." 723 F.3d

at 1146 (emphasis added)).  Several other courts appear to require a plaintiff to allege a likelihood of success on the merits before concluding that it has shown irreparable harm.  See, e.g., Powell v. Noble, 798 F.3d 690 (8th Cir. 2015)(concluding that the plaintiff did not show irreparable harm where he did not show that his First Amendment rights were violated); Hohe v. Casey, 868 F.2d at 72-73 ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . .  Rather the plaintiffs must show 'a chilling effect on free expression.'" (quoting Dombrowski v. Pfister, 380 U.S. 479, 487 (1965));  Myers v. Gant, 49 F. Supp. 3d 658, 668 (D.S.D. 2014)(Piersol, J.)("Once a constitutional injury has been demonstrated, the Court assumes that Myers has satisfied the irreparable harm prong.").  The Tenth Circuit has also reversed district courts for failing to consider how the movant's likelihood of success affects the other three preliminary injunction factors.  See Derma Pen, LLC v. 4EverYoung Ltd., 773 F.3d 1117, 1121-22 (10th Cir. 2014); Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556, 559 (10th Cir. 1984).

        The United States Court of Appeals for the D.C. Circuit indirectly addressed this issue in Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006).  It distinguished conflicting caselaw and noted that, although in freedom-of-expression cases, the plaintiffs must "also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct," 454 F.3d at 301, the law does not impose the same requirement when alleging Establishment Clause violations, because the constitutional violation occurs at the moment the government acts "without any concomitant protected conduct on the movants' part," 454 F.3d at 302.  The D.C. Circuit noted that irreparable harm analysis assumes that the movant has demonstrated a likelihood that the non-

movant violated the law and asks only whether "that violation, if true, inflicts irremediable injury." 454 F.3d at 303 (citing Elrod v. Burns, 427 U.S. at 373).

In Winter, the Supreme Court clarified the burden that plaintiffs must satisfy to obtain a preliminary injunction. The Supreme Court stated that the preliminary injunction standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" and that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997))(emphasis in original). The Supreme Court's reasoning, therefore, suggests that courts should interpret the irreparable harm factor in conjunction with whether the movant is likely to succeed on the merits. See also Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1145 ("In addition, 'in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.'" (quoting ACLU of Ill. v. Alvarez, 679 F.3d 583, 589 (7th Cir. 2012)). This test has entirely reversed course from earlier Tenth Circuit doctrine that allowed movants to make a lesser showing of their likely success when the other preliminary injunction factors strongly weighed in their favor. See Diné, 839 F.3d 1276 (overruling Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002)); Diné Citizens Against Ruining Our Environment v. Jewell, , 2015 WL 4997207, at *35-38.

The Court concludes above that the Libertarian Plaintiffs have established that they are substantially likely to succeed on their right-to-vote claim under the Due Process Clause. If the Libertarian Plaintiffs do not obtain injunctive relief, then a significant number of votes for Position 2 on the Court of Appeals of New Mexico will not be counted or otherwise accounted for. Mr. Curtis' final vote total is twenty-six votes shy of the 230 votes that he needs to have his name

added to the general election ballot.  See FOF, supra, ¶¶ 27, 29, at 10.  If the Court does not grant injunctive relief, Mr. Curtis' name will not appear on the general election ballot.  See FOF, supra, ¶¶ 29-30, at 10-11.  This injury cannot be remedied with money damages.  The Court concludes, therefore, that the Libertarian Plaintiffs have demonstrated that "irreparable injury is *likely* in the absence of an injunction."  Winter, 555 U.S. at 22 (emphasis in original).

### B.    THE BALANCE OF EQUITIES WEIGHS IN THE LIBERTARIAN PLAINTIFFS' FAVOR.

The third factor for courts to consider is whether the "balance of equities tips in [the movant's] favor."  Winter, 555 U.S. at 20.  In analyzing whether a movant satisfies this fact, he or she must show that the "threatened injury outweighs any injury to [non-movants] caused by granting the injunction."  Awad v. Ziriax, 670 F.3d at 1131.  The Libertarian Plaintiffs argue that, as to "the weighing of harms, '[w]hen a constitutional right hangs in the balance, [] even a temporary loss usually trumps any harm to the defendant.'"  Reply at 5 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 806)(first alteration in Reply only and second alteration added).  Secretary Oliver counters that granting injunctive relief to the Libertarian Plaintiffs would irreparably harm New Mexico's regulatory interests.  See Response at 19.  Secretary Oliver asserts that New Mexico has a "compelling interest in preserving the integrity of its election process."  Response at 19.  According to Secretary Oliver, if the Court issues a TRO and orders her to direct the New Mexico State Canvassing Board to conduct a recount without requiring the Libertarian Plaintiffs to pay sufficient funds to pay for the recount, New Mexico "would be responsible for paying at least $618,800, the cost of the requested discretionary recount."  Response at 19.

As in the irreparable harm analysis, district courts in the Tenth Circuit must consider the likelihood of success when analyzing potential harm.  See Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d at 1265 ("The threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account [the plaintiff's] likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to [the plaintiff].").  The Court already has concluded that the Libertarian Plaintiffs are substantially likely to succeed on the merits of their right-to-vote claim under the Due Process Clause and that they very likely will suffer irreparable harm if the Court does not grant them injunctive relief.  New Mexico has a strong interest in regulating its elections, and its election laws are designed to protect the right to vote and to ensure that elections are fair and just. See FOF, supra, ¶ 85, at 19.  This interest aligns with the Supreme Court's mandate -- as the Supreme Court expressed the principle in Reynolds v. Sims and United States v. Mosley -- that States must count every vote when they extend the right to vote for State officials to their citizens. See Harper v. Va. State Bd. of Elections, 383 U.S. at 665 ("For it is enough to say that once the franchise is granted to the electorate [of a State], lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").  Although the Libertarian Plaintiffs allege that counting errors "permeated throughout the state," Motion at 5 (citing Complaint ¶ 21, at 6), the evidence in the record indicates only that Bank's vote and a significant number of votes in the Libertarian Party primary election in Bernalillo County have not been counted and accounted for, and, thus, counting Mr. Curtis' votes to determine if he received 230 votes will not require Secretary Oliver to direct the New Mexico State Canvassing Board to conduct a statewide count or to count the votes in multiple Counties.  Moreover, the evidence that the parties produce at the preliminary hearing on Monday, August 17, 2020, might clearly and

unequivocally establish that Mr. Curtis did or did not receive 230 votes in the Libertarian Party primary election, which would obviate the need to conduct a recount for the State or particular Counties and precincts.  Accordingly, ensuring that every vote for Mr. Curtis in Bernalillo County has been counted will not harm Secretary Oliver and New Mexico's interest in regulating its elections, and, thus, the balance of equities tips in the Libertarian Plaintiffs' favor.[22]

### C.   GRANTING THE LIBERTARIAN PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS NOT CONTRARY TO THE PUBLIC'S INTEREST.

The last issue to consider is whether the preliminary injunction is in the public's interest. See Winter, 555 U.S. at 20.  This factor "is another way of inquiring whether there are policy considerations that bear on whether the order should issue."  "Grounds for Granting or Denying a Preliminary Injunction -- Public Interest," 11A Fed. Prac. & Proc. Civ., § 2948.4 (3d ed.).  The Libertarian Plaintiffs argue that "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'"  Reply at 4 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 807).  Secretary Oliver again notes that New Mexico would have to foot the bill if the Court grants injunctive relief and orders a recount.  Secretary Oliver argues that this "astronomical cost[]" would affect New Mexico and New Mexico taxpayers, and that "federal courts have long held that the 'protection of the public fisc is a matter that is of interest to every citizen.'"  Response at 19-20 (quoting Brock v. Pierce Cty., 476 U.S. at 262).

---

[22]The Court also notes that the timing of the Libertarian Plaintiffs' request weighs in their favor.  The Supreme Court has recently relied on Purcell v. Gonzales, 549 U.S. 1 (2006)(per curiam), for the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election."  Republican Nat'l Comm. v. Democratic Nat'l Comm, 140 S. Ct. 1205, 1207 (2020).  The parties agree that Secretary Oliver has until late August to finalize the general election ballot and being printing in early September, 2020.  See FOF, supra, ¶ 97, at 22.  As that deadline approaches, the Court may grow more reluctant to insert itself into New Mexico's election process without further evidence of constitutional violations.

Although Secretary Oliver does not dispute that the Libertarian Plaintiffs seek prospective relief, she emphasizes that granting injunctive relief would impact New Mexico's revenues.  In Edelman v. Jordan, the Supreme Court notes that, although the Eleventh Amendment permits suits against a state official seeking prospective relief and bars suits for damages that will be paid out of a State's treasury, 415 U.S. at 664 (citing Ex Parte Young, 209 U.S. 123), the "injunction issued in Ex Parte Young was not totally without effect on the State's revenues," Edelman v. Jordan, 415 U.S. at 667.  The Supreme Court also acknowledged that "[l]ater cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in Ex Parte Young."  Edelman v. Jordan, 415 U.S. at 667 (citing Graham v. Richardson, 403 U.S. 365 (1971); Goldberg v. Kelly, 397 U.S. 254 (1970)).  The Supreme Court then explained the impact of ordering prospective injunctive relief on state treasuries and how such ancillary effects comport with Ex Parte Young:

> But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature.  State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct.  Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex Parte Young.

Edelman v. Jordan, 415 U.S. at 667-68.

The Court acknowledges that a TRO -- which is prospective, injunctive relief -- would impose a financial burden on New Mexico, because counting votes undeniably costs money.  New Mexico's interest in avoiding drain on the public fisc is significant, but this interest should not prevent the Libertarian Plaintiffs from vindicating their constitutional rights and ensuring that every vote for Mr. Curtis is counted.  See Peña Martínez v. U.S. Dep't of Health and Human Servs., No. CIV 18-12060 WGY, 2020 WL 4437859, at * (D.P.R. Aug. 3, 2020)(Young, J.)(concluding

that a "drain on the public fisc . . . cannot stand in the way of vindicating the constitutional rights to equal protection of residents of Puerto Rico").  As the Court discusses above, the evidence in the record indicates that Banks' vote and a significant number of votes in the Libertarian Party primary election in Bernalillo County have not been counted, and counting these votes should cost less than conducting a recount for the entire State or for the seven Counties that the Libertarian Plaintiffs contend experienced counting errors.  Moreover, New Mexico residents have an interest in fair and just elections, and this interest obliges the State to ensure that every New Mexico voter's vote must be counted.  Accordingly, a TRO is not against the public interest.

**VI.     SECRETARY OLIVER MUST DIRECT THE NEW MEXICO STATE CANVASSING BOARD TO COUNT AND ACCOUNT FOR ALL VOTES IN THE LIBERTARIAN PARTY PRIMARY ELECTION FOR POSITION 2 ON THE COURT OF APPEALS OF NEW MEXICO IN BERNALILLO COUNTY.**

In the Complaint, the Libertarian Plaintiffs request that the Court declare that: (i) Secretary Oliver's failure to count all of Mr. Curtis' votes is unconstitutional; and (ii) the discretionary recount provision is unconstitutional.  See Complaint ¶ A, at 11.  The Libertarian Plaintiffs also request that the Court grant injunctive relief that: (i) orders Secretary Oliver to direct the New Mexico State Canvassing Board to conduct a statewide recount of votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico; and (ii) prohibits enforcement of the discretionary recount provision.  See Complaint ¶ B, at 12.  In the Motion, however, the Libertarian Plaintiffs request that the Court grant injunctive relief which orders Secretary Oliver to direct the New Mexico State Canvassing Board to count all votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in seven Counties: Bernalillo County, Sandoval County, Doña Ana County, Santa Fe County, San Juan County, Chaves County, and Los Alamos County.  See Motion at 13.  As discussed above, the

evidence in the record before the Court indicates that only in Bernalillo County did vote-counting reach the level of fundamental unfairness such that the Libertarian Plaintiffs have established that their right-to-vote claim under the Due Process Clause is substantially likely to succeed on the merits.  The Court thus grants the Libertarian Plaintiffs' request that Secretary Oliver direct the New Mexico State Canvassing Board to count all votes in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in Bernalillo County, but not in other Counties.

**IT IS ORDERED** that: (i) the Plaintiffs' Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction with Verified Complaint in Support, filed July 29, 2020 (Doc. 7), is granted in part, and denied in part; and (ii) Defendant Maggie Toulouse Oliver must direct the New Mexico State Canvassing Board to count and account for all ballots cast in the Libertarian Party primary election for Position 2 on the Court of Appeals of New Mexico in Bernalillo County.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stephen P. Curtis
Stephen P. Curtis Attorney at Law PC
Albuquerque, New Mexico

--and--

Christopher D. Wiest
Crestview Hills, Kentucky

      *Attorneys for the Plaintiffs*
Dylan K. Lange
  General Counsel to the Office of the
    Secretary of State of New Mexico
Santa Fe, New Mexico

      *Attorney for the Defendant*

Robin S. Hammer
  Sandoval County Attorney
David C. Mann
  Sandoval County Deputy Attorney
Bernalillo, New Mexico

      *Attorneys for Sandoval County Clerk Eileen Garbagni*

Nelson J. Goodwin
  Doña Ana County Attorney
Las Cruces, New Mexico

      *Attorney for Doña Ana County Clerk Amanda Lopez Askin*

W. Ken Martinez
  Bernalillo County Attorney
Natalia Sanchez Downey
  Bernalillo County Assistant Attorney
Albuquerque, New Mexico

      *Attorneys for Bernalillo County Clerk Linda Stover*